AO 91 (Rev. 11/11) Criminal Complaint · · · · · · · · · · · · · · · · · · · · · · AUSA David Green (312) 469-6024

**FILED**
5/2/2022
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

In the matter of the Extradition of

MAREK BLACHA

CASE NUMBER:    22cr251

**UNDER SEAL**    Jeffrey I. Cummings

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Pursuant to the extradition treaty between the United States and Poland, Poland has requested the extradition of MAREK BLACHA, who is believed to reside currently in the Northern District of Illinois, for (1) participation in an organized crime group, in violation of Article 258, Section 1, and in relation to Article 65, Section 1, of the Criminal Code of Poland; and (2) Import duty fraud, in violation Article 87, Section 2, and in relation to Article 90, Sections 1-2; Article 6, Section 2; Article 7, Section 1; and Article 37, Section 1, items 1, 2, and 5, of the Fiscal Penal Code of Poland.

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 3184 | Being a fugitive from Poland, which has sought provisional arrest and extradition for participation in an organized crime group, and import duty fraud, in violation of the Criminal Code of Poland and the Fiscal Penal Code of Poland, respectively. |

This criminal complaint is based upon these facts:

  X  Continued on the attached sheet.

DAVID GREEN  *Digitally signed by DAVID GREEN Date: 2022.05.02 13:40:18 -05'00'*

David Green
Assistant U.S. Attorney, U.S. Attorney's Office

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named attorney, being duly sworn, stated on information and belief by telephone that the Complaint and Affidavit are true and correct.

Date: May 2, 2022

*Judge's signature*

City and state: Chicago, Illinois

JEFFREY I. CUMMINGS, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

## **AFFIDAVIT**

I, the undersigned Assistant United States Attorney, being duly sworn, state on information and belief that the following is true and correct:

1.    In this matter, I represent the United States in fulfilling its treaty obligation to the Republic of Poland ("Poland").

2.    There is an extradition treaty in force between the United States and Poland: the Extradition Treaty Between the United States of America and the Republic of Poland, U.S.-Pol., July 10, 1996, S. TREATY DOC. NO. 105-14 (1997), and the Agreement Between the United States of America and the Republic of Poland on the application of the Extradition Treaty Between the United States of America and the Republic of Poland signed 10 July 1996, U.S.-Pol., June 9, 2006, S. TREATY DOC. NO. 109-14 (2006) (collectively hereinafter, "the Treaty").

3.    Pursuant to the Treaty, the Government of Poland has submitted a formal request through diplomatic channels for the extradition of MAREK BLACHA ("BLACHA").

4.    According to the information provided by the Government of Poland, BLACHA is wanted in Poland for prosecution on two charges: (1) Participation in an organized crime group, in violation of Article 258, Section 1, and in relation to Article 65, Section 1, of the Criminal Code of Poland; and (2) Import duty fraud, in violation Article 87, Section 2, and in relation to Article 90, Sections 1-2; Article 6, Section 2;

Article 7, Section 1; and Article 37, Section 1, items 1, 2, and 5, of the Fiscal Penal Code of Poland.

5.     These alleged offenses were committed within the jurisdiction of Poland. The District Court of Siedlce issued a provisional arrest warrant for BLACHA on June 9, 2015. On August 6, 2015, the Circuit Prosecutor's Office in Siedlce issued an All-Points Bulletin (wanted persons notice) to search for BLACHA.

6.     The statements in this affidavit are based on information I received from Poland through the Office of International Affairs, United States Department of Justice. Because this affidavit is submitted for the limited purpose of securing the defendant's extradition pursuant to treaty obligations, I have not included each and every fact known concerning this matter.

7.     Specifically, the information that follows primarily derives from Poland's translated extradition request. A declaration from the U.S. Department of State, a copy of the diplomatic note from Poland, a copy of the Treaty, and a copy of the extradition request and certified documents submitted in support of the request are submitted collectively as Exhibit 1.

8.     The extradition request presents the following facts as the basis for the criminal charges and arrest warrant:

9.     In summary, from July 2009 through April 2010, BLACHA and several other individuals worked together to execute a fraudulent scheme involving the importation and distribution of hundreds of thousands of kilograms of garlic within Poland that deprived the Polish government of approximately 2,352,385 Polish złoty

(approximately $526,757 based on the exchange rate on April 28, 2022) in lost duties and tax revenues.

10.     According to the extradition request, during the relevant time period Polish law imposed customs duties and taxes on garlic that was shipped into and remained in Poland for legitimate sale, but garlic that only transited through Poland en route to another country was excluded from Polish customs duty and tax liability. During the time in question, Poland held inbound shipments of garlic under the supervision of Polish customs authorities to ensure proper tracking of shipments and compliance with payment of required duties and taxes.

11.     BLACHA and others, including his brother, truck drivers, owners and managers of trucking, shipping and transportation companies, and several unidentified citizens of Ukraine, jointly executed a fraudulent scheme under which large shipments of garlic marked for transit through Poland en route to Ukraine were instead diverted and sold within Poland, thus avoiding Polish customs duties and taxes. To successfully defraud Polish authorities, BLACHA and his partners covertly removed the garlic from customs warehouses, bribed customs officers, and falsified documents to conceal the removal of the garlic from customs authorities' control and the subsequent sales in Poland. BLACHA and his co-conspirators replaced the missing garlic intended for foreign delivery outside of Poland with construction materials, which were then shipped onward to other foreign countries, including Ukraine. BLACHA and his co-conspirators then sold the garlic to others in Poland and did not pay the Polish duties taxes and duties for the garlic imported into and

sold in Poland. In total, Poland suffered losses in customs duties and taxes amounting to approximately 2,352,385 Polish złoty (approximately $526,000 USD based on the exchange rate on April 28, 2022).

12.    The allegations against BLACHA are based on the Polish authorities' seizure and review of documentary evidence, including export invoices, sales invoices, export declarations, and customs clearance documents that, upon investigation, were determined to contain false information. Poland's allegations are also based on statements from at least five other participants in BLACHA's criminal scheme. Specifically, BLACHA's brother, Andrzej Blacha, told Polish authorities that he worked for a transport and logistics company that was owned by MAREK BLACHA and their father. According to Andrzej Blacha, he took instructions from his brother MAREK BLACHA to help carry out the customs fraud scheme by transporting garlic, accepting money for its sale, and passing the money to BLACHA's co-conspirator, Witold Szpindor ("Szpindor"), a partner at a customs warehouse. According to a statement provided by Szpindor, BLACHA asked and obtained from him a loan of Polish złoty 50,000 (approximately $11,196 USD) so that he could purchase garlic, without any invoices to record the transaction, and the garlic was sold within Poland.

13.    Polish authorities also obtained statements from two wholesalers who knowingly purchased and resold the fraudulently imported garlic in Poland. Krzysztof Piotr Jakubik told Polish authorities about the mechanics of the criminal scheme and said that BLACHA was responsible for setting the price of the fraudulently imported garlic sold to Polish wholesalers and retailers. Daniel Czop

("Czop") told authorities that he met with BLACHA and his brother, Andrzej, to help facilitate the sale of the fraudulently imported garlic within Poland. As Czop described, he arranged for the transport and sale of garlic to Huber Osko multiple times in exchange for payments of Polish złoty 100,000 (approximately $22,393 USD); Czop then provided the money from the sale to BLACHA.

14.     One of Czop's drivers, Tarek Orfali ("Orfali"), further confirmed to Polish authorities that MAREK BLACHA, Andrzej Blacha, and Czop worked together to unlawfully sell garlic in Poland that had been intended to be transported to Ukraine. According to Orfali, BLACHA was present when garlic was being loaded onto Orfali's truck for transport to a Polish buyer.  Orfali told authorities that BLACHA was aware of the criminal investigation in Poland and asked Orfali to tell Polish authorities that the garlic was exported to Ukraine if Orfali was ever interrogated.

15.     According to a search conducted by the U.S. Marshals Service, BLACHA is believed to reside in Chicago, Illinois, within the jurisdiction of this Court.

16.     Michael N. Jacobsohn, an attorney in the Office of the Legal Adviser of the U.S. Department of State, provided the U.S. Department of Justice with a declaration authenticating a copy of the diplomatic note by which the request for extradition was made and a copy of the Treaty. The declaration states that the offenses for which extradition is sought are covered by the Treaty, and it confirms that the documents supporting the request for extradition bear the certificate or seal of the Ministry of Justice of Poland, in accordance with Article 10 of the Treaty, so as to enable them to be received into evidence.

17.    The declaration from the U.S. Department of State with its attachments, including a copy of the diplomatic note from Poland, a copy of the Treaty, and the certified documents submitted in support of the request, (marked collectively as Exhibit 1) are filed with this complaint and incorporated by reference herein.

FURTHER AFFIANT SAYETH NOT.

DAVID GREEN  Digitally signed by DAVID GREEN
Date: 2022.05.02 13:41:11 -05'00'

David Green
Assistant United States Attorney
219 S. Dearborn Street, Rm. 500
Chicago, Illinois 60604
(312) 469-6024

SWORN TO AND AFFIRMED by telephone May 2, 2022.

Honorable JEFFREY I. CUMMINGS
United States Magistrate Judge

DECLARATION OF MICHAEL N. JACOBSOHN

I, Michael N. Jacobsohn, declare and say as follows:

1. I am an Attorney Adviser in the Office of the Legal Adviser for the Department of State, Washington, DC. This office has responsibility for extradition requests, and I am charged with the extradition case of Marek Blacha. I make the following statements based upon my personal knowledge and upon information made available to me in the performance of my official duties.

2. The relevant and applicable treaty provisions in full force and effect between the United States and Poland are found in the Extradition Treaty Between the United States of America and the Republic of Poland signed July 10, 1996, and the Agreement between the United States of America and the Republic of Poland on the application of the Extradition Treaty between the United States of America and the Republic of Poland signed July 10, 1996, pursuant to Article 3(2) of the Agreement on Extradition between the United States of America and the European Union signed at Washington June 25, 2003 (the "Agreement"), with Annex, signed June 9, 2006. The Annex to the Agreement (the "Annex") reflects the integrated text of the provisions of the 1996 U.S.-Poland Extradition Treaty and the U.S.-E.U. Extradition Agreement. A copy of the Agreement and Annex are attached to this declaration.

3. In accordance with the provisions of the Annex, the Embassy of Poland has submitted Diplomatic Note No. 34.4.2019, dated January 28, 2019, formally requesting the extradition of Marek Blacha. The Ministry of Justice of Poland submitted additional information relating to this request to the United States Department of Justice by letter dated August 17, 2020. Copies of the diplomatic note and letter are attached to this declaration.

4. In accordance with Article 22 of the Annex, the Government of the United States of America provides legal representation in the U.S. courts for the Government of Poland in its extradition requests, and the Government of Poland provides legal representation in its courts for extradition requests made by the United States.

5. The offenses for which extradition is sought are covered under Article 2 of the Annex.

-2-

6. Under Article 10 of the Annex, documents that bear the certificate or seal of the Ministry of Justice, or Ministry or Department responsible for foreign affairs, of the requesting state are admissible in extradition proceedings without further certification, authentication or other legalization. Poland, in submitting documents in the instant case that bear the certificate or seal of the Ministry of Justice, has complied with the authentication requirements of Article 10.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed in Montgomery County, Maryland on November 4 , 2020.


MICHAEL N. JACOBSOHN

Attachments:

    1. Copies of Note and Letter

    2. Copy of Agreement with Annex



Amb.Wasz.34.4.2019

The Embassy of the Republic of Poland presents its compliments to the United States Department of State and in accordance with Article 1, Article 2 (1)(2) and Article 12 of the Treaty of Extradition between the Republic of Poland and the United States of America, signed in Washington on July 10, 1996 in conjunction with Article 5 (2) of the Agreement on Extradition between United States of America and the European Union dated June 25, 2003, has the honor to request the pretrial detention and extradition of Marek Blacha, citizen of Poland, suspected of committing tax fraud and participation in an organized crime group.

The Circuit Prosecutor in Siedlce issued the request for the pretrial detention and extradition dated December 11, 2018 and the Minister of Justice of the Republic of Poland supports the position expressed in the request.

The Embassy of the Republic of Poland avails itself of this opportunity to renew to the United States Department of State the assurances of its highest consideration.

Enclosures: Documents supporting the extradition request.



U.S. Department of State

W a s h i n g t o n, D. C.

Washington, DC, January 28, 2019

TREATIES AND OTHER INTERNATIONAL ACTS SERIES 10-201.17

# EXTRADITION

**Agreement Amending the
Treaty of July 10, 1996
Between the
UNITED STATES OF AMERICA
and POLAND**

Signed at Warsaw June 9, 2006

*with*

Annex



NOTE BY THE DEPARTMENT OF STATE

Pursuant to Public Law 89—497, approved July 8, 1966
(80 Stat. 271; 1 U.S.C. 113)—

". . .the Treaties and Other International Acts Series issued
under the authority of the Secretary of State shall be competent
evidence . . . of the treaties, international agreements other than
treaties, and proclamations by the President of such treaties and
international agreements other than treaties, as the case may be,
therein contained, in all the courts of law and equity and of maritime
jurisdiction, and in all the tribunals and public offices of the
United States, and of the several States, without any further proof
or authentication thereof."

# POLAND

## Extradition

*Agreement amending the treaty of July 10, 1996.*
*Signed at Warsaw June 9, 2006;*
*Transmitted by the President of the United States of America*
  *to the Senate September 28, 2006 (Treaty Doc. 109-14,*
  *109th Congress, 2d Session);*
*Reported favorably by the Senate Committee on Foreign Relations*
  *July 29, 2008 (Senate Executive Report No. 110-12,*
  *110th Congress, 2d Session);*
*Advice and consent to ratification by the Senate*
  *September 23, 2008;*
*Ratified by the President December 11, 2008;*
*Exchange of Instruments of Ratification at*
  *Warsaw June 1, 2009;*
*Entered into force February 1, 2010.*
*With annex.*

Agreement between the United States of America and the Republic of Poland
on the application of the Extradition Treaty between the United States
of America and the Republic of Poland signed 10 July 1996, pursuant to
Article 3(2) of the Agreement on Extradition between the United States
of America and the European Union signed at Washington 25 June 2003

The United States of America and the Republic of Poland (the "Contracting States"
referred to in the Annex to this Agreement),

In view of Article 3(2) of the Agreement on Extradition between the United States of
America and the European Union signed at Washington 25 June 2003,

Have agreed as follows:

## Article 1

As contemplated by Article 3(2) of the Agreement on Extradition between the United
States of America and the European Union signed at Washington 25 June 2003
(hereafter "the U.S.-EU Extradition Agreement"), the United States of America and the
Republic of Poland acknowledge that, in accordance with the provisions of this
Agreement, the bilateral Extradition Treaty between the United States of America and
the Republic of Poland signed at Washington on 10 July 1996 (hereafter "the U.S.-
Poland Extradition Treaty") is applied in relation to the U.S.-EU Extradition
Agreement, under the following terms:

(a)      Article 6 of the Annex to this Agreement shall be applied in place of Article 6 of
the U.S.-Poland Extradition Treaty, pursuant to Article 13 of the U.S.-EU Extradition
Agreement;

(b)      Article 9(1) of the Annex to this Agreement shall be applied in place of Article
9(1) of the U.S.-Poland Extradition Treaty, pursuant to Article 5(1) of the U.S.-EU
Extradition Agreement;

(c)      Article 9 bis of the Annex to this Agreement shall be applied to supplement the
provisions of the U.S.-Poland Extradition Treaty, pursuant to Article 14 of the U.S.-EU
Extradition Agreement;

(d)      Article 10 of the Annex to this Agreement shall be applied in place of Article 10
of the U.S.-Poland Extradition Treaty, pursuant to Article 5(2) of the U.S.-EU
Extradition Agreement;

(e)      Article 12(4) of the Annex to this Agreement shall be applied to supplement the
provisions of the U.S.-Poland Extradition Treaty, pursuant to Articles 5(1) and 7(1) of
the U.S.-EU Extradition Agreement; the previous Article 12(4) and 12(5) shall be
renumbered as Articles 12(5) and 12(6) respectively;

1

(f)     Article 17 of the Annex to this Agreement shall be applied in place of Article 17 of the U.S.-Poland Extradition Treaty, pursuant to Article 10 of the U.S.-EU Extradition Agreement;

(g)     In view of Articles 3 and 5 of this Agreement, Articles 24 and 26 of the U.S.-Poland Extradition Treaty shall be deleted. Accordingly, Article 25 of the U.S.-Poland Extradition Treaty shall be renumbered as Article 24 of the Annex, and Article 27 of the U.S.-Poland Extradition Treaty shall be renumbered as Article 25 of the Annex.

## Article 2

The Annex reflects the integrated text of the provisions of the U.S.-Poland Extradition Treaty and the U.S.-EU Extradition Agreement as a result of Article 1 of this Agreement. This integrated text shall apply upon entry into force of this Agreement.

## Article 3

In accordance with Article 16 of the U.S.-EU Extradition Agreement, this Agreement shall apply to offenses committed before as well as after it enters into force.

## Article 4

This Agreement shall not apply to requests made prior to its entry into force.

## Article 5

1.     This Agreement shall be subject to ratification and the instruments of ratification shall be exchanged as soon as possible. This Agreement shall enter into force on the date of entry into force of the U.S.-EU Extradition Agreement.

2.     In the event of termination of the U.S.-EU Extradition Agreement, this Agreement shall be terminated as of the date of termination of the U.S.-EU Extradition Agreement, and the U.S.-Poland Extradition Treaty shall be applied instead. The United States of America and the Republic of Poland nevertheless may agree to continue to apply some or all of the provisions of this Agreement.

IN WITNESS WHEREOF, the undersigned, being duly authorized by their respective Governments, have signed this Agreement.

DONE at ⟨Warsaw⟩ this 9th day of June, 2006, in duplicate, in the English and Polish languages, both texts being equally authentic.

FOR THE GOVERNMENT OF THE
UNITED STATES OF AMERICA:

FOR THE GOVERNMENT OF THE
REPUBLIC OF POLAND:

2

ANNEX

EXTRADITION TREATY BETWEEN THE UNITED STATES OF AMERICA AND THE REPUBLIC OF POLAND

### Article 1
### Obligation to Extradite

The Contracting States agree to extradite to each other, pursuant to the provisions of this Treaty, persons whom the authorities in the Requesting State seek for prosecution or have found guilty of an extraditable offense.

### Article 2
### Extraditable Offenses

1. An offense shall be an extraditable offense if it is punishable under the laws in both Contracting States by deprivation of liberty for a maximum period of more than one year or by a more severe penalty.

2. An offense shall also be an extraditable offense if it consists of an attempt to commit, or participation in the commission of, an offense described in paragraph 1 of this Article. Any type of association to commit offenses described in paragraph 1 of this Article, as provided by the laws of Poland, and conspiracy to commit an offense described in paragraph 1 of this Article, as provided by the laws of the United States, shall also be extraditable offenses.

3. For the purposes of this Article, an offense shall be an extraditable offense:

(a) whether or not the laws in the Contracting States place the offense within the same category of offenses or describe the offense by the same terminology; or

(b) whether or not the offense is one for which United States federal law requires the showing of such matters as interstate transportation, or use of the mails or of other facilities affecting interstate or foreign commerce, such matters being merely for the purpose of establishing jurisdiction in a United States federal court.

4. If the offense has been committed outside the territory of the Requesting State, extradition shall be granted if the laws in the Requested State provide for the punishment of an offense committed outside its territory in similar circumstances. If the laws in the Requested State do not so provide, the executive authority of the Requested State may, in its discretion, grant extradition.

5. If extradition has been granted for an extraditable offense, it shall also be granted for any other offense specified in the request, even if the latter offense is punishable by

3

deprivation of liberty for one year or less, provided that all other requirements for extradition are met.

## Article 3
### Fiscal Offenses

An offense shall also be an extraditable offense if it consists of an offense in connection with taxes, duties, international transfers of funds, and importation, exportation, and transit of goods, even if the law of the Requested State does not require the same type of fee or tax or does not regulate fees, taxes, duties, transit of goods, and currency transactions in the same manner as the laws of the Requesting State.

## Article 4
### Nationality

1. Neither Contracting State shall be bound to extradite its own nationals, but the Executive Authority of the Requested State shall have the power to extradite such persons if, in its discretion, it be deemed proper and possible to do so.

2. If extradition is refused solely on the basis of the nationality of the person sought, the Requested State shall, at the request of the Requesting State, submit the case to its competent authorities for a decision as to prosecution.

## Article 5
### Political and Military Offenses

1. Extradition shall not be granted if the offense for which extradition is requested is an offense of a political character.

2. For the purposes of this Treaty, the following offenses shall not be considered to be of a political character:

    (a) murder or any other offense against the person of a Head of State of one of the Contracting States, or of a member of the Head of State's family;

    (b) an offense for which both Contracting States have the obligation pursuant to a multilateral international agreement to extradite the person sought or to submit the case to their competent authorities for decision as to prosecution; and

    (c) murder, manslaughter, malicious wounding, or inflicting grievous bodily harm or other grievous injury to health;

    (d) an offense involving kidnapping, abduction, or any form of unlawful detention, including the taking of a hostage;

4

(e)   placing or using an explosive, incendiary or destructive device capable of endangering life, of causing substantial bodily harm, or of causing substantial property damage; and,

(f)   an attempt to commit, or participation in the commission of, any of the foregoing offenses, as well as an association to commit these offenses as provided by the laws of Poland, or conspiracy to commit these offenses as provided by the laws of the United States.

3.   Notwithstanding paragraph 2 of this Article, extradition shall not be granted if the executive authority of the Requested State determines that the request was politically motivated.

4. The executive authority of the Requested State may refuse extradition for offenses under military law which are not offenses under ordinary criminal law.

## Article 6
### Capital Punishment

Where the offense for which extradition is sought is punishable by death under the laws in the Requesting State and not punishable by death under the laws in the Requested State, the Requested State may grant extradition on the condition that the death penalty shall not be imposed on the person sought, or if for procedural reasons such condition cannot be complied with by the Requesting State, on condition that the death penalty if imposed shall not be carried out.  If the Requesting State accepts extradition subject to conditions pursuant to this Article, it shall comply with the conditions.   If the Requesting State does not accept the conditions, the request for extradition may be denied.

## Article 7
### Prior Prosecution

1. Extradition shall not be granted when the person sought has been convicted or acquitted with final and binding effect in the Requested State for the offense for which extradition is requested.

2. Extradition shall not be precluded by the fact that the competent authorities in the Requested State have decided either:

(a)   not to prosecute the person sought for the acts for which extradition is requested; or

(b)   to discontinue any criminal proceedings which have been instituted against the person sought for those acts.

5

## Article 8
### Lapse of Time

Extradition shall not be granted when the prosecution or the enforcement of the penalty for the offense for which extradition has been sought has become barred by lapse of time according to the law of the Requesting State.

## Article 9
### Extradition Procedures and Required Documents

1. Requests for extradition and supporting documents shall be transmitted through the diplomatic channel.

2. A request for extradition shall be supported by:

(a) documents, statements, or other types of information which describe the identity, nationality, and probable location of the person sought;

(b) information describing the facts of the offense and the procedural history of the case;

(c) the text of the law describing the essential elements of the offense for which extradition is requested;

(d) the text of the law prescribing the punishment for the offense;

(e) a statement of the provisions of law describing any time limit on the prosecution or enforcement of the penalty for the offense for which extradition has been sought; and

(f) the documents, statements, or other types of information specified in paragraph 3 or paragraph 4 of this Article, as applicable.

3. A request for extradition of a person who is sought for prosecution shall also be supported by:

(a) a copy of the warrant or order of arrest, if any, issued by a judge or other competent authority;

(b) a copy of the charging document, if any; and

(c) such information as would justify the committal for trial of the person if the offense had been committed in the Requested State.

6

4. A request for extradition relating to a person who has been found guilty of the offense for which extradition is sought shall also be supported by:

(a) a copy of the warrant or order of arrest, if any, issued by a judge or other competent authority;

(b) a copy of the judgment of conviction or, if such copy is not available, a statement by a judicial authority that the person has been found guilty;

(c) information establishing that the person sought is the person to whom the finding of guilt refers;

(d) a copy of the sentence imposed, if the person sought has been sentenced, and a statement establishing to what extent the sentence has been carried out; and

(e) in the case of a person who has been convicted in absentia, the documents required in paragraph 3.

### Article 9 bis
### Sensitive Information in a Request

Where the Requesting State contemplates the submission of particularly sensitive information in support of its request for extradition, it may consult the Requested State to determine the extent to which the information can be protected by the Requested State. If the Requested State cannot protect the information in the manner sought by the Requesting State, the Requesting State shall determine whether the information shall nonetheless be submitted.

### Article 10
### Admissibility of Documents

Documents that bear the certificate or seal of the Ministry or Department of Justice, or Ministry or Department responsible for foreign affairs, of the Requesting State shall be admissible in extradition proceedings in the Requested State without further certification, authentication, or other legalization.

### Article 11
### Translation

All documents submitted by the Requesting State shall be translated into the language of the Requested State.

7

### Article 12
### Provisional Arrest

1. In case of urgency, a Contracting State may apply for the provisional arrest of the person sought before the request for extradition is submitted. An application for provisional arrest may be transmitted through the diplomatic channel or directly between the United States Department of Justice and the Ministry of Justice of the Republic of Poland. The facilities of the International Criminal Police Organization (INTERPOL) may be used to transmit such a request.

2. The application for provisional arrest shall contain:

    (a) a description of the person sought and information concerning the person's nationality;

    (b) the location of the person sought, if known;

    (c) a brief statement of the facts of the case, including, if possible, the time and location of the offense;

    (d) a description of the laws violated;

    (e) a statement of the existence of either:

        (i) a warrant of arrest for a person sought for prosecution or already found guilty but not yet sentenced, or

        (ii) a judgment of conviction against a person sought for the enforcement of a sentence; and

    (f) a statement that a request for extradition for the person sought will follow.

3. The Requesting State shall be notified without delay of the disposition of its application and the reasons for any denial.

4. If the person whose extradition is sought is held under provisional arrest by the Requested State, the Requesting State may satisfy its obligation to transmit its request for extradition and supporting documents through the diplomatic channel pursuant to Article 9, by submitting the request and documents to the Embassy of the Requested State located in the Requesting State. In that case, the date of receipt by the Embassy shall be considered to be the date of receipt by the Requested State for purposes of applying the time limit that must be met under paragraph 5 of this Article in order to enable the person's continued detention.

8

5. A person who is provisionally arrested shall be discharged from custody upon the expiration of sixty (60) days from the date of provisional arrest pursuant to this Treaty if the executive authority of the Requested State has not received the formal request for extradition and the supporting documents required in Article 9.

6. The fact that the person sought has been discharged from custody pursuant to paragraph (5) of this Article shall not prejudice the subsequent rearrest and extradition of that person if the extradition request and supporting documents are delivered at a later date.

## Article 13
### Additional Information

If the Requested State considers that the information furnished in support of a request for extradition is not sufficient to fulfill the requirements of this Treaty, that State may request that additional information be furnished within such a reasonable length of time as it specifies. Such additional information may be requested and furnished directly between the United States Department of Justice and the Ministry of Justice of Poland or through the diplomatic channel.

## Article 14
### Decision and Surrender

1. The Requested State shall promptly notify the Requesting State of its decision on the request for extradition.

2. If the request is denied in whole or in part, the Requested State shall provide an explanation of the reasons for the denial. The Requested State shall provide copies of pertinent judicial decisions upon request.

3. If the request for extradition is granted, the authorities of the Contracting States shall agree on the time and place for the surrender of the person sought.

4. Surrender of the person sought shall take place within such time as may be prescribed by the laws of the Requested State. If the law of the Requested State does not provide a specific time for surrender, it shall take place within thirty (30) days from the date on which the Requesting State is notified of the decision to extradite.

5. If the person sought is not removed from the territory of the Requested State within the time required under paragraph (4), he may be set at liberty. The Requested State may subsequently refuse to extradite the person sought for the same offense.

9

6. If circumstances beyond its control prevent a Contracting State from timely surrendering or taking delivery of the person to be extradited, it shall notify the other Contracting State before the expiration of the time limit. In such a case the competent authorities of the Contracting States may agree upon a new date for the surrender.

## Article 15
### Convictions in Absentia

If a Contracting State has applied to the other State for extradition of a person convicted in absentia, the executive authority of the Requested State may refuse to surrender the person if it deems that the proceedings in absentia did not ensure the minimum right to defense to which the person charged is entitled. Extradition may be effected, however, if the Requesting State guarantees, in a manner deemed adequate, that the case against the person whose extradition is requested will be reopened, with guaranteed right of defense.

## Article 16
### Temporary and Deferred Surrender

1. If the extradition request is granted in the case of a person who is being prosecuted for an offense other than that for which extradition is sought or is serving a sentence in the territory of the Requested State for an offense other than that for which extradition is sought, the Requested State may temporarily surrender the person sought to the Requesting State for the purpose of prosecution. The person so surrendered shall be kept in custody in the Requesting State and shall be returned to the Requested State after the conclusion of the proceedings against that person, in accordance with conditions to be determined by agreement of the Contracting States.

2. The Requested State may postpone the extradition proceedings against a person who is being prosecuted for the same offense for which that person is sought or any other offense, or who is serving a sentence in that State for an offense other than that for which extradition is sought. The postponement shall continue until the prosecution of the person sought has been concluded or until such person has served any sentence imposed.

## Article 17
### Requests for Extradition or Surrender Made by Several States

1. If the Requested State receives requests from the Requesting State and from any other State or States for the extradition of the same person, either for the same offense or for different offenses, the executive authority of the Requested State shall determine to which State, if any, it will surrender the person.

10

2.If the Republic of Poland receives an extradition request from the United States of America and a request for surrender pursuant to the European arrest warrant for the same person, either for the same offense or for different offenses, its executive authority shall determine to which State, if any, it will surrender the person.

3.In making its decision under paragraphs 1 and 2 of this Article, the Requested State shall consider all of the relevant factors, including, but not limited to, the following:

(a)    whether the requests were made pursuant to a treaty;
(b)    the places where each of the offenses was committed;
(c)    the respective interests of the requesting States;
(d)    the seriousness of the offenses;
(e)    the nationality of the victim;
(f)    the possibility of any subsequent extradition between the requesting States; and
(g)    the chronological order in which the requests were received from the requesting States.

Article 18
Seizure and Surrender of Property

1. To the extent permitted under its law, the Requested State may seize and surrender to the Requesting State all articles, documents, and evidence connected with the offense in respect of which extradition is granted. The items mentioned in this Article may be surrendered, to the extent permitted under the law of the Requested State, even when extradition cannot be effected due to the death, disappearance, or escape of the person sought.

2. The Requested State may condition the surrender of the property upon satisfactory assurances from the Requesting State that the property will be returned to the Requested State as soon as practicable. The Requested State may also defer the surrender of such property if it is needed as evidence in the Requested State.

3. The rights of third parties in such property shall be duly respected.

Article 19
Rule of Speciality

1. A person extradited under this Treaty may not be detained, prosecuted, sentenced, or punished in the Requesting State except for:

(a) an offense for which extradition has been granted or a differently denominated offense based on the same facts on which extradition was granted, provided such offense is extraditable or is a lesser form of such offense;

11

(b) an offense committed after the extradition of the person; or

(c) an offense for which the executive authority of the Requested State has consented to the person's detention, prosecution, sentencing, or punishment. For the purpose of this subparagraph:

    (i) the Requested State may require the submission of the documents specified in Article 9; and

    (ii) unless the Requested State objects in writing, the person extradited may be detained by the Requesting State for ninety (90) days, or for such longer period of time as the Requested State may authorize, while the request is being processed.

2.    A person extradited under this Treaty may not be extradited to a third State for an offense committed prior to the surrender unless the surrendering State consents.

3.    Paragraphs 1 and 2 of this Article shall not prevent the detention, prosecution, sentencing, or punishment of an extradited person, or the extradition of that person to a third State, if:

(a) that person leaves the territory of the Requesting State after extradition and voluntarily returns to it; or

(b) that person does not leave the territory of the Requesting State within thirty (30) days of the day on which that person is free to leave.

Article 20
Simplified Extradition

If the extradition of a person sought to the Requesting State is not obviously precluded by the laws of the Requested State and provided the person sought irrevocably agrees in writing to his extradition after personally being advised by a judge or competent magistrate of his rights to formal extradition proceedings and the protection afforded by them that he would lose, the Requested State may surrender the person sought without a formal extradition proceeding having taken place. In this case Article 19 shall not be applicable.

Article 21
Transit

1. Either Contracting State may authorize transportation through its territory of a person surrendered to the other State by a third State. A request for transit shall be made through the diplomatic channel or directly between the United States Department of

12

Justice and the Ministry of Justice of the Republic of Poland. The facilities of the International Criminal Police Organization (INTERPOL) may be used to transmit such a request. It shall contain a description of the person being transported and a brief statement of the facts of the case. A person in transit may be detained in custody during the period of transit.

2. No authorization is required where air transportation is being used by one Contracting State and no landing is scheduled on the territory of the other Contracting State. If an unscheduled landing occurs on the territory of the other Contracting State, that Contracting State may require the request for transit as provided in paragraph 1. That Contracting State may detain the person to be transported until the request for transit is received and the transit is effected, so long as the request is received within ninety-six (96) hours of the unscheduled landing.

### Article 22
### Representation and Expenses

1. The Requested State shall assist, appear in court, and represent the interests of the Requesting State, in any proceeding arising out of a request for extradition.

2. The Requesting State shall bear the expenses related to the translation of documents and the transportation of the person surrendered. The Requested State shall pay all other expenses incurred in that State by reason of the extradition proceedings.

3. Neither State shall make any other pecuniary claim against the other State arising out of extradition procedures under this Treaty.

### Article 23
### Consultation

1. The United States Department of Justice and Ministry of Justice of the Republic of Poland may consult with each other directly or through the facilities of INTERPOL in connection with the processing of individual cases and in furtherance of maintaining and improving procedures for the implementation of this Treaty.

2. The Requesting State shall, at the request of the Requested State, inform the Requested State of the status of criminal proceedings against persons who have been extradited, and provide a copy of the final and binding decision if one has been issued in the case in question.

13

### Article 24
### Executive Authorities

For the United States of America, the executive authority shall be the Secretary of State or a person designated by the Secretary of State. For Poland, the executive authority shall be the Minister of Justice-Attorney General or a person designated by the Minister of Justice-Attorney General.

### Article 25
### Termination

Either Contracting State may terminate this Treaty at any time by giving written notice to the other Contracting State, and the termination shall be effective six months after the date of the receipt of such notice.

14



*COPY*

Warszawa, 3.01 2019. r.

NISI III
**SPRAWIEDLIWOŚCI**

DWMPC II 071.2.2018

**Pan**

**Mike Pompeo**

**Sekretarz Stanu**

**Stanów Zjednoczonych Ameryki**

W oparciu o treść artykułu 1, artykułu 2 ustęp 1 i 2 oraz artykułu 12 Umowy między Rzecząpospolitą Polską a Stanami Zjednoczonymi Ameryki o ekstradycji z dnia 10 lipca 1996 roku a także w oparciu o treść artykułu 5 ustęp 2 Umowy między Unią Europejską a Stanami Zjednoczonymi Ameryki o ekstradycji z dnia 25 czerwca 2003 roku, uprzejmie przedstawiam wniosek Prokuratora Okręgowego w Siedlcach z dnia 11 grudnia 2018 roku, sygnatura PO I Ds 65.2017, o tymczasowe aresztowanie i ekstradycję do Polski poszukiwanego obywatela polskiego – Marka Blachy (Marek Blacha), podejrzanego o popełnienie oszustw skarbowych oraz udział w zorganizowanej grupie przestępczej.

Podzielając stanowisko wyrażone we wniosku, proszę o jego pozytywne rozpatrzenie.

z upoważnienia
MINISTRA SPRAWIEDLIWOŚCI

Łukasz Piebiak
Podsekretarz Stanu

Al. Ujazdowskie 11, 00-950 Warszawa
·48 22 52 12 888,

EXT-BLACHA-00021

Sworn translator of English and Russian
mgr Małgorzata Panasiuk

_____ Certified translation from the Polish language _____

*Italics used for translator's comments.*

*National emblem of the Republic of Poland*
          Minister of Justice                          Warsaw, 9 January 2019

          DWMPC-II-071.2.2019

                                        **Mr Mike Pompeo**
                                        **Secretary of State**
                                        **United States of America**

          Pursuant to the provisions of Article 1, Article 2 clauses 1 and 2 and Article 12 of the
Extradition Treaty of 10 July 1996 between the United States of America and the Republic of
Poland as well as pursuant to the provisions of Article 5 clause 2 of the Agreement on
Extradition Between the European Union and the United States of America of 25 June 2003, I
am sending the hereto enclosed request of the Circuit Prosecutor *(Prokurator Okręgowy)* in
Siedlce of 11 December 2018 – file number PO I DS 65.2017, for provisional detention and
extradition to Poland, of a Polish citizen Marek Blacha, suspected of committing tax frauds
and participation in an organised crime group.
          Your action upon the request will be greatly appreciated.

*Round stamp with the national emblem of the Republic of Poland in the centre and the*
*following circumscription:* MINISTER OF JUSTICE *4*

                                        *Oblong stamp:*
                                   by Minister of Justice
                                     Łukasz Piebiak
                                   Undersecretary of State
                                   *(-) illegible signature*

*The footer of the document includes address details of the Ministry of Justice*



Siedlce, dnia 11 grudnia 2018 roku.

Sygnatura akt:

PO I Ds 65.2017

## WNIOSEK
## O TYMCZASOWE ARESZTOWANIE I EKSTRADYCJĘ

Zwracam się z uprzejmą prośbą o tymczasowe aresztowanie i ekstradycję obywatela Rzeczypospolitej Polskiej:

**Marka Blachy**,

syna Jana i Janiny z domu Obszyńskiej,

urodzonego 21 kwietnia 1969 roku w Biłgoraju,

zamieszkałego w Biłgoraju, ulica Wiejska 13A,

przebywającego w Stanach Zjednoczonych

W sprawie o sygnaturze V Ds 62/15/Sp prowadzonej przez Prokuraturę Okręgową w Siedlcach, Marek Blacha, podejrzany jest o to, że:

I. W okresie od 4 lipca 2009 roku do 28 kwietnia 2010 roku w miejscowościach: Dorohusk, Biłgoraj, Lubycza Królewska, Latowicz, Tomaszów Lubelski i innych miejscowościach na terytorium kraju, wziął udział w zorganizowanej grupie przestępczej, w skład której wchodzili Witold Szpindor, Krzysztof Jakubik, Andrzej Blacha i inne nieustalone osoby, w tym nie mniej niż siedmiu nieustalonych obywateli Ukrainy, mającej na celu popełnianie przestępstw skarbowych oraz kryminalnych, polegających na dokonywaniu oszustw celnych związanych z procedurą tranzytu świeżego czosnku, usuwaniu towaru spod dozoru celnego, korumpowaniu funkcjonariuszy celnych w związku z odprawami celnymi, poświadczaniu nieprawdy w fakturach eksportowych dotyczących sprzedaży świeżego czosnku i posługiwaniu się takimi dokumentami, poświadczaniu nieprawdy w deklaracjach eksportowych T 1, to jest o czyn z artykułu 258 paragraf 1 kodeksu karnego

II. W okresie od 4 lipca 2009 roku do 28 kwietnia 2010 roku, w Dorohusku i Hrebennem, w ramach funkcjonowania zorganizowanej grupy przestępczej, jako pracownik firmy „Bak-Trans Zakład Transportowy Jan i Marek Blacha" z siedzibą w Biłgoraju, działając wspólnie i w porozumieniu z Andrzejem Blachą - pracownikiem tejże firmy, Witoldem Szpindorem - udziałowcem spółki jawnej „HUSAR" i osobą faktycznie kierującą tą spółką, Danielem Czopem - współwłaścicielem spółki „Cytrus", oraz innymi nieustalonymi osobami, działając w krótkich odstępach czasu, w wykonaniu tego samego i z góry powziętego zamiaru spowodowania uszczupleń podatkowo-celnych, wprowadzał w błąd Oddział Celny Drogowy Dorohusk oraz Oddział Celny w Hrebennem, jako urzędy przeznaczenia, co do rodzaju wywożonego na Ukrainę towaru, poprzez przedkładanie za pośrednictwem Agencji Celnej D.T.A, spółka z ograniczoną odpowiedzialnością, do odpraw celnych dokonywanych w ramach procedury tranzytu zewnętrznego, deklaracji eksportowych T 1, w których jako eksporterzy figurowały firmy: „Bak-Trans -Zakład Transportowy Jan i Marek Blacha", BH „Bartek Małgorzata Ptach-Taube", wraz z dokumentami wskazującymi na wywóz na Ukrainę świeżego czosnku jako towaru, co do którego istnieje reglamentacja pozataryfowa, gdy w rzeczywistości na Ukrainę wywożone były materiały budowlane w postaci płytek, bloczków z betonu Solbet Optimal, co skutkowało zamknięciem przez wymienione urzędu celne procedury tranzytu, w potwierdzonej deklaracji T 1 o numerach:

1. MRN 09PL30308010E9A430 z dnia 4 lipca 2009 roku, przy czym przedmiotowego oszustwa dopuścił się działając wspólnie i w porozumieniu wraz z Andrzejem Blachą oraz nieustalonymi obywatelami Ukrainy,

2. MRN 09PL30308010EC66C0 z dnia 10 lipca 2009 roku, przy czym przedmiotowego oszustwa dopuścił się działając wspólnie i w porozumieniu wraz z Andrzejem Blachą oraz nieustalonymi obywatelami Ukrainy,

3. MRN 09PL30308010EC4F90 z dnia 10 lipca 2009 roku, przy czym przedmiotowego oszustwa dopuścił się działając wspólnie i w porozumieniu wraz z Andrzejem Blachą oraz nieustalonymi obywatelami Ukrainy,

4. MRN 09PL30308010EF6855 z dnia 17 lipca 2009 roku, przy czym przedmiotowego oszustwa dopuścił się działając wspólnie i w porozumieniu wraz z Andrzejem Blachą oraz nieustalonymi obywatelami Ukrainy,

5. MRN 09PL30308010F575B3 z dnia 31 lipca 2009 roku, przy czym przedmiotowego oszustwa dopuścił się działając wspólnie i w porozumieniu wraz z Andrzejem Blachą, Danielem Czop oraz nieustalonymi obywatelami Ukrainy,

6. MRN 09PL30308010ABDC6 z dnia 18 września 2009 roku, przy czym przedmiotowego oszustwa dopuścił się działając wspólnie i w porozumieniu wraz z Andrzejem Blachą, Danielem Czop oraz nieustalonymi obywatelami Ukrainy,

7. MRN 09PL3030801148C087 z dnia 29 stycznia 2010 roku, przy czym przedmiotowego oszustwa dopuścił się działając wspólnie i w porozumieniu wraz z Andrzejem Blachą, Witoldem Szpindor oraz nieustalonymi obywatelami Ukrainy,

8. MRN 10PL3030801154D2F0 z dnia 20 lutego 2010 roku, przy czym przedmiotowego oszustwa dopuścił się działając wspólnie i w porozumieniu wraz z Andrzejem Blachą oraz nieustalonymi obywatelami Ukrainy,

9. MRN 10PL3030801173B7D0 z dnia 21 kwietnia 2010 roku, przy czym przedmiotowego oszustwa dopuścił się działając wspólnie i w porozumieniu wraz z Witoldem Szpindorem, Andrzejem Blachą oraz nieustalonymi obywatelami Ukrainy,

10. MRN 10PL303080117785F9 z dnia 28 kwietnia 2010 roku, przy czym przedmiotowego oszustwa dopuścił się działając wspólnie i w porozumieniu wraz z Witoldem Szpindorem, Andrzejem Blachą, oraz nieustalonymi obywatelami Ukrainy,

powodując jednocześnie w każdym przypadku usuwanie towaru spod dozoru celnego, oraz usuwanie zamknięć celnych, w efekcie poprzez powyższe działania pozostał w Polsce i został sprzedany między innymi poprzez Daniela Czopa towar w postaci 220.000 kg świeżego czosnku powodując w ten sposób uszczuplenie należności celnych na kwotę nie mniejszą niż 1.223.180,00 zł, co stanowi kwotę uszczuplenia dużej wartości, to jest o czyn z artykułu 87 paragraf 2 kodeksu karnego skarbowego w związku z artykułem 90 paragraf 1 i 2 kodeksu karnego skarbowego w związku z artykułem

EXT-BLACHA-00025

6 paragraf 2 kodeksu karnego skarbowego w związku z artykułem 7 paragraf 1 kodeksu karnego skarbowego w związku z artykułem 37 paragraf 1 ustęp 1, 2, 5 kodeksu karnego skarbowego.

Na sprawstwo Marka Blachy w zakresie czynów opisanych w punkcie I i II wskazują następujące dowody:

*Numer 1:*

*Wyjaśnienia podejrzanego Krzysztofa Piotra Jakubika udokumentowane protokołami jego przesłuchań z dni: 22 kwietnia 2013 roku, 2 czerwca 2014 roku, 3 czerwca 2015 roku oraz protokołami przesłuchania z rozprawy przed Sądem Okręgowym w Siedlcach w sprawie II K 83/15 z dnia 12 października 2015 roku i 14 października 2015 roku.*

Z wyjaśnień tych wynika, że Krzysztof Piotr Jakubik prowadził firmę „Lat-Pol" z siedzibą w Latowiczu, która zajmowała się handlem hurtowym i detalicznym warzywami i owocami. W ramach prowadzonej działalności Krzysztof Piotr Jakubik był głównym odbiorcą świeżego czosnku pochodzącego z oszustw celnych.

Wyjaśnienia te wskazują, że w okresie od 28 września 2009 roku do 3 marca 2010 roku około 160 ton do 200 ton czosnku, który teoretycznie miał być transportowany na Ukrainę, pozostało w Polsce.

Z wyjaśnień Krzysztofa Piotra Jakubika wynikało, że umowy dotyczące sprzedaży czosnku kontrahentom ukraińskim, były fikcyjne.

Dla nadania tym transakcjom pozorów legalności korumpowano funkcjonariuszy celnych, którzy przeprowadzali fikcyjne zamknięcia procedur tranzytowych wskazujących na to, że czosnek rzeczywiście był eksportowany na Ukrainę.

Za nielegalne zamknięcie procedury tranzytowej, celnikom wręczono 15.000 euro korzyści majątkowej.

Nadto podejrzany Krzysztof Piotr Jakubik relacjonował, że w 2009 roku skontaktował się z nim telefonicznie Hubert Ośko z firmy „Borex", proponując nabycie czosnku pochodzącego Chin, bez wystawiania faktur dokumentujących tę transakcję. Po przyjechaniu na miejsce, w którym miał być ten towar, zauważył ciężarówkę wypełnioną czosnkiem, którą kierował Andrzej Blacha.

W czasie spotkania, Krzysztof Jakubik bezpośrednio negocjował cenę z Hubertem Ośko, który z kolei rozmawiał o cenie z Andrzejem Blachą. Ostatecznie wysokość ceny za towar ustalił Marek Blacha.

Do transakcji jednak nie doszło bowiem Krzysztof Piotr Jakubik nie zaakceptował ceny za czosnek, która była zbyt wysoka.

*Numer 2:*

***Protokoły przesłuchania podejrzanego Witolda Szpindora z dni: 21 marca 2013 roku, 12 kwietnia 2013 roku, 16 kwietnia 2013 roku, 13 maja 2014 roku, 18 marca 2015 roku oraz protokół przesłuchania z rozprawy z Sądu Okręgowego w Siedlcach w sprawie II K 83/15 z dnia 12 października 2015 roku***

Witold Szpindor był udziałowcem spółki z ograniczoną odpowiedzialnością „Husar", która była jednocześnie składem celnym.

Tenże podejrzany ostatecznie przyznał się do zarzutów, potwierdzając w ten sposób uczestnictwo w przestępstwach Marka Blachy.

Z treści przesłuchania Witolda Szpindora wynikało, między innymi, iż Marek Blacha zwrócił się do niego dwukrotnie o pożyczkę pieniędzy w kwocie 50.000 złotych na zakup czosnku. Witold Szpindor wyraził zgodę i pożyczył mu pieniądze.

Czosnek ten miał być nabyty bez wystawiania stosownych faktur, dokumentujących fakt sprzedaży. Zakupiony w ten sposób czosnek, został sprzedany na terenie Polski, nie był przedmiotem eksportu na Ukrainę.

*Numer 3:*

***Protokoły przesłuchania podejrzanego Andrzeja Blachy z dnia 4 czerwca 2013 roku, 24 września 2013 roku oraz protokół przesłuchania z rozprawy z Sądu Okręgowego w Siedlcach w sprawie II K 83/15 z dnia 14 października 2015 roku***

Andrzej Blacha w 2013 roku pracował w firmie „Bak-Trans Zakład Transportowy Jan i Marek Blacha" zajmującej się usługami transportowymi i logistyką.

Właścicielami firmy byli jego brat Marek Blacha oraz ojciec Jan Blacha. Andrzej Blacha zajmował się w firmie organizacją transportu, czasami też jako kierowca realizował zlecone transporty.

Z treści wyjaśnień podejrzanego Andrzeja Blachy wynikało, iż poprzez brata Marka poznał Romana i Witolda Szpindorów. Firma „Bak-Trans" wykonywała dla Romana i Witolda Szpindorów usługi transportowe, między innymi w zakresie transportu świeżego czosnku. Według Andrzeja Blachy, to jego brat – Marek Blacha, wspólnie z Witoldem Szpindorem dokonywali oszustw. Andrzej Blacha, miał jedynie wykonywać polecenia Marka Blachy w zakresie przewozu czosnku, przyjmowania pieniędzy za ten towar i przekazywania ich Witoldowi Szpindorowi. Andrzej Blacha potwierdził, że brał udział bezpośrednio w jednej transakcji sprzedaży czosnku na prośbę Witolda Szpindora i brata Marka Blachy. Czosnek ten pochodził z Chin, a z dokumentacji wynikało, iż miał być dostarczony na terytorium Ukrainy. W rzeczywistości towar został sprzedany na terenie Polski. W przedmiotowej transakcji pośrednikiem był Daniel Czop, który znalazł firmę, zainteresowaną zakupem tego towaru. Pierwotnie czosnek miał kupić Krzysztof Piotr Jakubik, jednakże cena była zbyt wysoka i do transakcji nie doszło. Ostatecznie część czosnku kupił Daniel Czop, a resztę świadek Cezary Zagrabski – prowadzący firmę pod nazwą „Cezary Jakub Zagrabski" z siedzibą w Mińsku Mazowieckim, zajmującą się handlem warzywami w tym czosnkiem.

*Numer 4:*

*Protokół przesłuchania podejrzanego Daniela Czopa z dnia 5 kwietnia 2013 roku.*

Daniel Czop w 2013 roku był współwłaścicielem hurtowni „Cytrus" z siedzibą w Biłgoraju. Firma ta zajmowała się skupem i sprzedażą hurtową owoców, warzyw i innych produktów rolnych, w tym czosnku.

W toku składanych wyjaśnień Daniel Czop potwierdził, że brał udział w dwóch transakcjach związanych ze sprzedażą czosnku pochodzącego z oszustw celnych.

Przedstawiał, iż zna między innymi braci Andrzeja Blachę i Marka Blachę. Wyjaśnił, że dwukrotnie pomagał im przewieźć towar w postaci czosnku. Czosnek ten pochodził z Chin, został nabyty w Holandii i miał być przetransportowany na Ukrainę.

Faktycznie towar został dostarczony do Huberta Ośko z firmy „Borex". Za czosnek Hubert Ośko płacił Danielowi Czop każdorazowo po 100.000 złotych. Następnie pieniądze te Daniel Czop przekazywał Markowi Blacha.

Wyjaśniał także, że Andrzej Blacha opowiadał mu, jak dokładnie wygląda mechanizm oszustwa, polegającego na fikcyjnym eksportowaniu czosnku na Ukrainę

### Numer 4:

### Protokół przesłuchania podejrzanego Tarka Orfali z dnia 3 czerwca 2013 roku.

Tarek Orfali pracował w firmie „Cytrus", jako kierowca. Dwukrotnie na polecenia Daniela Czopa transportował z Urzędu Celnego w Tomaszowie Lubelskim towar w postaci czosnku, który miał pierwotnie być przewieziony na Ukrainę, a trafiał do innych miejsc na terytorium Polski. Jeden z transportów trafił do magazynów firmy „Borex", znajdujących się w nieustalonym dokładnie miejscu, w pobliżu miejscowości Grójec. Podczas tych przewozów Tarek Orfali miał cały czas kontakt telefoniczny ze swoim pracodawcą – Danielem Czopem, a ten zaś kontaktował się z Andrzejem Blachą. Podczas każdego z załadunków czosnku na samochód kierowany przez Tarka Orfali, obecny był Marek Blacha, który nadzorował pracę i pomagał w załadunku towaru.

Po tym Tarek Orfali, spotkał się z Markiem Blachą i Danielem Czopem. W czasie tych spotkań Marek Blacha, wiedząc o toczącym się postępowaniu karnym, namawiał go, aby w razie ewentualnych przesłuchań potwierdzał, że towar w postaci czosnku został wywieziony na Ukrainę.

W czasie kolejnego spotkania Marek Blacha opowiadał Tarkowi Orfali o szczegółach oszustw, między innymi potwierdził fakt korumpowania w związku z tym polskich funkcjonariuszy celnych.

### Numer 6:

### Dokumentacja zabezpieczona w firmie „Bak- Trans".

W dniu 25 lutego 2013 roku w firmie „Bak - Trans" dokonano przeszukania, w trakcie którego zabezpieczono dowody w postaci: faktur eksportowych sprzedaży,

deklaracji eksportowych T 1, gdzie jako eksporter figurowała firma „Bak Trans - Zakład Transportowy Jan i Marek Blacha", drogowych listów przewozowych CMR.

Z ujawnionej dokumentacji wynika, iż sprowadzony z Holandii do Polski czosnek pochodzący z Chin, został sprzedany przez firmę „Bak-Trans" na podstawie faktur VAT odbiorcom ukraińskim – między innymi firmie „Donis Trading" z filią w Kijowie, nabywcy Yuriy Kvochka z Lwowa oraz nabywcy Stachiw Anatoij z Tarnopola. Towar ten podlegał odprawie celnej na przejściu granicznym w Dorohusku, gdzie dokonywano zamykania procedury tranzytu. Zamknięcie procedury tranzytu potwierdzało fakt, że towar opuścił terytorium Rzeczypospolitej Polskiej.

Analiza zgromadzonej dokumentacji potwierdza fakt, iż transakcje sprzedaży czosnku odbiorcom ukraińskim nie miały miejsca, a na terytorium Ukrainy eksportowany był towar w postaci między innymi asortymentu budowlanego. W rzeczywistości czosnek pozostawał w Polsce.

### Numer 7:
#### Dokumenty uzyskane z polskich urzędów celnych.

W toku prowadzonego postępowania uzyskano dokumenty z odpraw celnych w postaci: deklaracji eksportowej T1 gdzie jako eksporter figurowała firma „Bak – Trans – Zakład Transportowy Jan i Marek Blacha", wydruków z systemów elektronicznych wykorzystywanych przez urzędy celne przy eksporcie, w tym zdjęcia środków transportu oraz materiały z postępowań dyscyplinarnych wszczętych wobec celników.

Analiza powyższych materiałów wskazuje, że w dokumentach tych poświadczano nieprawdę, bowiem towar w postaci czosnku, którego eksportu dotyczyły te dokumenty, nie został wyeksportowany na Ukrainę.

### Numer 8:
#### Dokumenty uzyskane od Strony ukraińskiej.

Wystąpiono do Strony ukraińskiej z wnioskiem o pomoc prawną, którego celem było uzyskanie informacji o firmie Donis Trading" z filią w Kijowie oraz nabywcy Yuriy Kvochka z Lwowa, będących rzekomymi nabywcami czosnku.

Uzyskano w ten sposób informację, że firma o nazwie „Donis Trading" nie istnieje. Nie istnieje też osoba o danych: Yuriy Kvochka.

Z materiałów dotyczących odpraw celnych udostępnionych przez Stronę ukraińską wynika, że przedmiotem wwozu na terytorium Ukrainy był inny towar, niż czosnek.

*Numer 9:*

***Wyliczenie cła i podatku VAT przedstawiona przez Urząd Celny w Siedlcach.***

Urząd Celny w Siedlcach dokonał - na podstawie zgromadzonych w sprawie dowodów oraz w oparciu o przepisy dotyczące prawa podatkowego i prawa celnego wyliczenia uszczupleń cła i podatku ustalając, że suma kwot uszczuplonego cła wynosi 2.228.796 PLN (słownie: dwa miliony, dwieście dwadzieścia osiem tysięcy, siedemset dziewięćdziesiąt sześć złotych), a suma kwot uszczuplonego podatku od towarów i usług (VAT) wynosi 123.589 PLN (słownie: sto dwadzieścia trzy tysiące, pięćset osiemdziesiąt dziewięć złotych).

Ujawnione i przedstawione w sprawie dokumenty wskazują, że grupa przestępcza, w której działał Marek Blacha wykorzystała w oszustwach procedurę celną opisaną we Wspólnotowym Kodeksie Celnym (Dziennik Ustaw Unii Europejskiej L 92.302.1) to jest procedurę tranzytu wspólnotowego (tranzyt zewnętrzny T 1).

W świetle przepisów unijnych, legalna sprzedaż pochodzącego z Chin czosnku na terenie Unii Europejskiej (w przedmiotowej sprawie - w Polsce), obliguje importera do uruchomienia procedury dopuszczenia towaru do obrotu.

Dopuszczenie do swobodnego obrotu nadaje niewspólnotowemu towarowi, statut celny towaru wspólnotowego.

Działania grupy przestępczej, w której działał Marek Blacha, godziły nie tylko w interesy Polski - Skarbu Państwa, ale również w interesy finansowe Wspólnoty Europejskiej.

Stosownie do artykułu 2 Konwencji w sprawie ochrony interesów finansowych Wspólnot Europejskich, państwa członkowskie mają zapewnić karalność tego typu

oszustw, z tym, że przy oszustwach poważnych, przekraczających kwotę określoną przez prawo krajowe (nie niższą jednak niż 50 000 euro), powinny być one zagrożone karą pozbawienia wolności umożliwiającą wydanie sprawcy.

Zebrane w sprawie dowody wskazują, iż Marek Blacha działał w zorganizowanej grupie przestępczej, mającej na celu popełnianie opisanych wcześniej przestępstw.

Ponadto nie ma żadnych wątpliwości, że Marek Blacha wraz z Witoldem Szpindorem, Andrzejem Blachą, Michałem Nawrockim, Danielem Czopem, oraz nieustalonymi osobami, wprowadzali w błąd Urząd Celny, co do faktu, że towar w postaci świeżego czosnku pochodzący z Chin, miał być dalej eksportowany na Ukrainę. Towar ten faktycznie pozostawał w Polsce. Świeży czosnek pochodzenia chińskiego był legalnie kupowany w Holandii. W celu uwiarygodniania tranzytów na Ukrainę, wywożono tam inny niż czosnek towar, na przykład materiały budowlane w postaci pustaków.

W efekcie tych działań opartych na sfałszowanych dokumentach, z polskich dokumentów celnych wynikało, że czosnek był wywożony poza Unię Europejską, zaś z dokumentów celnych Strony ukraińskiej, że tym samym zespołem środków transportu wwożone są na Ukrainę materiały budowlane.

Podejrzani przedkładali dokumenty z odprawach tranzytowych, z których wynikało, że osoby fizyczne z Ukrainy z firma o nazwie „Donis Trading", także z Ukrainy zakupiły świeży czosnek w asortymencie i nazwie widniejącą na fakturach eksportowych. Fakt wywozu deklarowano w dokumentach celnych, przede wszystkim zaś w najważniejszym dokumencie deklaracji celnej T - 1, inaczej też nazywanej MRN.

Dalej podejrzani, usuwali plomby celne z pojazdów, którymi transportowano czosnek. Czosnek ten zastępowano innym towarem. Po ponownym zaplombowaniu, ten inny był wwożony na Ukrainę.

W efekcie funkcjonariusze Urzędu Celnego byli przekonani, że dokonano eksportu deklarowanego świeżego czosnku.

Przestępstwa, których popełnienie zarzucono Markowi Blacha zagrożone są następującymi karami:

– czyn z artykułu 258 paragraf 1 kodeksu karnego karą pozbawienia wolności od 3 miesięcy do 5 lat,

– czyn z artykuł 87 paragraf 2 kodeksu karnego skarbowego karą grzywny do 720 stawek dziennych albo karą pozbawienia wolności albo obu tym karom łącznie,

– czyn z artykułu 90 paragraf 1 kodeksu karnego skarbowego karą grzywny do 720 stawek dziennych albo karą pozbawienia wolności do lat 3 albo obu tym karom łącznie,

– czyn z artykułu 90 paragraf 2 kodeksu karnego skarbowego karą grzywny do 720 stawek dziennych albo karą pozbawienia wolności do lat 3 albo obu tym karom łącznie.;

Przedawnienie karalności przestępstw, których popełnienie zarzucono Markowi Blacha nastąpi:

– czynu opisanego w punkcie I wniosku: w dniu 28 kwietnia 2030 roku,

– czynu opisanego w punkcie II wniosku: w dniu 1 stycznia 2031 roku.

Śledztwo prowadzone przeciwko Markowi Blacha nie zostało dotychczas zakończone.

Z uwagi na fakt, iż podejrzany ukrywa się przed organami ścigania, nie wykonano czynności procesowych z jego udziałem.

W związku z tym, na wniosek Prokuratora Okręgowego w Siedlcach z dnia 8 czerwca 2015 roku, Sąd Rejonowy w Siedlcach postanowieniem z dnia 9 czerwca 2015 roku, sygnatura akt II Kp 195/15, zastosował wobec Marka Blachy środek zapobiegawczy w postaci tymczasowego aresztowania na okres 14 dni od daty zatrzymania.

W dniu 6 sierpnia 2015 roku Prokurator Okręgowy w Siedlcach zarządził poszukiwanie Marka Blachy listem gończym, a następnie wydał list gończy.

Tymczasowe aresztowanie podejrzanego i poszukiwanie go listem gończym zgodnie z treścią artykułów 258 i 279 kodeksu postępowania karnego, może nastąpić między innymi, jeżeli ukrywa się on lub nie ma stałego miejsca pobytu w Polsce.

Obie te okoliczności zaistniały w przypadku podejrzanego Marka Blachy.

W toku postępowania uzyskano informację z Centralnego Biura Śledczego Policji z siedzibą w Warszawie, iż Marek Blacha zamieszkuje przebywa w Chicago, Stany Zjednoczone Ameryki.

Okoliczność tę potwierdza kolejna informacja wskazująca, że w dniu 13 marca 2018 roku Marek Blacha został zatrzymany na terytorium Stanów Zjednoczonych Ameryki w celach imigracyjnych. W związku z zatrzymaniem odbyła się jego rozprawa w Sądzie Emigracyjnym. Na wstępnej rozprawie zastosowano wobec niego areszt tymczasowy, jednak następnie Sąd uznał, że może on odpowiadać z wolnej stopy do czasu podjęcia ostatecznej decyzji w przedmiocie ewentualnego wydalenia Marka Blachy z terytorium Stanów Zjednoczonych.

W związku z przedstawionymi wyżej okolicznościami wnoszę o tymczasowe aresztowanie i ekstradycję podejrzanego.

Oświadczam, iż treść wniosku o tymczasowe aresztowanie i ekstradycję, jest zgodna z materiałami stanowiącymi dowód w niniejszym śledztwie.

Zapewniam, iż Marek Blacha nie zostanie bez zgody władz Stanów Zjednoczonych Ameryki pociągnięty do odpowiedzialności karnej za przestępstwa, które nie zostały objęte niniejszym wnioskiem i nie zostanie on wydany władzom innego państwa.

Tg)Tg



PROKURATOR OKRĘGOWY
w Siedlcach

Radosław Romaniuk

Do wniosku dołączam następujące dokumenty:

1- odpis postanowienia Sądu Rejonowego w Siedlcach z dnia 9 czerwca 2015 roku, w sprawie II Kp 195/15, o tymczasowym aresztowaniu Marka Blachy na okres 14 dni od daty jego zatrzymania,

2- odpis postanowienia Prokuratora Okręgowego w Siedlcach z dnia 6 sierpnia 2015 roku o poszukiwaniu podejrzanego listem gończy,

3- odpis listu gończego z dnia 6 sierpnia 2015 roku,

4- kopia fotografii Marka Blachy,

5- wyciąg z mających zastosowanie w niniejszej sprawie przepisów kodeksu karnego, kodeksu karnego skarbowego, w tym przepisów o przedawnieniu karalności,

6- kopia karty daktyloskopijnej Marka Blachy.



O D P I S

Sygn. akt. II Kp 195/15

POSTANOWIENIE

Dnia 09 czerwca 2015 r.

Sąd Rejonowy w Siedlcach w II Wydziale Karnym

w składzie:

Przewodniczący: SSR Joanna Wardak

Protokolant: starszy sekretarz sądowy Alina Nestorowicz

po rozpoznaniu na posiedzeniu w dniu 09 czerwca 2015 r.

wniosku Prokuratora Okręgowego w Siedlcach

z dnia 08 czerwca 2015 r. sygn. akt VI Ds. 1/13/Sp

w przedmiocie zastosowania tymczasowego aresztowania w stosunku do Marka Blachy

**podejrzanego o to, że:**

I) W okresie od 4 lipca 2009 roku do 28 kwietnia 2010 roku w Dorohusku województwa lubelskiego, w Biłgoraju województwa lubelskiego, w Lubyczy Królewskiej województwa lubelskiego, w Latowiczu województwa mazowieckiego, w Tomaszowie Lubelskim województwa lubelskiego i innych miejscowościach na terytorium kraju wziął udział w zorganizowanej grupie przestępczej w skład której wchodzili Witold Szpindor, Roman Szpindor, Elżbieta Putkowska, Krzysztof Jakubik, Michał Nawrocki, Andrzej Blacha, Daniel Czop, Marek Jamrozy, Tarek Orfali i inne osoby, oraz nie mniej niż siedmiu obywateli Ukrainy, mającej na celu popełnianie przestępstw skarbowych oraz kryminalnych polegających na dokonywaniu oszustw celnych związanych z procedurą tranzytu świeżego czosnku, prania brudnych pieniędzy pochodzących z oszustw celnych z tym związanych, usuwania towaru spod dozoru celnego, korumpowania funkcjonariuszy celnych w związku z odprawami celnymi, poświadczenia nieprawdy w fakturach eksportowych dotyczących sprzedaży świeżego czosnku i posługiwania się takimi dokumentami, podrabiania faktur zakupowych pustaków i posługiwania się takimi dokumentami, poświadczania nieprawdy deklaracjach eksportowych T 1, czyniąc z tej działalności stałe źródło dochodu,

**tj. o czyn z art. 258§1 kk w zw. z art. 65§1 kk**

II) W okresie od 4 lipca 2009 roku do 28 kwietnia 2010 roku w Dorohusku województwa lubelskiego, w ramach funkcjonowania zorganizowanej grupy przestępczej będąc pracownikiem firmy "Bak-Trans Zakład Transportowy Jan i Marek Blacha" z Biłgoraja, działając wspólnie i w porozumieniu z Andrzejem Blacha współwłaścicielem firmy "Bak-Trans", Witoldem Szpindor, Romanem Szpindorem udziałowcami spółki "Husar", Elżbietą Putkowską kierownikiem sprzedaży spółki "HUSAR", kierowcą spółki "Husar" Michałem Nawrockim, właścicielem firmy "Lat-Pol" Krzysztofem Jakubik, współwłaścicielem firmy "Cytrus" Danielem Czop, kierowcą firmy "Cytrus" Tarek Orfali i kierowcą firmy "Bak-Trans" Markiem Jamrozy oraz innymi osobami, w tym nie z nie mniej niż siedmioma obywatelami

1

Ukrainy, działając w krótkich odstępach czasu, w wykonaniu tego samego i z góry powziętego zamiaru spowodowania uszczupleń podatkowo - celnych czyniąc z popełniania przestępstw skarbowych stałe źródło dochodu, wprowadzał w błąd Oddział Celny Drogowy Dorohusk, jako urząd przeznaczenia, co do rodzaju wywożonego na Ukrainę towaru poprzez przedkładanie do odpraw celnych w ramach procedury tranzytu zewnętrznego deklaracji eksportowych T 1 gdzie, jako eksporter figurowała firma "Bak-Trans", BH "Bartek Małgorzata Ptach - Taube za pośrednictwem Agencji Celnej D.T.A spółka z o.o. wraz z dokumentem:

1. co do deklaracji MRN 09PL30308010E9A430 z dnia 4 lipca 2009 roku, gdzie eksporterem był "Bak-Trans" - faktury sprzedaży nr 43)2009 - potwierdzającej sprzedaż świeżego czosnku w ilości 22.000 kg za kwotę 15.400,00 euro przez firmę "Bak-Trans" nabywcy Yuriy Kvochka z Lwowa z Ukrainy, podczas gdy transakcja nie miała miejsca, gdzie zamiast świeżego czosnku został w dniu 7 lipca 2009 roku wywieziony samochodem marki DAF o nr. AC 3906A1 i naczepą marki PP o nr. rej. AC 4502XX kierowanym przez Andrii Lagoda towar w postaci 22 sztuk bloków z betonu komórkowego o wartości 1.044,70 EURO, w efekcie czego wprowadzony w błąd Urząd zamknął procedurę tranzytu w zakresie świeżego czosnku, potwierdzając ten fakt w deklaracji T 1 o wyżej wymienionym numerze, przy czym przedmiotowego oszustwa dopuścił się działając wspólnie i w porozumieniu wraz z Andrzejem Blacha oraz nieustalonymi dotychczas obywatelami Ukrainy,

2. co do deklaracji MRN 09PL30308010EC66C0 z dnia 10 lipca 2009 roku gdzie eksporterem był "Bak-Trans" - faktury sprzedaży nr. 45)2009 - potwierdzającej sprzedaż świeżego czosnku w ilości 22.000 kg za kwotę 16.500,00 euro przez firmę "Bak-Trans" nabywcy Yuriy Kvochka z Lwowa z Ukrainy, podczas, gdy transakcja nie miała miejsca, gdzie zamiast świeżego czosnku został w dniu 15 lipca 2009 roku wywieziony samochodem marki Renault o nr. AC 4472AP i naczepą marki Krone o nr. rej. AC 8069XX kierowanym przez Viktora Treshchetka towar w postaci 816 sztuk bloczków z betonu Solbet o wartości 6.666,72 zł, w efekcie czego wprowadzony w błąd Urząd zamknął procedurę tranzytu w zakresie świeżego czosnku, potwierdzając ten fakt w deklaracji T 1 o wyżej wymienionym numerze, przy czym przedmiotowego oszustwa dopuścił się działając wspólnie i w porozumieniu wraz z Andrzejem Blacha oraz nieustalonymi dotychczas obywatelami Ukrainy,

3. co do deklaracji MRN 09PL30308010EC4F90 z dnia 10 lipca 2009 roku gdzie eksporterem był "Bak-Trans" - faktury sprzedaży nr. 44)2009 - potwierdzającej sprzedaż świeżego czosnku w ilości 22.000 kg za kwotę 16.500,00 euro przez firmę "Bak-Trans" nabywcy Yuriy Kvochka z Lwowa z Ukrainy, podczas, gdy transakcja nie miała miejsca, gdzie zamiast świeżego czosnku został w dniu 25 lipca 2009 roku wywieziony samochodem nieustalonej marki o nr. BKL9375AO i naczepą marki Schmitz nr. rej. AC 6 498XX kierowanym przez Mykoła Tkhoruk towar w postaci 720 sztuk bloczków z betonu Solbet-Optimal o wartości 5.414,00 zł, w efekcie czego wprowadzony w błąd Urząd zamknął procedurę tranzytu w zakresie świeżego czosnku, potwierdzając ten fakt w deklaracji T 1 o wyżej wymienionym numerze, przy czym przedmiotowego oszustwa dopuścił się działając wspólnie i w porozumieniu wraz z Andrzejem Blacha oraz nieustalonymi dotychczas obywatelami

Ukrainy,

4. co do deklaracji MRN 09PL30308010EF6855 z dnia 17 lipca 2009 roku gdzie eksporterem był "Bak-Trans" - faktury sprzedaży nr. 48)2009 - potwierdzającej sprzedaż świeżego czosnku w ilości 22.000 kg za kwotę 16.500,00 euro przez firmę "Bak-Trans" nabywcy Yuriy Kvochka z Lwowa z Ukrainy, podczas, gdy transakcja nie miała miejsca, gdzie zamiast świeżego czosnku został w dniu 29 lipca 2009 roku wywieziony samochodem marki DAF o nr. AC8591AM i naczepą marki Schmitz nr. rej. AC 855XX kierowanym przez Romana Lutsyk towar w postaci 864 sztuk bloczków z betonu Solbet-Optimal o wartości 4.259,52 zł, w efekcie czego wprowadzony w błąd Urząd zamknął procedurę tranzytu w zakresie świeżego czosnku, potwierdzając ten fakt w deklaracji T 1 o wyżej wymienionym numerze, przy czym przedmiotowego oszustwa dopuścił się działając wspólnie i w porozumieniu wraz z Andrzejem Blacha oraz nieustalonymi dotychczas obywatelami Ukrainy,

5. co do deklaracji MRN 09PL30308010F575B3 z dnia 31 lipca 2009 roku gdzie eksporterem był "Bak-Trans" - faktury sprzedaży nr. 53)2009 - potwierdzającej sprzedaż świeżego czosnku w ilości 22.000 kg za kwotę 16.500,00 euro przez firmę "Bak-Trans" nabywcy Yuriy Kvochka z Lwowa z Ukrainy, podczas, gdy transakcja nie miała miejsca, gdzie zamiast świeżego czosnku został w dniu 4 sierpnia 2009 roku wywieziony samochodem marki Renault o nr. AC 7874AH i naczepą marki Paction nr. rej. AC 3793XX kierowanym przez Oleh Rakovets towar w postaci 1.728 płytek Solbet-Optimal o wartości 4.250,88 zł, w efekcie czego wprowadzony w błąd Urząd zamknął procedurę tranzytu w zakresie świeżego czosnku, potwierdzając ten fakt w deklaracji T 1 o wyżej wymienionym numerze, przy czym przedmiotowego oszustwa dopuścił się działając wspólnie i w porozumieniu wraz z Andrzejem Blacha, Danielem Czop, Tarek Orfali oraz nieustalonymi dotychczas obywatelami Ukrainy,

6. co do deklaracji MRN 09PL30308010ABDC z dnia 18 września 2009 roku gdzie eksporterem był "Bak-Trans" - faktury sprzedaży nr. 67)09 - potwierdzającej sprzedaż świeżego czosnku w ilości 22.000 kg za kwotę 26.180,00 euro przez firmę "Bak-Trans" nabywcy Yuriy Kvochka z Lwowa z Ukrainy, podczas, gdy transakcja nie miała miejsca, gdzie zamiast świeżego czosnku został w dniu 23 września 2009 roku wywieziony samochodem marki DAF o nr. AC0382AE naczepą marki Krone nr. rej. EA265920 kierowanym przez Bogdana Marchuk towar w postaci 912 płytek Solbet-Optimal o wartości 3.685,38 zł, w efekcie czego wprowadzony w błąd Urząd zamknął procedurę tranzytu w zakresie świeżego czosnku, potwierdzając ten fakt w deklaracji T 1 o wyżej wymienionym numerze, przy czym przedmiotowego oszustwa dopuścił się działając wspólnie i w porozumieniu wraz z Andrzejem Blacha, Danielem Czop i Terekiem Orfali oraz nieustalonymi dotychczas obywatelami Ukrainy,

7. co do deklaracji MRN 09PL3030801148C087 z dnia 29 stycznia 2010 roku gdzie eksporterem był "Bak-Trans" - faktury sprzedaży nr. 7)2010 - potwierdzającej sprzedaż świeżego czosnku w ilości 22.000 kg za kwotę 27.500.00 euro przez firmę "Bak-Trans" nabywcy Yuriy Kvochka z Lwowa z Ukrainy, podczas, gdy transakcja nie miała miejsca, gdzie zamiast świeżego czosnku został w dniu 31 stycznia 2010 roku wywieziony samochodem marki DAF o nr. AC6532AX naczepą marki SOR o nr. rej. AC0187XT przcz

Olga Smal towar w postaci 864 sztuk płytek Solbet-Optimal o wartości 4.259,52 zł, w efekcie czego wprowadzony w błąd Urząd zamknął procedurę tranzytu w zakresie świeżego czosnku, potwierdzając ten fakt w deklaracji T 1 o wyżej wymienionym numerze, przy czym przedmiotowego oszustwa dopuścił się działając wspólnie i w porozumieniu wraz z Andrzejem Blacha, Witoldem Szpindor, Romanem Szpindor oraz nieustalonymi dotychczas obywatelami Ukrainy,

8. co do deklaracji MRN 09PL3030801154D2F0 z dnia 20 lutego 2010 roku gdzie eksporterem był "Bak-Trans" - faktury sprzedaży nr. 15)2010 - potwierdzającej sprzedaż świeżego czosnku w ilości 22.000 kg za kwotę 27.940,00 euro przez firmę "Bak-Trans" nabywcy Yuriy Kvochka z Lwowa z Ukrainy, podczas, gdy transakcja nie miała miejsca, gdzie zamiast świeżego czosnku został w dniu 4 marca 2010 roku wywieziony samochodem nieustalonej marki DAF o nr. AC6532AX naczepą marki SOR o nr. rej. AC0187XT przez nieustalonego kierowcę obywatela Ukrainy towar w postaci dotychczas nieustalonej ilości płytek Solbet-Optimal, w efekcie czego wprowadzony w błąd Urząd zamknął procedurę tranzytu w zakresie świeżego czosnku, potwierdzając ten fakt w deklaracji T 1 o wyżej wymienionym numerze, przy czym przedmiotowego oszustwa dopuścił się działając wspólnie i w porozumieniu wraz z Andrzejem Blacha oraz nieustalonymi dotychczas obywatelami Ukrainy,

9. co do deklaracji MRN 10PL3030801173B7D0 z dnia 21 kwietnia 2010 roku gdzie eksporterem był "Bak-Trans" - faktury sprzedaży nr. 35)2010, nr. 36)2010 wraz z drogowym listem przewozowym CMR - bez numeru, potwierdzających sprzedaż świeżego czosnku w ilości łącznej 22.000 kg o wartości łącznej 28.600,00 euro przez firmę "Bak-Trans" nabywcom Yuriy Kvochka z Lwowa z Ukrainy i Yuriy Pidlisnyak z Lwowa z Ukrainy wykonanie usługi transportowej na rzecz nabywcy samochodem marki DAF o nr. LBL40CT i naczepą marki Kogel o nr. rej. AT9455235 kierowanym przez Marka Jamroży, podczas, gdy transakcja nie miała miejsca, jak również nie wykonano usługi transportowej w zakresie świeżego czosnku, w efekcie zamiast świeżego czosnku został w dniu 23 kwietnia 2010 roku wywieziony wymienionym środkami transportu towar w postaci 864 bloczków Solbet-Optimal o wartości 4.259,52 zł, co spowodowało, że wprowadzony w błąd Urząd zamknął procedurę tranzytu w zakresie świeżego czosnku, potwierdzając ten fakt w deklaracji T 1 o wyżej wymienionym numerze, przy czym przedmiotowego oszustwa dopuścił się działając wspólnie i w porozumieniu wraz z Witoldem Szpindor, Romanem Szpindor, Andrzejem Blacha, Markiem Jamroży oraz nieustalonymi dotychczas obywatelami Ukrainy,

10. co do deklaracji MRN 10PL303080117785F9 z dnia 28 kwietnia 2010 roku gdzie eksporterem był "BH-Bartek" - faktury sprzedaży nr. 45)2010, nr. 36)2010 wraz z drogowym listem przewozowym CMR - bez numeru, potwierdzających sprzedaż świeżego czosnku w ilości łącznej 22.300 kg o wartości 54.614,00 zł przez firmę "BH Bartek-Małgorzata Ptach-Taube" nabywcy Stachiw Anatolij z Tarnopola z Ukrainy wykonanie usługi transportowej na rzecz nabywcy samochodem marki DAF o nr. LBL40CT i naczepą marki Kogel o nr. rej. AT9455235 kierowanym przez Marka Jamroży, podczas, gdy transakcja nie miała miejsca, jak również nie wykonano usługi transportowej w zakresie świeżego czosnku, w efekcie zamiast świeżego czosnku został w dniu 29 kwietnia 2010 roku wywieziony wymienionymi

Za zgodność świadczy
Prokuratury Okręgowej w Siedlcach
EXT-BLACHA-00039

środkami transportu towar w postaci 720 sztuk pustaków D600 o wartości 2.268,00 USD, co spowodowało, że wprowadzony w błąd Urząd zamknął procedurę tranzytu w zakresie świeżego czosnku, potwierdzając ten fakt w deklaracji T 1 o wyżej wymienionym numerze, a towar w postaci świeżego czosnku został sprzedany na terenie Polski przez firmę "Bak-Trans", "BH Bartek Małgorzata Ptach-Taube" i "Bak-Trans", przy czym przedmiotowego oszustwa dopuścił się działając wspólnie i w porozumieniu wraz z Witoldem Szpindor, Romanem Szpindor, Andrzejem Blacha, Markiem Jamroży oraz nieustalonymi dotychczas obywatelami Ukrainy, powodując jednoczenie w każdym przypadku usuwanie towaru spod dozoru celnego powodując w w/w przypadkach usuwanie towaru spod dozoru celnego, w efekcie poprzez powyższe działania pozostał w Polsce i został sprzedany towar postaci 220.000 kg czosnku powodując w ten sposób uszczuplenie należności celnych na kwotę nie mniejszą niż 1.223,180,00zł, co stanowi kwotę uszczuplenia dużej wartości,

**tj. o czyn z art. 87§2 kks w zw. z art. 90 §1i2kks w zw. z art. 6§2kks i w zw. z art. 7§1kks w zw. z art. 37§1 ust. 1,2,5 kks**

**na podstawie art. 249§1 kpk, 250§2 kpk oraz 258§1 pkt 2 kpk**

postanawia

zastosować wobec Marka Blachy s. Jana i Janiny zd. Obszyńska urodzonego 21 kwietnia 1969 r. w Biłgoraju środek zapobiegawczy w postaci tymczasowego aresztowania na okres 14 dni od daty zatrzymania

Uzasadnienie

W dniu 8 czerwca 2015 do tut. Sądu wpłynął wniosek Prokuratora Prokuratury Okręgowej w Siedlcach o zastosowanie wobec Marka Blachy podejrzanego o popełnienie czynu z art. 258§1kk w zw. z art. 65§1kk, z art. 87§2 kks w zw. z art. 90 §1i2kks w zw. z art. 6§2kks i w zw. z art. 7§1kks w zw. z art. 37§1 ust. 1,2,5 kks środka zapobiegawczego w postaci tymczasowego aresztowania na okres 14 dni od daty zatrzymania.

Zgromadzony dotychczas w sprawie materiał dowodowy w wysokim stopniu uprawdopodabnia, iż podejrzany popełnił zarzucany mu czyn. Świadczą o tym wyjaśnienia 4 współpodejrzanych (pierwszy podejrzany – k. 9341 – 9354 tom XLVI, k. 9452-9460 tom XLVII, drugi podejrzany – k. 10203 – 10205 tom LI, trzeci podejrzany k. 9341-9354 tom XLVI, czwarty podejrzany k. 12471-12483 tom LXII), częściowo wyjaśnienia podejrzanego Andrzeja Blachy (k. 12515-12516 tom LXII), dokumenty zabezpieczone w firmie „Bak-Trans", dokumenty z odpraw celnych pozyskane z polskich urzędów celnych, ze strony ukraińskiej (k. 7042-7081 tom XXXV k. 7117-7146 tom XXXVI k. 7199-7266 tom XXXVII, k. 7374-7427 tom XXXVII, k. 9030-9277 tom XLV-

EXT-BLACHA-00040

XLVI), wycena uszczupleń (k. 8367-8377 tom XLII) oraz pośrednio co do mechanizmu oszustw wyjaśnienia innych podejrzanych (k. 4878-4886 tom XXV, k. 3804-3807 tom XXIX, k. 8153-8163 tom XLI, k. 1578-1583, 1586-1588 tom VIII), zeznania świadka (k. 8294-8310 tom XLI).

Dwukrotne próby zatrzymania podejrzanego w toku postępowania przygotowawczego nie dały efektów, gdyż nie przebywał on w miejscu zamieszkania. Nadto ustalono, że podejrzany od początku prowadzenia śledztwa przebywał poza granicami kraju. W 2013r. miał przebywać na terytorium Ukrainy, a obecnie przebywa na terenie Stanów Zjednoczonych Ameryki Północnej, przy czym brak jest bliższych danych, w którym stanie lub miejscowości. Brak jest także informacji odnośnie jego powrotu do kraju.

W ocenie Sądu powyższe okoliczności świadczą o tym, że jedynym adekwatnym środkiem zapobiegawczym będzie zastosowanie wobec podejrzanego tymczasowego aresztowania na okres 14 dni od daty zatrzymania. Tylko izolacyjny środek zapobiegawczy zabezpieczy prawidłowy tok postępowania przygotowawczego i zapobiegnie obawie matactwa ze strony podejrzanego. W zgromadzonym materiale dowodowym Sąd nie dopatrzył się negatywnych przesłanek zastosowania tymczasowego aresztowania wynikających z art. 259 kpk.

**Postanowienie jest natychmiast wykonalne.**

**Pouczenie**

Na powyższe postanowienie służy podejrzanemu zażalenie do Sądu Okręgowego w Siedlcach w terminie zawitym 7 dni od daty doręczenia postanowienia.

Wniesienie zażalenia po tym terminie jest bezskuteczne (art. 107 i 410 kpk). Zażalenie składa się za pośrednictwem Sądu, który wydał postanowienie.

Podejrzany może składać w każdym czasie wniosek o uchylenie lub zmianę środka zapobiegawczego do Prokuratora Prokuratury Okręgowej w Siedlcach do dyspozycji, której pozostaje (art. 254 kpk).

**Zarządzenie:**
1. odpis postanowienia wraz z nakazem doprowadzenia i nakazem przyjęcia podejrzanego do Zakładu Karnego właściwego dla miejsca zamieszkania podejrzanego, doręczyć KPP Biłgoraj, zaznaczając w nakazie przyjęcia, że podejrzany pozostaje do dyspozycji Prokuratury Okręgowej w Siedlcach w sprawie VI Ds 1/13/SP(c).
2. Odpis postanowienia doręczyć podejrzanemu.

Na oryginale właściwe podpisy.
Zgodność z oryginałem stwierdzam.

SEKRETA...

**Starszy sekretarz sądowy**
Sądu Rejonowego w Siedlcach

*Alina Nestorowicz*

Za zgodność świadczy
Referent
Prokuratury Okręgowej w Siedlcach

Ewa Sobstel

..............................................
Data i podpis Sędziego

EXT-BLACHA-00041

O D P I S

Sygn. akt V Ds 62/15/Sp

poprzednia sygn. VI Ds 1/13/Sp

# P O S T A N O W I E N I E
## o poszukiwaniu podejrzanego listem gończym

Dnia 6 sierpnia 2015 roku

Tomasz Giza – Prokurator Prokuratury Okręgowej w Siedlcach
w sprawie przeciwko m. in. Markowi Blacha i innym
podejrzanemu o przestępstwo z art. 258 § 1 KK i inne
**na podstawie art. 279 § 1 kpk**

### p o s t a n o w i ł:

zarządzić poszukiwanie listem gończym ukrywającego się podejrzanego **MARKA BLACHY**
s. Jana (PESEL 69042107355, zam. ul. Wiejska 13 A 23-400 Biłgoraj), co do którego Sąd
Rejonowy w Siedlcach wydał w dniu 9 czerwca 2015 roku postanowienie o tymczasowym
aresztowaniu na okres 14 dni od daty zatrzymania (sygn. akt II Kp 195/15)

### U z a s a d n i e n i e

Dnia 18 czerwca 2015 roku Prokurator Prokuratury Okręgowej w Siedlcach wydał
postanowienie o wyłączeniu z akt śledztwa prowadzonego przez tut. jednostkę Prokuratury
za sygn. akt VI Ds 1/13/Sp materiałów przeciwko Markowi Blacha i Tarkowi Orfali
podejrzanym o czyny z art. 258 § 1 kk w zw. z art. 65 § 1 kk i inne. Niniejszą sprawę
zarejestrowano w repertorium V Ds Prokuratury Okręgowej w Siedlcach Wydział V Śledczego
za sygn. akt V Ds 62/15 celem dalszego prowadzenia.

W toku postępowania VI Ds 1/13/Sp wydano postanowienie o przedstawieniu
zarzutów Markowi Blacha. Niniejsze zarzuty nie zostały ogłoszone z uwagi na fakt, iż
podejrzany nie przebywa w miejscu swojego zameldowania i ukrywa się przed organami
ścigania. Podjęta próba zatrzymania podejrzanego nie powiodła się.

Z tych względów w dniu 9 czerwca 2015 roku Sąd Rejonowy w Siedlcach wydał
postanowienie (sygn. II Kp 195/15) o tymczasowym aresztowaniu Marka Blachy na okres 14
dni od daty zatrzymania.

W celu wykonania czynności procesowych z udziałem podejrzanego i realizacji zadań
postępowania przygotowawczego należało postanowić jak na wstępie.

Prokurator
Prokuratury Okręgowej w Siedlcach
Tomasz Giza

**Z a r z ą d z e n i e:**
1. Sporządzić list gończy i przesłać do właściwej jednostki policji w celu
   rozpowszechnienia poprzez rozesłanie

Prokurator
Prokuratury Okręgowej w Siedlcach
Tomasz Giza

TG/dk

EXT-BLACHA-00043

ODPIS

Siedlce, dnia 6 sierpnia 2015 roku

Sygn. akt V Ds 62/15/Sp
poprzednia sygn. VI Ds 1/13/Sp

## KOMENDA POWIATOWA POLICJI
## W BIŁGORAJU

## LIST GOŃCZY

Tomasz Giza Prokurator Prokuratury Okręgowej w Siedlcach

stosownie do postanowienia o poszukiwaniu listem gończym podejrzanego Marka Blachy z dnia

5 sierpnia 2015 roku

wydanego na podstawie art. 279 § 1 kpk w sprawie V Ds 62/15/Sp

**I.** Zarządza poszukiwanie listem **gończym** niżej wymienionego(ej) podejrzanego(ej):

1. Nazwisko i imiona MARKA BLACHY

2. Pseudonim ----------------

3. Imię ojca JAN

   Imię i nazwisko panieńskie matki JANINA z domu OBSZYŃSKA

4. Data i miejsce urodzenia **21.04.1969  BIŁGORAJ**

Nr ewidencyjny PESEL

| 6 | 9 | 0 | 4 | 2 | 1 | 0 | 7 | 3 | 5 | 5 |

5. Ostatnie miejsce zameldowania **UL. WIEJSKA 13A, BIŁGORAJ**

6. Ostatnie miejsce zamieszkania **UL. WIEJSKA 13A, BIŁGORAJ**

7. Ostatnie miejsce pracy  **BRAK DANYCH**

8. Zawód **BRAK DANYCH**

9. Obywatelstwo **POLSKIE**

10. Płeć **MĘŻCZYZNA**

11. Rysopis:    wzrost - ..................................    włosy - ....................................

   czoło - ....................................    twarz - ....................................

   kolor oczu - ...............................    uszy - ....................................

   nos - ....................................    usta - ....................................

EXT-BLACHA-00044

znaki szczególne - .............................................................................................................

inne cechy rysopisowe - .....................................................................................................

Rysopis ze zbiorów prowadzonych na podstawie ustawy przez organy władzy publicznej. *)

12. Informacja o treści postawionego zarzutu

ANDRZEJ BLACHA podejrzany jest o to że:

I) W okresie od 4 lipca 2009 roku do 28 kwietnia 2010 roku w Dorohusku województwa lubelskiego, w Biłgoraju województwa lubelskiego, w Lubyczy Królewskiej województwa lubelskiego, w Łatowiczu województwa mazowieckiego, w Tomaszowie Lubelskim województwa lubelskiego i innych miejscowościach na terytorium kraju **wziął udział w zorganizowanej grupie przestępczej w skład której wchodzili Witold Szpindor, Roman Szpindor, Elżbieta Putkowska, Krzysztof Jakubik, Michał Nawrocki, Andrzej Blacha, Daniel Czop, Marek Jamrozy, Tarek Orfali** i inne osoby, oraz nie mniej niż siedmiu obywateli Ukrainy, mającej na celu popełnianie przestępstw skarbowych oraz kryminalnych polegających na dokonywaniu oszustw celnych związanych z procedurą tranzytu świeżego czosnku, prania brudnych pieniędzy pochodzących z oszustw celnych z tym związanych, usuwania towaru spod dozoru celnego, korumpowania funkcjonariuszy celnych w związku z odprawami celnymi, poświadczania nieprawdy w fakturach eksportowych dotyczących sprzedaży świeżego czosnku i posługiwania się takimi dokumentami, podrabiania faktur zakupowych pustaków i posługiwania się takimi dokumentami, poświadczania nieprawdy w deklaracjach eksportowych T 1, czyniąc z tej działalności stałe źródło dochodu, **tj. o czyn z art. 258 § 1 KK w zw. z art. 65 § 1 KK**

II) W okresie od 4 lipca 2009 roku do 28 kwietnia 2010 roku w Dorohusku województwa lubelskiego, w **ramach funkcjonowania zorganizowanej grupy przestępczej będąc pracownikiem firmy „Bak-Trans Zakład Transportowy Jan i Marek Blacha" z Biłgoraja,** działając wspólnie i w porozumieniu z **Andrzejem Blacha współwłaścicielem firmy „Bak-Trans", Witoldem Szpindor, Romanem Szpindor udziałowcami spółki „Husar", Elżbietą Putkowską kierownikiem sprzedaży spółki „HUSAR", kierowcą spółki „Husar" Michałem Nawrockim, właścicielem firmy „Lat-Pol" Krzysztofem Jakubik, współwłaścicielem firmy „Cytrus" Danielem Czop, kierowcą firmy „Cytrus" Tarek Orfali i kierowcą firmy „Bak-Trans" Markiem Jamroży oraz innymi osobami, w tym z nie mniej niż siedmioma obywatelami Ukrainy,** działając w krótkich odstępach czasu, w wykonaniu tego samego i z góry powziętego zamiaru spowodowania uszczupleń podatkowo-celnych czyniąc z popełniania przestępstw skarbowych stałe źródło dochodu, wprowadzał w błąd Oddział Celny Drogowy Dorohusk, jako urząd **przeznaczenia,** co do rodzaju wywożonego na Ukrainę towaru poprzez **przedkładanie do odpraw celnych w ramach procedury tranzytu zewnętrznego deklaracji eksportowych T 1 gdzie, jako eksporter figurowała firma „Bak-Trans", BH „Bartek Małgorzata Ptach-Taube"** za pośrednictwem Agencji Celnej D.T.A spółka z.o.o wraz **z dokumentem:**

1. co do deklaracji MRN 09PL30308010E9A430 z dnia 4 lipca 2009 roku gdzie eksporterem był „Bak-Trans" - faktury sprzedaży nr 43) 2009 – potwierdzającej sprzedaż świeżego czosnku w ilość 22.000 kg za kwotę 15.400,00 euro przez firmę „Bak-Trans" nabywcy Yuriy Kvochka z Lwowa z Ukrainy, podczas gdy transakcja nie miała miejsca, gdzie zamiast świeżego czosnku został w dniu 7 lipca 2009 roku wywieziony samochodem marki DAF o nr. AC 3906A1 i naczepą marki PP o nr. rej. AC 4502XX kierowanym przez Andrii Lagoda towar w postaci 22 sztuk bloków z betonu komórkowego o wartości 1.044,70 EURO, w efekcie czego wprowadzono w błąd Urząd zamknął procedurę tranzytu w zakresie świeżego czosnku, potwierdzając ten fakt w deklaracji T1 o wyżej wymienionym numerze, przy czym przedmiotowego oszustwa dopuścił się działając wspólnie i w porozumieniu wraz z Andrzejem Blacha oraz nieustalonymi dotychczas obywatelami Ukrainy,

2. co do deklaracji MRN 09PL30308010EC66C0 z dnia 10 lipca 2009 roku gdzie eksporterem był „Bak-Trans" - faktury sprzedaży nr 45)2009 – potwierdzającej sprzedaż świeżego czosnku w ilości 22.000 kg za kwotę 16.500,00 euro przez firmę „Bak-Trans" nabywcy Yuriy Kvochka z Lwowa z Ukrainy, podczas gdy transakcja nie miała miejsca, gdzie zamiast świeżego czosnku został w dniu 15 lipca 2009 roku wywieziony samochodem marki Renault o nr. AC 4472AP i naczepą marki Krone o nr. rej. AC 8069XX kierowanym przez Viktora Treshchetka towar w postaci 816 sztuk bloczków z betonu Solbet o wartości 6.666,72 zł, w efekcie czego wprowadzony w błąd Urząd zamknął procedurę tranzytu w zakresie świeżego czosnku, potwierdzając ten fakt w deklaracji T1 o wyżej wymienionym numerze, **przy czym przedmiotowego oszustwa dopuścił się działając wspólnie i w porozumieniu wraz z Andrzejem Blacha oraz nieustalonymi dotychczas obywatelami Ukrainy,**

3. co do deklaracji MRN 09PL30308010EC4F90 z dnia 10 lipca 2009 roku gdzie eksporterem był „Bak-Trans" - faktury sprzedaży nr 44)2009 – potwierdzającej sprzedaż świeżego czosnku w ilości 22.000 kg za kwotę 16.500,00 euro przez firmę „Bak-Trans" nabywcy Yuriy Kvochka z Lwowa z Ukrainy, podczas gdy transakcja nie miała miejsca, gdzie zamiast świeżego czosnku został w dniu 25 lipca 2009 roku wywieziony samochodem nieustalonej marki o nr. BKL9375AO i naczepą marki Schmitz nr. rej. AC 6 498XX kierowanym przez Mykola Tkhoruk towar w postaci 720 sztuk bloczków z betonu Solbet - Optimal o wartości 5.414,00 zł, w efekcie czego wprowadzony w błąd Urząd zamknął procedurę tranzytu w zakresie świeżego czosnku, potwierdzając ten fakt w deklaracji T1 o wyżej wymienionym numerze, **przy czym przedmiotowego oszustwa dopuścił się działając wspólnie i w porozumieniu wraz z Andrzejem Blacha oraz nieustalonymi dotychczas obywatelami Ukrainy,**

4. co do deklaracji MRN 09PL30308010EF6855 z dnia 17 lipca 2009 roku gdzie eksporterem był „Bak-Trans" - faktury sprzedaży nr 48)2009 – potwierdzającej sprzedaż świeżego czosnku w ilości 22.000 kg za kwotę 16.500,00 euro przez firmę „Bak-Trans" nabywcy Yuriy Kvochka z Lwowa z Ukrainy, podczas gdy transakcja nie miała miejsca, gdzie zamiast świeżego czosnku został w dniu 29 lipca 2009 roku wywieziony samochodem marki DAF o nr. AC8591AM i naczepą marki Schmitz nr. rej. AC 855XX kierowanym przez Romana Lutsyk towar w postaci 864 sztuk bloczków z betonu Solbet-Optimal o wartości 4.259,52 zł, w efekcie czego wprowadzony w błąd Urząd zamknął procedurę tranzytu w zakresie świeżego czosnku, potwierdzając ten fakt w deklaracji T1 o wyżej wymienionym numerze, **przy czym przedmiotowego oszustwa dopuścił się działając wspólnie i w porozumieniu wraz z Andrzejem Blacha oraz nieustalonymi dotychczas obywatelami Ukrainy,**

5. co do deklaracji MRN 09PL30308010F575B3 z dnia 31 lipca 2009 roku gdzie eksporterem był „Bak-Trans" - faktury sprzedaży nr 53)2009 – potwierdzającej sprzedaż świeżego czosnku w ilości 22.000 kg za kwotę 16.500,00 euro przez firmę „Bak-Trans" nabywcy Yuriy Kvochka z Lwowa z Ukrainy, podczas gdy transakcja nie miała miejsca, gdzie zamiast świeżego czosnku został w dniu 4 sierpnia 2009 roku wywieziony samochodem marki Renault o nr. AC 7874AH i naczepą marki Paction o nr. rej. AC 3793XX kierowanym przez Oleh Rakovets towar w postaci 1.728 płytek Solbet – Optimal o wartości 4.250,88 zł, w efekcie czego wprowadzony w błąd Urząd zamknął procedurę tranzytu w zakresie świeżego czosnku, potwierdzając ten fakt w deklaracji T1 o wyżej wymienionym numerze, **przy czym przedmiotowego oszustwa dopuścił się działając wspólnie i w porozumieniu wraz z Andrzejem Blacha, Danielem Czop, Tarek Orfali oraz nieustalonymi dotychczas obywatelami Ukrainy,**

6. co do deklaracji MRN 09PL30308010ABDC z dnia 18 września 2009 roku gdzie eksporterem był „Bak-Trans" - faktury sprzedaży nr 67)09 – potwierdzającej sprzedaż świeżego czosnku w ilości 22.000 kg za kwotę 26.180,00 euro przez firmę „Bak-Trans" nabywcy Yuriy Kvochka z Lwowa z Ukrainy, podczas gdy transakcja nie miała miejsca, gdzie zamiast świeżego czosnku został w dniu 23 września 2009 roku wywieziony samochodem marki DAF o nr. AC0382AE naczepą marki Krone o nr. rej. EA265920 przez Bogdana Marchuk towar w postaci 912 płytek Solbet – Optimal o wartości 3.685,38 zł, w efekcie czego wprowadzony w błąd Urząd zamknął procedurę tranzytu w zakresie

3

świeżego czosnku, potwierdzając ten fakt w deklaracji T1 o wyżej wymienionym numerze, **przy czym przedmiotowego oszustwa dopuścił się działając wspólnie i w porozumieniu wraz z Andrzejem Blacha, Danielem Czop i Tarkiem Orfali oraz nieustalonymi dotychczas obywatelami Ukrainy,**

7. co do deklaracji MRN 09PL3030801148C087 z dnia 29 stycznia 2010 roku gdzie eksporterem był „Bak-Trans" - faktury sprzedaży nr 7)2010 – potwierdzający sprzedaż świeżego czosnku w ilości 22.000 kg za kwotę 27.500,00 euro przez firmę „Bak-Trans" nabywcy Yuriy Kvochka z Lwowa z Ukrainy, podczas gdy transakcja nie miała miejsca, gdzie zamiast świeżego czosnku został w dniu 31 stycznia 2010 roku wywieziony samochodem marki DAF o nr. AC6532AX naczepą marki SOR o nr. rej. AC0187XT przez Olga Smal towar w postaci 864 sztuk płytek Solbet – Optimal o wartości 4.259,52 zł , w efekcie czego wprowadzony w błąd Urząd zamknął procedurę tranzytu w zakresie świeżego czosnku, potwierdzając ten fakt w deklaracji T1 o wyżej wymienionym numerze, **przy czym przedmiotowego oszustwa dopuścił się działając wspólnie i w porozumieniu wraz z Andrzejem Blacha, Witoldem Szpindor, Romanem Szpindor, oraz nieustalonymi dotychczas obywatelami Ukrainy,**

8. co do deklaracji MRN 09PL3030801154D2F0 z dnia 20 lutego 2010 roku gdzie eksporterem był „Bak-Trans" - faktury sprzedaży nr 15)2010 –potwierdzający sprzedaż świeżego czosnku w ilości 22.000 kg za kwotę 27.940,00 euro przez firmę „Bak-Trans" nabywcy Yuriy Kvochka z Lwowa z Ukrainy, podczas gdy transakcja nie miała miejsca, gdzie zamiast świeżego czosnku został w 4 marca 2010 roku wywieziony samochodem nieustalonej marki DAF nr. AC6532AX naczepą marki SOR o nr. rej. AC0187XT przez nieustalonego kierowcę obywatela Ukrainy towar w postaci dotychczas nieustalonej ilości płytek Solbet – Optimal , w efekcie czego wprowadzony w błąd Urząd zamknął procedurę tranzytu w zakresie świeżego czosnku, potwierdzając ten fakt w deklaracji T1 o wyżej wymienionym numerze, **przy czym przedmiotowego oszustwa dopuścił się działając wspólnie i w porozumieniu wraz z Andrzejem Blacha oraz nieustalonymi dotychczas obywatelami Ukrainy,**

9. co do deklaracji MRN 10PL3030801173B7D0 z dnia 21 kwietnia 2010 roku gdzie eksporterem był „Bak-Trans" - faktur sprzedaży nr 35)2010 , nr 36)2010 wraz z drogowym listem przewozowym CMR- bez numeru, potwierdzających sprzedaż świeżego czosnku w ilości łącznej 22.000 kg o wartości łącznej 28.600,00 euro przez firmę „Bak-Trans" nabywcom Yuriy Kvochka z Lwowa z Ukrainy i Yuriy Pidlisnyak z Lwowa z Ukrainy wykonanie usługi transportowej na rzecz nabywcy samochodem marki DAF nr. LBL40CT i naczepą marki Kogel o nr. rej. AT9455235 kierowanym przez Marka Jamroży, podczas gdy transakcja nie miała miejsca, jak również nie wykonano usługi transportowej w zakresie świeżego czosnku, w efekcie zamiast świeżego czosnku został w dniu 23 kwietnia 2010 roku wywieziony wymienionymi środkami transportu towar w postaci 864 bloczków Solbet – Optimal o wartości 4.259,52 zł, co spowodowało, że wprowadzony w błąd Urząd zamknął procedurę tranzytu w zakresie świeżego czosnku, potwierdzając ten fakt w deklaracji T 1 o wyżej wymienionym numerze, **przy czym przedmiotowego oszustwa dopuścił się działając wspólnie i w porozumieniu wraz z Witoldem Szpindor, Romanem Szpindor, Andrzejem Blacha, Markiem Jamroży oraz nieustalonymi dotychczas obywatelami Ukrainy,**

10. co do deklaracji MRN 10PL303080117785F9 z dnia 28 kwietnia 2010 roku gdzie eksporterem był „BH Bartek" - faktur sprzedaży nr 45)2010, nr 36)2010 wraz z drogowym listem przewozowym CMR-bez numeru, potwierdzających sprzedaż świeżego czosnku w ilości łącznej 22.300 kg o wartości 54.614,00 zł przez firmę „BH Bartek–Małgorzata Ptach-Taube" nabywcy Stachiw Anatolij z Tarnopola z Ukrainy wykonanie usługi transportowej na rzecz nabywcy samochodem marki DAF nr. LBL40CT i naczepą marki Kogel o nr. rej. AT9455235 kierowanym przez Marka Jamroży, podczas gdy transakcja nie miała miejsca, jak również nie wykonano usługi transportowej w zakresie świeżego czosnku, w efekcie zamiast świeżego czosnku został w dniu 29 kwietnia 2010 roku wywieziony wymienionymi środkami transportu towar w postaci 720 sztuk pustaków D600 o wartości 2.268,00 USD, co spowodowało, że wprowadzony w błąd Urząd zamknął procedurę tranzytu w zakresie świeżego czosnku, potwierdzając ten fakt w deklaracji T 1 o

EXT-BLACHA-00047

wyżej wymienionym numerze, a towar w postaci świeżego czosnku został sprzedany na terenie Polski przez firmę „Bak-Trans", „BH Bartek Małgorzata Ptach-Taube" i „Bak-Trans", przy czym przedmiotowego oszustwa dopuścił się działając wspólnie i w porozumieniu wraz z Witoldem Szpindor, Romanem Szpindor, Andrzejem Blacha, Markiem Januroży oraz nieustalonymi dotychczas obywatelami Ukrainy, powodując jednoczenie w każdym przypadku usuwanie towaru spod dozoru celnego powodując w w)w przypadkach usuwanie towaru spod dozoru celnego, w efekcie poprzez powyższe działania pozostał w Polsce i został sprzedany towar postaci **220.000 kg** czosnku powodując w ten sposób uszczuplenie należności celnych na kwotę nie mniejszą niż **1.223,180,00 zł**, co stanowi kwotę uszczuplenia dużej wartości,

**tj. o czyn z art. 87 § 2 KKS w zw. z art. 90 § 1 i 2 KKS w zw. z art. 6 § 2 KKS i w zw. z art. 7 § 1 KKS w zw. z art. 37 § 1 ust. 1, 2, 5 KKS**

13. Data i sygnatura postanowienia o tymczasowym aresztowaniu **09.06.2015r. SĄD REJONOWY W SIEDLCACH sygn. akt II Kp 195/15.**

II. Rozpowszechnienie listu gończego nastąpi poprzez rozesłanie do jednostek Policji, oraz:
- ~~rozplakatowanie *)~~
- publikację danych z listu gończego w sieci Internet *)
- ~~publikację danych z listu gończego w środkach masowego przekazu (radio, telewizja, prasa).*)~~

III. Fotografia poszukiwanego:
- ~~w załączeniu *)~~
- ~~fotografia ze zbiorów prowadzonych na podstawie ustawy przez organy władzy publicznej.*)~~

Wzywa się każdego, kto zna miejsce pobytu poszukiwanego, do zawiadomienia o tym najbliższej jednostki Policji lub prokuratora (art. 280 § 1 pkt 4 kpk).

Ostrzega się, że za ukrywanie poszukiwanego lub dopomaganie mu w ucieczce grozi kara pozbawienia wolności do lat 5 (art. 239 § 1 kk).

~~Za ujęcie lub przyczynienie się do ujęcia poszukiwanego wyznaczono nagrodę w wysokości ................................................... złotych*)~~

Udziela się zapewnienia o utrzymaniu tajemnicy co do osoby informującej (art. 280 § 2 kpk).

<u>Załączniki:</u>

1. Odpis postanowienia o tymczasowym aresztowaniu.
2. Nakaz przyjęcia do najbliższego aresztu śledczego

(podpis i pieczęć prokuratora)

*) - niepotrzebne skreślić.

5

Kopia fotografii Marka Blachy - jako załącznik do wniosku o tymczasowe
aresztowanie i ekstradycję Marka Blachy



Za zgodność świadczy
Referent
Prokuratury Okręgowej w Siedlcach

Ewa Chostek

1

Wyciąg z mających zastosowanie w sprawie V Ds. 62/15 przeciwko Markowi Blacha przepisów kodeksu karnego, kodeksu karnego skarbowego, w tym przepisów o przedawnieniu karalności- jako załącznik do wniosku o tymczasowe aresztowanie i ekstradycję Marka Blachy

Art. 258. [Przestępczość zorganizowana. Udział w zorganizowanej grupie przestępczej]
§ 1. Kto bierze udział w zorganizowanej grupie albo związku mających na celu popełnienie przestępstwa lub przestępstwa skarbowego,

podlega karze pozbawienia wolności od 3 miesięcy do lat 5.

Art. 87. [Oszustwo celne]
§ 1. Kto przez wprowadzenie w błąd organu uprawnionego do kontroli celnej naraża należność celną na uszczuplenie,

podlega karze grzywny do 720 stawek dziennych albo karze pozbawienia wolności, albo obu tym karom łącznie.

§ 2. Tej samej karze podlega sprawca, jeżeli oszustwo celne dotyczy towaru lub usługi w obrocie z zagranicą, co do których istnieje reglamentacja pozataryfowa.

Art. 90. [Usunięcie towaru spod dozoru celnego]
§ 1. Kto usuwa towar lub środek przewozowy spod dozoru celnego,

podlega karze grzywny do 720 stawek dziennych albo karze pozbawienia wolności do lat 3, albo obu tym karom łącznie.

§ 2. Tej samej karze podlega, kto bez zgody uprawnionego organu niszczy, uszkadza lub usuwa zamknięcie celne.

Art. 6. [Jedność czynu]
§ 2. Dwa lub więcej zachowań, podjętych w krótkich odstępach czasu w wykonaniu tego samego zamiaru lub z wykorzystaniem takiej samej sposobności, uważa się za jeden czyn zabroniony; w zakresie czynów zabronionych polegających na uszczupleniu lub narażeniu na

uszczuplenie należności publicznoprawnej za krótki odstęp czasu uważa się okres do 6
miesięcy.

Art. 7. [Kumulatywny zbieg przepisów]

§ 1. Jeżeli ten sam czyn wyczerpuje znamiona określone w dwóch albo więcej przepisach
kodeksu, przypisuje się tylko jedno przestępstwo skarbowe lub tylko jedno wykroczenie
skarbowe na podstawie wszystkich zbiegających się przepisów.

Art. 37. [Nadzwyczajne obostrzenie kary]

§ 1. Sąd stosuje nadzwyczajne obostrzenie kary, jeżeli sprawca:

1) popełnia umyślnie przestępstwo skarbowe, powodując uszczuplenie należności
publicznoprawnej dużej wartości albo popełnia umyślnie przestępstwo skarbowe, a wartość
przedmiotu czynu zabronionego jest duża;

2) uczynił sobie z popełniania przestępstw skarbowych stałe źródło dochodu;

5) popełnia przestępstwo skarbowe, działając w zorganizowanej grupie albo w związku
mającym na celu popełnienie przestępstwa skarbowego;

Art. 44. [Przedawnienie przestępstwa skarbowego]

§ 1. Karalność przestępstwa skarbowego ustaje, jeżeli od czasu jego popełnienia upłynęło
lat:

1) 5 - gdy czyn stanowi przestępstwo skarbowe zagrożone karą grzywny, karą ograniczenia
wolności lub karą pozbawienia wolności nieprzekraczającą 3 lat;

2) 10 - gdy czyn stanowi przestępstwo skarbowe zagrożone karą pozbawienia wolności
przekraczającą 3 lata.

§ 2. Karalność przestępstwa skarbowego polegającego na uszczupleniu lub narażeniu na
uszczuplenie należności publicznoprawnej ustaje także wówczas, gdy nastąpiło
przedawnienie tej należności.

§ 3. W wypadkach przewidzianych w § 1 lub § 2 bieg przedawnienia przestępstwa
skarbowego polegającego na uszczupleniu lub narażeniu na uszczuplenie należności
publicznoprawnej rozpoczyna się z końcem roku, w którym upłynął termin płatności tej
należności. Jeżeli sprawca przestępstwa skarbowego dopuścił się uszczuplenia lub narażenia
na uszczuplenie należności celnej, bieg jego przedawnienia rozpoczyna się z dniem, w którym
powstał dług celny; jeżeli nie jest możliwe określenie dnia powstania długu celnego, bieg
przedawnienia przestępstwa skarbowego rozpoczyna się z dniem najwcześniejszym, w
którym istnienie długu celnego zostało ustalone.

§ 4.  W wypadkach przewidzianych w § 1 lub § 2, jeżeli dokonanie przestępstwa skarbowego zależy od nastąpienia określonego w kodeksie skutku, bieg przedawnienia rozpoczyna się od czasu, gdy skutek nastąpił.

§ 5.  Jeżeli w okresie przewidzianym w § 1 lub § 2 wszczęto postępowanie przeciwko sprawcy, karalność popełnionego przez niego przestępstwa skarbowego określonego w § 1 pkt 1 ustaje z upływem 5 lat, a przestępstwa skarbowego określonego w § 1 pkt 2 - z upływem 10 lat od zakończenia tego okresu.

§ 6.  W razie uchylenia prawomocnego orzeczenia przedawnienie biegnie od dnia wydania orzeczenia w tym przedmiocie, chyba że karalność przestępstwa skarbowego już ustała.

§ 7.  Przedawnienie nie biegnie, jeżeli przepis ustawy nie pozwala na wszczęcie lub dalsze prowadzenie postępowania w sprawie o przestępstwo skarbowe.



KOMENDA WOJEWÓDZKA POLICJI
w Rzeszowie
35-036 Rzeszów, ul. Dąbrowskiego

**RZECZPOSPOLITA POLSKA**
**(POLAND)**

CENTRALNE LABORATORIUM KRYMINALISTYCZNE KGP

0044724288

pieczęć jednostki policji
*stamp of police unit*

| nazwisko / family name | BLACHA | STWIERDZAM ZGODNOŚĆ | nr identyfikacyjny połączenia dokonującego rejes | | / | / | 5 |
|---|---|---|---|---|---|---|---|
| imiona / forename(s) | MAREK | Centralne Laboratorium Kryminalistyczne Policji | Z ORYGINAŁEM OIO- | | 5208076? | | |
| nazwisko panieńskie / maiden name | BLACHA | 06 PAŹ 201 | znak sprawy | D-11-8/221- | | | |
| imię ojca / father's forename | JAN | imię matki / mother's forename | JANINA | kod jednostki policji | 0 1 9 9 0 9 5 | | |
| adres / address | ul. WIEJSKA 13A, 23-400 BIŁGORAJ | | | nr sprawy / case N° | RSD-31/10 | | |
| płeć (M/K/?) / sex (M/F/?) | M | data urodzenia (r, m, d) / date of birth (y, m, d) | 1 9 6 9 0 4 2 1 | PESEL 0 7 3 5 5 | DOWÓD OSOBISTY AN 7 4 11 596 | | |
| miejsce urodzenia / place of birth | BIŁGORAJ | | | rodzaj i numer dokumentu tożsam / true identity | | | |
| narodowość / nationality | POLSKA | powód daktyloskopowania / offence | art 286 § k | | | | |

| 1. wielki palec | 2. wskazujący palec | 3. środkowy palec | 4. serdeczny palec | 5. mały palec |
|---|---|---|---|---|
| | | | | |

| 6. wielki palec | 7. wskazujący palec | 8. środkowy palec | 9. serdeczny palec | 10. mały palec |
|---|---|---|---|---|
| | | | | |

| LEWA RĘKA — jednoczesny odcisk czterech palców | jednoczesne odciski wielkich palców | | PRAWA RĘKA — jednoczesny odcisk czterech palców |
|---|---|---|---|
| | LEWY | PRAWY | |

czytelny podpis osoby daktyloskopowanej
J. view. A Burel

data daktyloskopowania 22 02 2010
miejsce daktyloskopowania
KPP BIŁGORAJ

czytelny podpis osoby daktyloskopuję
Marek Blacha

Mak-17  Udz. tel (34) 366-14-22, ziec 1805

EXT-BLACHA-00053

658

## KARTA DO REJESTRACJI ODBITEK DŁONI W SYSTEMIE AFIS

MIEJSCE NA PASEK KODOWY

czytelny podpis osoby daktyloskopowanej

*Marek Blach*

nr identyfikacyjny policjanta dokonującego rejestracji

| 0 | 5 | 1 | 1 | 3 | 0 |

**Prawa dłoń**

Powód daktyloskopowania (zaznaczyć poniżej)

| Kradzież rozbójnicza | Rozbójniczy zabór pojazdu w celu krótkotrwałego użycia | Kradzież z włamaniem |
| Zabójstwo | Kradzież | Inne  X |
| Rozbój | Wymuszenie rozbójnicze | Zgłac. w tym miejscu |

czytelny podpis osoby daktyloskopującej

*st. sierż. A. Bird*

Centralne Laboratorium Kryminalistyczne Policji

STWIERDZAM ZGODNOŚĆ Z ORYGINAŁEM  0 6 PAŹ. 2017

**Lewa dłoń**

| Miejsce zamieszkania | UL. WIEJSKA 134, 23-400 BLGORAJ |
| Znak sprawy | D-11-8/2015 |
| OIO | |

Prawy wskazujący

Lewy wskazujący

EXT-BLACHA-00064

Pieczęć jednostki

| Nazwisko | BLACHA |
| Imię | MAREK |
| Data i miejsce urodzenia | 1959.04.21 BLGORAJ |

PROKURATURA OKRĘGOWA



Siedlce, 11 December 2018

File number:
PO I Ds 65.2017

### REQUEST
### FOR PROVISIONAL DETENTION AND EXTRADITION

The following is a request for provisional detention and extradition of a Polish citizen:

**Marek Blacha**
son of Jan and Janina née Obszyńska
born on 21 April 1969 in Biłgoraj
domiciled in Biłgoraj at ul. Wiejska 13A
currently residing in the USA

In reference to the case file number V Ds 62/15/Sp handled by the Circuit Prosecutor's Office in Siedlce, Marek Blacha is suspected of having committed the following crimes:

I.   From 4 July 2009 to 28 April 2010, in Dorohusk, Biłgoraj, Lubycza Królewska, Latowicz, Tomaszów Lubelski and other locations in Poland, he participated in an organised crime group composed by Witold Szpindor, Krzysztof Jakubik, Andrzej Blacha and other unidentified persons, including not less than seven unidentified citizens of Ukraine, aiming to commit fiscal and criminal offences which involved engaging in customs frauds in the course of the transit procedure for fresh garlic, removing goods from customs supervision, bribing customs officers in connection with customs clearance process, providing untrue information in export invoices relating to the sale of fresh garlic and using such documents, providing untrue information in T1 export declarations, where the foregoing is considered a crime under Article 258 Section 1 of the Criminal Code;

II.  From 4 July 2009 to 28 April 2010, in Dorohusk and Hrebenne, as part of an organized criminal group, while he was a staff member of the company "Bak-Trans Zakład Transportowy Jan i Marek Blacha" based in Biłgoraj, acting jointly and in concert with Andrzej Blacha, a staff member of the same company, Witold Szpindor, partner of the company "HUSAR" spółka jawna and de facto manager of this company, Daniel Czop, co-owner of the company "Cytrus", and other unidentified persons, acting within short time intervals, with the aim of achieving the same and premeditated objective of causing losses of tax revenue and customs duties, he was providing misleading information to the Road Customs Branch in Dorohusk and the Customs Branch in Hrebenne, being the offices of destination, about the type of goods exported to Ukraine in that during the customs clearance process under the external transit procedure he submitted – through Agencja Celna D.T.A. spółka z ograniczoną odpowiedzialnością – T1 export declarations, where the following companies were indicated as exporters: "Bak-Trans – Zakład Transportowy Jan i Marek Blacha" and BH "Bartek Małgorzata Ptach-Taube", together with documents showing that fresh garlic was exported to Ukraine as goods subject to non-tariff restrictions, where in fact the goods exported to Ukraine included plates, Solbet Optimal concrete blocks, which resulted in closing the transit procedure by the customs agencies referred to above as indicated in the approved T1 declarations with numbers as follows:

1.   MRN 09PL30308010E9A430 of 4 July 2009, where the said fraud was committed by

Marek Blacha acting jointly and in concert with Andrzej Blacha and some unidentified citizens of Ukraine;

2. MRN 09PL30308010EC66C0 of 10 July 2009, where the said fraud was committed by Marek Blacha acting jointly and in concert with Andrzej Blacha and some unidentified citizens of Ukraine;

3. MRN 09PL30308010EC4F90 of 10 July 2009, where the said fraud was committed by Marek Blacha acting jointly and in concert with Andrzej Blacha and some unidentified citizens of Ukraine;

4. MRN 09PL30308010EF6855 of 17 July 2009, where the said fraud was committed by Marek Blacha acting jointly and in concert with Andrzej Blacha and some unidentified citizens of Ukraine;

5. MRN 09PL30308010F575B3 of 31 July 2009, where the said fraud was committed by Marek Blacha acting jointly and in concert with Andrzej Blacha, Daniel Czop and some unidentified citizens of Ukraine;

6. MRN 09PL30308010ABDC6 of 18 September 2009, where the said fraud was committed by Marek Blacha acting jointly and in concert with Andrzej Blacha, Daniel Czop and some unidentified citizens of Ukraine;

7. MRN 09PL3030801148C087 of 29 January 2010, where the said fraud was committed by Marek Blacha acting jointly and in concert with Andrzej Blacha, Witold Szpindor and some unidentified citizens of Ukraine;

8. MRN 10PL3030801154D2F0 of 20 February 2010, where the said fraud was committed by Marek Blacha acting jointly and in concert with Andrzej Blacha and some unidentified citizens of Ukraine;

9. MRN 10PL3030801173B7D0 of 21 April 2010, where the said fraud was committed by Marek Blacha acting jointly and in concert with Witold Szpindor, Andrzej Blacha and some unidentified citizens of Ukraine;

10. MRN 10PL3030801173B7D0 of 28 April 2010, where the said fraud was committed by Marek Blacha acting jointly and in concert with Witold Szpindor, Andrzej Blacha and some unidentified citizens of Ukraine;

while causing at the same time in all the cases that the goods were removed from customs supervision and that customs seals were broken, whereby the goods in question, 220,000 kg of fresh garlic, remained in Poland and were sold inter alia by Daniel Czop, which led to a loss of customs duties in the amount of not less than PLN 1,223,180.00, i.e. a considerable loss, i.e. a crime under Article 87 Section 2 of the Fiscal Penal Code in relation to Article 90 Sections 1 and 2 of the Fiscal Penal Code in relation to Article 6 Section 2 of the Fiscal Penal Code in relation to Article 7 Section 1 of the Fiscal Penal Code in relation to Article 37 Section 1 items 1, 2 and 5 of the Fiscal Penal Code.

The following evidence indicates that Marek Blacha did in fact commit the acts described in sections I and II:

**Number 1:**
**Statements submitted by the suspect Krzysztof Piotr Jakubik as evidenced by the relevant hearing reports dated 22 April 2013, 2 June 2014, 3 June 2015, and hearing reports from the trial of 12 October 2015 and 14 October 2015 before the Circuit Court in Siedlce, case file number II K 83/15**
The above statements indicate that Krzysztof Piotr Jakubik was running the company "Lat-Pol" based in Latowicz, a vegetable and fruit wholesaler and retail trader. As part of his

business operations, Krzysztof Piotr Jakubik was the main person receiving fresh garlic obtained by customs frauds.

The above statements show that from 28 September 2009 to 3 March 2010, about 160 tonnes to 200 tonnes of garlic remained in Poland, which theoretically was to be transported to Ukraine.

As explained by Krzysztof Piotr Jakubik, agreements concerning the sale of garlic to business partners from Ukraine were fictitious.

To make the transactions appear legitimate, customs officers who were responsible for the fictitious closing of transit procedures indicating that the garlic was in fact exported to Ukraine, were bribed.

The customs officers received an amount of EUR 15,000 for illegal closing of the transit procedure.

Additionally, Krzysztof Piotr Jakubik stated that in 2009, he was called by Hubert Ośko of the company "Borex", who offered purchasing garlic originating from China without any invoices to record the transaction. Having arrived at the site where the goods were supposedly located, he noticed a truck full of garlic, which was driven by Andrzej Blacha.

During the meeting Krzysztof Jakubik negotiated the price directly with Hubert Ośko, who in turn discussed the price with Andrzej Blacha. Finally, the price to be paid for the goods was decided by Marek Blacha.

However, the transaction did not take place because Krzysztof Piotr Jakubik did not accept the price for the garlic because it was too high.

**Number 2:**
**Hearing reports for Witold Szpindor dated 21 March 2013, 12 April 2013, 16 April 2013, 13 May 2014 and 18 March 2015, and a hearing report from the trial of 12 October 2015 before the Circuit Court in Siedlce, case file number II K 83/15**

Witold Szpindor was partner of the company "Husar" spółka z ograniczoną odpowiedzialnością, which was also a customs warehouse.

This suspect eventually admitted the charges, thus confirming his involvement in the crimes committed by Marek Blacha.

According to the testimony of Witold Szpindor, on two occasions he was asked by Marek Blacha, among others, for a loan of PLN 50,000 for purchasing garlic. Witold Szpindor agreed to lend him the money.

The garlic was to be purchased without any invoices to record the transaction. The garlic thus purchased was sold in Poland and it was not exported to Ukraine.

**Number 3:**
**Hearing reports for Andrzej Blacha dated 4 June 2013, 24 September 2013, and a hearing report from the trial of 14 October 2015 before the Circuit Court in Siedlce, case file number II K 83/15**

In 2013, Andrzej Blacha was a staff member of the company "Bak-Trans Zakład Transportowy Jan i Marek Blacha" which was providing transport and logistics services.

The company was owned by his brother, Marek Blacha, and his father, Jan Blacha. Andrzej Blacha was responsible for organizing transport and sometimes he also worked as a driver to deliver the requested transport services.

The statements submitted by the suspect Andrzej Blacha showed that he met Roman Szpindor and Witold Szpindor through his brother Marek. The company "Bak-Trans" was providing transport services to Roman Szpindor and Witold Szpindor, which included e.g. transport of fresh garlic. As stated by Andrzej Blacha, it was his brother – Marek Blacha, in concert with Witold Szpindor, who were carrying out the frauds. Andrzej Blacha was only to follow the instructions of Marek Blacha concerning the transport of garlic, accept money for

the goods and pass it on to Witold Szpindor. Andrzej Blacha confirmed that he was directly involved in one transaction of garlic sale at the request of Witold Szpindor and Marek Blacha. The garlic originated from China, and the records showed that it was to be delivered into Ukraine, however, it was in fact sold in Poland. The role of intermediary in this transaction was assumed by Daniel Czop who found a company interested in buying the garlic. Initially, the garlic was to be purchased by Krzysztof Piotr Jakubik, however, the price was too high and the transaction did not take place. In the end, some of the garlic was purchased by Daniel Czop, and the rest by the witness Cezary Zagrabski running the company "Cezary Jakub Zagrabski" based in Mińsk Mazowiecki, dealing in vegetable trade, including garlic.

**Number 4:**
**Hearing report for Daniel Czop dated 5 April 2013**
In 2013, Daniel Czop was co-owner of the wholesale company 'Cytrus' based in Biłgoraj. The company was a wholesaler involved in buying and selling fruit, vegetable and other agricultural products, including garlic.

In his statement, Daniel Czop acknowledged that he was involved in two transactions concerning the sale of garlic obtained by customs frauds.

He said he did meet the brothers Andrzej Blacha and Marek Blacha, among others. He explained that he helped them to transport the goods, i.e. garlic, on two occasions. The garlic originated from China, it was purchased in the Netherlands and was to be transported into Ukraine.

However, it was in fact delivered to Hubert Ośko of the "Borex" company. Huber Ośko paid to Daniel Czop each time an amount of PLN 100,000 for the garlic. This money was then given by Daniel Czop to Marek Blacha.

He also stated that Andrzej Blacha told him what was exactly the fraud mechanism, which involved fictitious export of garlic to Ukraine.

**Number 4** *(numbering - as in the original)***:**
**Hearing report for Tarek Orfali dated 3 June 2013**
Tarek Orfali worked as a driver for the "Cytrus" company. On two occasions, acting under instructions from Daniel Czop, he transported garlic from the Customs Agency in Tomaszów Lubelski, where such garlic was initially to be transported into Ukraine, and in fact it was transferred to other locations in Poland. One of such transports was made to warehouses of the company "Borex" with unidentified exact location, situated somewhere near Grójec. While transporting the goods, Tarek Orfali was at all times in touch by phone with his employer – Daniel Czop, who in turn was in touch with Andrzej Blacha. Marek Blacha was present each time when the garlic was loaded onto a truck driven by Tarek Orfali, supervising the works and helping Tarek Orfali to load the goods.

Afterwards Tarek Orfali met with Marek Blacha and Daniel Czop. During these meetings Marek Blacha, being aware of the ongoing criminal proceedings, tried to persuade Tarek Orfali to confirm, if he were to be interrogated on the subject, that the garlic was exported to Ukraine.

During the following meeting Marek Blacha told Tarek Orfali the fraud details, e.g. he confirmed that Polish customs officers were bribed in connection with these operations.

**Number 6:**
**Documents secured in the company "Bak-Trans"**
On 25 February 2013, the company "Bak-Trans" was searched and the following evidence was secured: export and sales invoices, T1 export declarations, where the company "Bak Trans – Zakład Transportowy Jan i Marek Blacha" was indicated as exporter, CMR road consignment notes.

The revealed documents show that garlic imported from the Netherlands to Poland, which originated from China, was sold by the company "Bak-Trans" under a VAT invoice to customers from Ukraine, e.g. the company "Donis Trading" with a branch office in Kiev, the buyer Yuriy Kvochka from Lviv and the buyer Stachiw Anatoij from Ternopil. The goods were to be customs cleared at the border-crossing point in Dorohusk, where the closing of the transit procedure was carried out. If the transit procedure was closed, it was a confirmation that the goods left the Republic of Poland.

Based on an analysis of the documents gathered, it can be confirmed that the transactions of sale of garlic to customers from Ukraine did not take place, and the goods in fact exported to Ukraine included inter alia construction products. The garlic remained in fact in Poland.

### Number 7:
### Documents submitted by Polish customs agencies

In the course of the procedure, the following customs clearance documents were obtained: T1 export declarations, where the company "Bak – Trans – Zakład Transportowy Jan i Marek Blacha" was indicated as exporter, printouts from electronic systems used by customs agencies during export procedures, including photographs of transportation vehicles and materials relating to disciplinary procedures initiated against the customs officers involved.

An analysis of these documents has shown that they contain untrue information because garlic referred to in the documents was not exported to Ukraine.

### Number 8:
### Documents received from Ukraine

Ukrainian authorities were requested to provide legal assistance in obtaining information about the company "Donis Trading" with a branch office in Kiev and the buyer Yuriy Kvochka from Lviv, who supposedly purchased the garlic.

According to the information received, there is no company by the name "Donis Trading" or a person by the name Yuriy Kvochka.

The customs clearance documents provided by Ukrainian authorities show that goods other than garlic were in fact exported to Ukraine.

### Number 9:
### Calculation of the customs duties and VAT as submitted by the Customs Agency in Siedlce

The Customs Agency in Siedlce calculated – based on the evidence gathered in the case and based on the regulations of the Tax Law and Customs Law – the amount of losses of tax revenues and customs duties, and determined that the amount of lost customs duties is PLN 2,228,796 (two million two hundred and twenty eight thousand seven hundred and ninety six) and the amount of lost VAT revenues is PLN 123,589 (one hundred and twenty three thousand five hundred and eighty nine).

The documents revealed and submitted in the case show that the criminal group, of which Marek Blacha was a member, carried out the frauds using the customs procedure described in the Community Customs Code (European Union Official Journal L 92.302.1), i.e. the procedure of community transit (T1 external transit).

In view of the EU regulations, an importer is required to initiate the procedure of release into circulation of goods to legally sell garlic originating from China in the European Union (in this case – in Poland).

Non-community goods released for free circulation are given the customs status of community goods.

The operations of the criminal group, in which participated Marek Blacha, were detrimental not only to the interests of Poland – the State Treasury, but also to the financial interests of the European Community.

In accordance with Article 2 of the Convention on the Protection of the European Communities' Financial Interests, Member States are required to ensure that any such frauds are punishable, where serious frauds, exceeding the amount specified under national regulations (however, not less than EUR 50,000) should be subject to imprisonment which may entail surrender of the perpetrator.

The evidence gathered in the case show that Marek Blacha acted as part of an organized criminal group aiming to commit the crimes described above.

Additionally, there is no doubt that Marek Blacha, together with Witold Szpindor, Andrzej Blacha, Michał Nawrocki, Daniel Czop and other unidentified persons, were submitting misleading information to Customs Agencies by declaring that fresh garlic originating from China was to be exported to Ukraine when it remained in fact in Poland. Fresh garlic originating from China was legally purchased in the Netherlands. To make the transit to Ukraine appear legitimate, goods other than garlic, e.g. construction products in the form of hollow masonry units, were transported there.

As a result of these operations supported by falsified documents, it results from Polish customs records that the garlic was exported outside the European Union, while the customs records of Ukrainian authorities show that the same transportation vehicles were used for transporting construction materials into Ukraine.

The suspects submitted documents from transit clearance process, which showed that natural persons from Ukraine, from the company "Donis Trading", which was also based in Ukraine, purchased fresh garlic of the type and name as specified in the relevant export invoices. The export was declared in customs documents, first of all in the most important T1 customs declaration, also referred to as MRN.

Furthermore, the suspects removed customs seals from the vehicles used for transporting the garlic. This garlic was then removed and different products were loaded into the vehicles. After re-sealing the vehicles, the other goods were transported into Ukraine.

As a result, officers of the Customs Agency were convinced that the fresh garlic referred to in the declarations was in fact exported.

The crimes allegedly committed by Marek Blacha carry the following penalties:
- crime under Article 258 Section 1 of the Criminal Code – imprisonment from 3 months to 5 years,
- crime under Article 87 Section 2 of the Fiscal Penal Code – a fine up to 720 daily rates or imprisonment, or both at the same time,
- crime under Article 90 Section 1 of the Fiscal Penal Code – a fine up to 720 daily rates or imprisonment up to 3 years, or both at the same time,
- crime under Article 90 Section 2 of the Fiscal Penal Code – a fine up to 720 daily rates or imprisonment up to 3 years, or both at the same time.

The crimes allegedly committed by Marek Blacha are due to become statute barred in Poland on the following respective dates:
- the crime described in section I hereof: on 28 April 2030,
- the crime described in section II hereof: on 1 January 2031.

The investigation against Marek Blacha has not been concluded yet.

As the suspect is fleeing from justice, the proceedings requiring his participation were not conducted.

As a result, at the request of Circuit Prosecutor in Siedlce dated 8 June 2015, the District Court in Siedlce decided on 9 June 2015, file number II Kp 195/15, to apply a preventive



measure against Marek Blacha in the form of provisional detention for a period of 14 days since the date of apprehension.

On 6 August 2015, Circuit Prosecutor in Siedlce ordered that an all-points bulletin be issued against Marek Blacha, and the said bulletin was issued.

In accordance with Articles 258 and 279 of the Code of Criminal Procedure, a suspect can be detained and an all-points bulletin can be issued if the suspect is hiding or has no permanent address of residence in Poland.

Both these situations apply to the suspect Marek Blacha.

In the course of the procedure, the Police Central Bureau of Investigation based in Warsaw informed that Marek Blacha was residing in Chicago, USA.

This circumstance is supported by another information indicating that on 13 March 2018, Marek Blacha was apprehended in the USA for immigration purposes. Upon his detention, a hearing was held at the immigration court. During the preliminary hearing he was placed in detention, however, the Court then considered that he could be released pending trial until the final decision was made as to whether Marek Blacha would be extradited from the USA.

In view of the circumstances described above, I request that the suspect be detained and extradited.

I declare that the request for provisional detention and extradition is in conformity with the evidence gathered during this investigation.

I can assure you that Marek Blacha will not be held criminally liable for any offences not covered herein nor surrendered to another state without a consent of the US authorities.

*Round stamp with the national emblem of the Republic of Poland and the following circumscription:* Circuit Prosecutor's Office in Siedlce *1*

Tg)Tg

> *Oblong stamp:*
> Circuit Prosecutor for Siedlce
> Radosław Romaniuk
> *(-) illegible signature*

*Round stamp with the national emblem of the Republic of Poland and the following circumscription:* Minister of Justice *4*

Appendices:
1. copy of decision of the District Court in Siedlce dated 9 June 2015, case file number II Kp 195/15, on provisional detention of Marek Blacha for a period of 14 days since the date of apprehension
2. copy of the decision of Circuit Prosecutor in Siedlce dated 6 August 2015 on issuing an all-points bulletin against the suspect
3. copy of the all-points bulletin of 6 August 2015
4. copy of the photograph of Marek Blacha
5. extract from relevant regulations of the Criminal Code, Fiscal Penal Code, including regulations on the statute of limitations
6. copy of fingerprint chart of Marek Blacha

*Round stamp with the national emblem of the Republic of Poland and the following circumscription:* Minister of Justice *4*



*Certified translation from Polish*          EXT-BLACHA-00061

*Document executed on 6 pages with the following stamps on each page:*
*Round stamp with the national emblem of the Republic of Poland and the following circumscription*: Circuit Prosecutor's Office in Siedlce *1*

Oblong stamp:
Certified true copy
Clerk
Circuit Prosecutor's Office in Siedlce
Ewa Szostek
*(-) illegible signature*

Oblong stamp: OFFICIAL COPY

File number: II Kp 195/15

**DECISION**

9 June 2015

The District Court in Siedlce, the 2nd Criminal Division
in the following personal composition:
    Chairperson: District Court Judge Joanna Wardak
    Recording clerk: Senior Court Clerk Alina Nestorowicz

having given due consideration during the session of 9 June 2015 to the request of 8 June 2015 from Circuit Prosecutor in Siedlce, file number VI Ds. 1/13/Sp, for provisional detention of Marek Blacha
**who is suspected of the following crimes:**

I)     From 4 July 2009 to 28 April 2010, in Dorohusk (Lubelskie Voivodeship), Biłgoraj (Lubelskie Voivodeship), Lubycza Królewska (Lubelskie Voivodeship), Latowicz (Mazowieckie Voivodeship), Tomaszów Lubelski (Lubelskie Voivodeship) and other locations in Poland, he participated in an organized criminal group composed by Witold Szpindor, Roman Szpindor, Elżbieta Rutkowska, Krzysztof Jakubik, Michał Nawrocki, Andrzej Blacha, Daniel Czop, Marek Jamrozy, Tarek Orfali and other persons, including not less than seven Ukrainian citizens, aiming to commit fiscal crimes and criminal offences which involved engaging in customs frauds in the course of the transit procedure for fresh garlic, laundering the proceeds of the related customs frauds, removing goods from customs supervision, bribing customs officers in connection with the customs clearance process, providing untrue information in export invoices relating to the sale of fresh garlic and using such documents, falsifying invoices relating to the purchase of hollow masonry units and using such documents, providing untrue information in T1 export declarations, while relying on such operations as a source of regular income;

**i.e. a crime under Article 258 Section 1 of the Criminal Code in relation to Article 65 Section 1 of the Criminal Code**

II)     From 4 July 2009 to 28 April 2010, in Dorohusk (Lubelskie Voivodeship), as part of an organized criminal group, while he was a staff member of the company "Eak-Trans Zakład Transportowy Jan i Marek Blacha" based in Biłgoraj, acting jointly and in

*Certified translation from Polish*      EXT-BLACHA-00062

concert with Andrzej Blacha, co-owner of the company "Bak-Trans", Witold Szpindor and Roman Szpindor, partners of the company 'Husar', Elżbieta Rutkowska, sales manager for the company "HUSAR", Michał Nawrocki, driver for the company "Husar", Krzysztof Jakubik, owner of the company "Lat-Pol", Daniel Czop, co-owner of the company "Cytrus", Parek Orfali, driver for the company "Cytrus", and Marek Jamrozy, driver for the company "Bak-Trans", as well as other persons, including not less than seven Ukrainian citizens, acting within short time intervals, with the aim of achieving the same and premeditated objective of causing losses of tax revenue and customs duties, while relying on operations involving fiscal crimes as a source of regular income, he was providing misleading information to the Road Customs Branch in Dorohusk, being the office of destination, about the type of goods exported to Ukraine in that during the customs clearance process under the external transit procedure he was submitting T1 export declarations where the company "Bak-Trans", BH "Bartek Małgorzata Ptach – Taube", acting through Agencja Celna D.T.A Spółka z o.o., was indicated as exporter, together with the following documents:

1. **as concerns the declaration No. MRN 09PL30308010E9A430** of 4 July 2009, where the company "Bak-Trans" was indicated as exporter – the sale invoice No. 43)2009 – confirming the sale of 22,000 kg of fresh garlic for EUR 15,400.00 by the company "Bak-Trans" to Yuriy Kvochka from Lviv, Ukraine, while no such transaction occurred because the goods exported, instead of fresh garlic, included 22 cellular concrete blocks worth EUR 1,044.70, which were transported abroad on 7 July 2009 by a DAF truck, reg. No. AC 3906A1, and a PP trailer, reg. No. AC 4502XX, driven by Andrii Lagoda, which resulted in that the misled Office closed the transit procedure for fresh garlic and acknowledged this fact in the T1 declaration, number as above, where the said fraud was committed by Marek Blacha acting jointly and in concert with Andrzej Blacha, and some citizens of Ukraine, who have not been identified so far;

2. **as concerns the declaration No. MRN 09PL30308010EC66C0** of 10 July 2009, where the company "Bak-Trans" was indicated as exporter – the sale invoice No. 45)2009 – confirming the sale of 22,000 kg of fresh garlic for EUR 16,500.00 by the company "Bak-Trans" to Yuriy Kvochka from Lviv, Ukraine, while no such transaction occurred because the goods exported, instead of fresh garlic, included 816 Solbet concrete blocks worth PLN 6,666.72, which were transported abroad on 15 July 2009 by a Renault truck, reg. No. AC 4472AP, and a Krone trailer, reg. No. AC 8069XX, driven by Viktor Treshchetko, which resulted in that the misled Office closed the transit procedure for fresh garlic and acknowledged this fact in the T1 declaration, number as above, where the said fraud was committed by Marek Blacha acting jointly and in concert with Andrzej Blacha, and some citizens of Ukraine, who have not been identified so far;

3. **as concerns the declaration No. MRN 09PI30308010EC4F90** of 10 July 2009, where the company "Bak-Trans" was indicated as exporter – the sale invoice No. 44)2009 – confirming the sale of 22,000 kg of fresh garlic for EUR 16,500.00 by the company "Bak-Trans" to Yuriy Kvochka from Lviv, Ukraine, while no such transaction occurred because the goods exported, instead of fresh garlic, included 720 Solbet-Optimal concrete blocks worth PLN 5,414.00, which were transported abroad on 25 July 2009 by a truck of unidentified make, reg. No. BKL9375AO, and a Schmitz trailer, reg. No. AC 6 498XX, driven by Mykola Tkhoruk, which resulted in that the misled Office closed the transit procedure for fresh garlic and acknowledged this fact in the T1



declaration, number as above, where the said fraud was committed by Marek Blacha acting jointly and in concert with Andrzej Blacha, and some citizens of Ukraine, who have not been identified so far;

4. **as concerns the declaration No. MRN 09PL303080J0EF6855** of 17 July 2009, where the company "Bak-Trans" was indicated as exporter – the sale invoice No. 48)2009 – confirming the sale of 22,000 kg of fresh garlic for EUR 16,500.00 by the company "Bak-Trans" to Yuriy Kvochka from Lviv, Ukraine, while no such transaction occurred because the goods exported, instead of fresh garlic, included 864 Solbet-Optimal concrete blocks worth PLN 4,259.52, which were transported abroad on 29 July 2009 by a DAF truck, reg. No. AC8591AM, and a Schmitz trailer, reg. No. AC 855XX, driven by Roman Lutsyk, which resulted in that the misled Office closed the transit procedure for fresh garlic and acknowledged this fact in the T1 declaration, number as above, where the said fraud was committed by Marek Blacha acting jointly and in concert with Andrzej Blacha, and some citizens of Ukraine, who have not been identified so far;

5. **as concerns the declaration No. MRN 09PL30308010F575B3** of 31 July 2009, where the company "Bak-Trans" was indicated as exporter – the sale invoice No. 53)2009 – confirming the sale of 22,000 kg of fresh garlic for EUR 16,500.00 by the company 'Bak-Trans' to Yuriy Kvochka from Lviv, Ukraine, while no such transaction occurred because the goods exported, instead of fresh garlic, included 1,728 Solbet-Optimal plates worth PLN 4,250.83, which were transported abroad on 4 August 2009 by a Renault truck, reg. No. AC 7874AH, and a Paction trailer, reg. No. AC 3793XX, driven by Oleh Rakovets, which resulted in that the misled Office closed the transit procedure for fresh garlic and acknowledged this fact in the T1 declaration, number as above, where the said fraud was committed by Marek Blacha acting jointly and in concert with Andrzej Blacha, Daniel Czop and Tarek Orfali, and some citizens of Ukraine, who have not been identified so far;

6. **as concerns the declaration No. MRN 09PL30308010ABDC** of 18 September 2009, where the company "Bak-Trans" was indicated as exporter – the sale invoice No. 67)09 – confirming the sale of 22,000 kg of fresh garlic for EUR 26,180.00 by the company 'Bak-Trans' to Yuriy Kvochka from Lviv, Ukraine, while no such transaction occurred because the goods exported, instead of fresh garlic, included 912 Solbet-Optimal plates worth PLN 3,685.38, which were transported abroad on 23 September 2009 by a DAF truck, reg. No. AC0382AE, and a Krone trailer, reg. No. EA265920, driven by Bogdan Marchuk, which resulted in that the misled Office closed the transit procedure for fresh garlic and acknowledged this fact in the T1 declaration, number as above, where the said fraud was committed by Marek Blacha acting jointly and in concert with Andrzej Blacha, Daniel Czop and Tarek Orfali, and some citizens of Ukraine, who have not been identified so far;

7. **as concerns the declaration No. MRN 09PL3030801148C087** of 29 January 2010, where the company "Bak-Trans" was indicated as exporter – the sale invoice No. 7)2010 – confirming the sale of 22,000 kg of fresh garlic for EUR 27,500.00 by the company "Bak-Trans" to Yuriy Kvochka from Lviv, Ukraine, while no such transaction occurred because the goods exported, instead of fresh garlic, included 864 Solbet-Optimal plates worth PLN 4,259.52, which were transported abroad on 31 January 2010 by a DAF truck, reg. No. AC6532AX, and a SOR trailer, reg. No. AC0187XT, driven



by Olga Smal, which resulted in that the misled Office closed the transit procedure for fresh garlic and acknowledged this fact in the T1 declaration, number as above, where the said fraud was committed by Marek Blacha acting jointly and in concert with Andrzej Blacha, Witold Szpindor and Roman Szpindor, and some citizens of Ukraine, who have not been identified so far;

8. **as concerns the declaration No. MRN 09PL3030801154D2F0** of 20 February 2010, where the company "Bak-Trans" was indicated as exporter – the sale invoice No. 15)2010 – confirming the sale of 22,000 kg of fresh garlic for EUR 27,940.00 by the company "Bak-Trans" to Yuriy Kvochka from Lviv, Ukraine, while no such transaction occurred because the goods exported, instead of fresh garlic, included a so far unidentified quantity of Solbet-Optimal plates, which were transported abroad on 4 March 2010 by a DAF truck of unidentified make, reg. No. AC6532AX, and a SOR trailer, reg. No. AC0187XT, driven by an unidentified citizen of Ukraine, which resulted in that the misled Office closed the transit procedure for fresh garlic and acknowledged this fact in the T1 declaration, number as above, where the said fraud was committed by Marek Blacha acting jointly and in concert with Andrzej Blacha and some citizens of Ukraine, who have not been identified so far;

9. **as concerns the declaration No. MRN 10PL3030801173B7D0** of 21 April 2010, where the company "Bak-Trans" was indicated as exporter – the sale invoice No. 35)2010 and a CMR road consignment note without number – confirming the sale of 22,000 kg of fresh garlic for EUR 28,600.00 by the company 'Bak-Trans' to Yuriy Kvochka from Lviv, Ukraine, and Yuriy Pidlisnyak from Lviv, Ukraine, the provision of transport services to the purchaser using a DAF truck, reg. No. LBL40CT, and a Kogel trailer, reg. No. AT9455235, driven by Marek Jamroży, while no such transaction occurred and no services of fresh garlic transport were provided, because the goods exported, instead of fresh garlic, included 864 Solbet-Optimal blocks worth PLN 4,259.52, which were transported abroad on 23 April 2010 by the vehicles referred to above, which resulted in that the misled Office closed the transit procedure for fresh garlic and acknowledged this fact in the T1 declaration, number as above, where the said fraud was committed by Marek Blacha acting jointly and in concert with Witold Szpindor, Roman Szpindor, Andrzej Blacha and Marek Jamroży, and some citizens of Ukraine, who have not been identified so far;

10. **as concerns the declaration No. MRN 10PL303080117785F9** of 28 April 2010, where the company "BH-Bartek" was indicated as exporter – the sale invoice No. 45)2010, No. 36)2010, and a CMR road consignment note without number – confirming the sale of 22,300 kg of fresh garlic for PLN 54,614.00 by the company "BH Bartek-Małgorzata Ptach – Taube" to Stachiw Anatolij from Ternopil, Ukraine, the provision of transport services to the purchaser using a DAF truck, reg. No. LBL40CT, and a Kogel trailer, reg. No. AT9455235, driven by Marek Jamroży, while no such transaction occurred and no services of fresh garlic transport were provided, because the goods exported, instead of fresh garlic, included 720 D600 hollow masonry units worth USD 2,268.00, which were transported abroad on 29 April 2010 by the vehicles referred to above, which resulted in that the misled Office closed the transit procedure for fresh garlic and acknowledged this fact in the T1 declaration, number as above, and the fresh garlic was sold in Poland by the company "Bak-Trans", "BH Bartek Małgorzata Ptach-Taube" and "Bak-Trans", where the said fraud was committed by Marek Blacha acting jointly and in concert with Witold Szpindor, Roman Szpindor, Andrzej Blacha and

Marek Jamroży, and some citizens of Ukraine, who have not been identified so far, while causing at the same time in all the cases referred to above that the goods in question were removed from customs supervision and as result remained in Poland and were sold – 220,000 kg of garlic – which led to a loss of customs duties of not less than PLN 1,223,180.00, i.e. a considerable loss;

**i.e. a crime under Article 87 Section 2 of the Fiscal Penal Code in relation to Article 90 Sections 1 and 2 of the Fiscal Penal Code in relation to Article 6 Section 2 of the Fiscal Penal Code and in relation to Article 7 Section 1 of the Fiscal Penal Code in relation to Article 37 Section 1 items 1, 2 and 5 of the Fiscal Penal Code**

**acting in accordance with Article 249 Section 1 of the Code of Criminal Procedure, 250 Section 2 of the Code of Criminal Procedure and 258 Section 1 item 2 of the Code of Criminal Procedure**

<strong>the Court decided as follows</strong>

to apply against Marek Blacha, son of Jan and Janina née Obszyńska, born on 21 April 1969 in Biłgoraj, a preventive measure in the form of provisional detention for a period of 14 days since the date of apprehension.

## STATEMENT OF REASONS

On 8 June 2015, this Court received a request from Prosecutor of the Circuit Prosecutor's Office in Siedlce to apply against Marek Blacha, suspected of committing a crime under Article 258 Section 1 of the Criminal Code in relation to Article 65 Section 1 of the Criminal Code, under Article 87 Section 2 of the Fiscal Penal Code in relation to Article 90 Sections 1 and 2 of the Fiscal Penal Code in relation to Article 6 Section 2 of the Fiscal Penal Code and in relation to Article 7 Section 1 of the Fiscal Penal Code in relation to Article 37 Section 1 items 1, 2 and 5 of the Fiscal Penal Code, a preventive measure in the form of provisional detention for a period of 14 days since the date of apprehension.

The evidence gathered in the case indicates that the suspect is very likely to have committed the act that he is accused of. This is also supported by the statements submitted by the other four suspects in the case (the first suspect – p. 9341-9354 vol. XLVI, p. 9452-9460 vol. XLVII, the second suspect – p. 10203-10205 vol. LI, the third suspect – p. 9341-9354 vol. XLVL, the fourth suspect – p. 12471-12483 vol. LXII), partially by the statements submitted by the suspect Andrzej Blacha (p. 12515-12516 vol. LXII), documents secured at the offices of the company "Bak-Trans", customs clearance documents obtained from Polish customs agencies and from Ukraine (p. 7042-7081 vol. XXXV, p. 7117-7146 vol. XXXVI, p. 7199-7266 vol. XXXVII, p. 7374-7427 vol. XXXVII, p. 9030-9277 vol. XLV-XLVI), the valuation of losses (p. 8367-8377 vol. XLII), and indirectly – as regards the fraud mechanism – statements submitted by the other suspects (p. 4878-4886 vol. XXV, p. 3804-3807 vol. XXIX, p. 8153-8163 vol. XLI, p. 1578-1583, 1586-1588 vol. VIII), testimony of the witness (p. 8294-8310 vol. XLI).

The two attempts at apprehending the suspect during the pre-trial procedure were ineffective as he was not staying at the place of his official residential address. It was also found that the suspect had been residing abroad since the beginning of the investigation. In 2013, he was supposedly residing in Ukraine, and currently – in the USA, however, there are no further data as to where exactly. Neither is it known if he has returned to Poland.

In the opinion of this Court, the above circumstances show that provisional detention for a period of 14 days since the date of apprehension will be the only adequate preventive

measure. Only the application of an isolative preventive measure will help to ensure that the pre-trial procedure proceeds properly and there is no risk of deception or obstruction of justice on the part of the suspect. According to the view taken by the Court, the evidence gathered in the case contains no contraindications for applying provisional detention as referred to under Article 259 of the Code of Criminal Procedure.

**The decision is immediately enforceable.**

**Instructions**

The suspect has the right to appeal against this decision to the Circuit Court in Siedlce no later than within 7 days from the date of delivery hereof.

Any appeals submitted after this deadline will be ineffective (Articles 107 and 410 of the Code of Criminal Procedure). The appeal should be submitted through the Court which issued the decision.

The suspect has the right to request Prosecutor of the Circuit Prosecutor's Office in Siedlce, in whose custody he is remaining, to repeal or change the preventive measure at any time (Article 254 of the Code of Criminal Procedure).

**It is ordered as follows:**

1. A copy of the decision, including a warrant of detention and admission of the suspect into prison having jurisdiction over the suspect's place of residence, is to be delivered to the Poviat Police Department in Biłgoraj, indicating in the warrant of prison admission that the suspect is in custody of the Circuit Prosecutor's Office in Siedlce in connection with the case number VI Ds 1/13/SP(c);
2. A copy of the Decision is to be served upon the suspect.

*Oblong stamp:*
Original document bears authentic signatures
Certified true copy

*Oblong stamp:*
Senior Court Secretary
District Court in Siedlce
Alina Nestorowicz
*(-) illegible signature*

*Round stamp with the national emblem of the Republic of Poland and the following circumscription:* District Court in Siedlce *8*

*Oblong stamp:*
Certified true copy
Clerk
Circuit Prosecutor's Office in Siedlce
Ewa Szostek
*(-) illegible signature*

*Round stamp with the national emblem of the Republic of Poland and the following circumscription:* Minister of Justice *4*



*Certified translation from Polish*      EXT-BLACHA-00067

*Oblong stamp:*
OFFICIAL COPY

File number V Ds 62/ 15/Sp
Previous file number VI Ds 1/13/Sp

## DECISION
### on search for the suspect by
### All Points Bulletin

6 August 2015

Tomasz Giza – a Prosecutor of the Circuit Prosecutor's Office *(Prokuratura Okręgowa)* in Siedlce, acting in the proceedings against Marek Blacha et al, suspected of a crime under Article 258 Section 1 of the Criminal Code and other crimes,
**on the basis of Article 279 Section 1 of the Code of Criminal Procedure**

### decided:

to order that the suspect MAREK BLACHA son of Jan (PESEL *(Personal ID Number)* 69042107355, domiciled at ul. Wiejska 13 A 23-400 Biłgoraj), with respect to whom – on 9 June 2015 - the District Court in Siedlce issued a decision on temporary detention for a period of 14 days since the date of arrest (file number II Kp 195/ 15), be sought by means of an All Points Bulletin

### Statement of Reasons

On 18 June 2015 a Prosecutor of the District Prosecutor's Office *(Prokuratura Rejonowa)* in Siedlce decided to remove, from the files of the investigation pursued by this Prosecutor's Office – file number VI Ds 1/13/Sp, the materials concerning Marek Blacha and Tarek Orfali – suspected of crimes under Article 258 Section 1 of the Criminal Code in relation to Article 65 Section 1 of the Criminal Code and other. This case was registered in files V Ds of the Circuit Prosecutor's Office in Siedlce – 5th Investigation Department under file number V Ds 62/15, for the purpose of further continuation.

In the course of the proceedings registered under file number VI Ds 1/13/Sp charges were pressed against Marek Blacha. The charges were not officially announced due to the fact that the suspect was not staying at his official registered address and had been fleeing from justice. The attempt to arrest the suspect proved to be unsuccessful.

For these reasons, on 9 June 2015 the District Court in Siedlce ruled that Marek Blacha be detained for a period of 14 days since the date of arrest (file number II Kp 195/15).

Therefore, to enable the execution of procedures with the participation of the suspect, and to complete the preparatory investigation, it was decided as first above stated.

*Round stamp with the national emblem of the Republic of Poland and the following circumscription: Circuit Prosecutor's Office - illegible*

Prosecutor
Circuit Prosecutor's Office in Siedlce
Tomasz Giza
*(-) illegible signature*



Order:

1.  Execute an All Points Bulletin and send the same to appropriate police unit for further dissemination.

Prosecutor
Circuit Prosecutor's Office in Siedlce
Tomasz Giza
*(-) illegible signature*

*Round stamp with the national emblem of the Republic of Poland and the following circumscription:* Circuit Prosecutor's Office in Siedlce *1*

*Oblong stamp:*
Certified true copy
Clerk
Circuit Prosecutor's Office in Siedlce
Ewa Szostek
*(-) illegible signature*

*Round stamp with the national emblem of the Republic of Poland and the following circumscription:* Minister of Justice *4*



*Document executed on 5 pages with the following stamps on each page:*
*Round stamp with the national emblem of the Republic of Poland and the following circumscription: Circuit Prosecutor's Office in Siedlce \*1\**

*Oblong stamp:*
Certified true copy
Clerk
Circuit Prosecutor's Office in Siedlce
Ewa Szostek
*(-) illegible signature*

*Oblong stamp:*
Official Copy

Siedlce, 6 August 2015

File No. V Ds. 62/15/Sp
previous file no. VI Ds 1/13/Sp

## POVIAT POLICE HEADQUARTERS
## IN BIŁGORAJ

### ALL POINTS BULLETIN

Tomasz Giza – a prosecutor of the Circuit Prosecutor's Office *(Prokuratura Okręgowa)* in Siedlce, acting in accordance with the decision to issue an All Points Bulletin against the suspect Marek Blacha, dated 5 August 2015, issued in accordance with Article 279 Section 1 of the Code of Criminal Procedure – in the case registered under file number V Ds. 62/15/Sp,

I.  Orders search by All Points Bulletin of the below named suspect:
 1. Full name: **Marek Blacha**
 2. Alias: -----
 3. Father's name: **Jan**
    Mother's name and maiden name: **Janina nee Obszyńska**
 4. Date and place of birth – **21 April 1969. Biłgoraj**
    PESEL *(Personal ID Number):* **69042107355**
 5. Recent registered place of residence: **ul. Wiejska 13A, Biłgoraj**
 6. Recent place of residence: **ul. Wiejska 13A, Biłgoraj**
 7. Recent place of employment: **N/A**
 8. Occupation: **N/A**
 9. Citizenship: **Polish**
 10. Sex: **male**
 11. Description:
   height: -----------           hair: -----------
   forehead: -----------         face: -----------
   colour of eyes: -----------   ears: -----------
   nose: -----------             lips: -----------
   Distinguishing marks: -----------
   Other features: -----------

Description from the records kept by public authorities under the Act. \*)

*Certified translation from Polish*          EXT-BLACHA-00070

12. Information about the charges:

**who is suspected of the following crimes:**

I)  From 4 July 2009 to 28 April 2010, in Dorohusk (Lubelskie Voivodeship), Biłgoraj (Lubelskie Voivodeship), Lubycza Królewska (Lubelskie Voivodeship), Latowicz (Mazowieckie Voivodeship), Tomaszów Lubelski (Lubelskie Voivodeship) and other locations in Poland, he participated in an organized criminal group composed by Witold Szpindor, Roman Szpindor, Elżbieta Rutkowska, Krzysztof Jakubik, Michał Nawrocki, Andrzej Blacha, Daniel Czop, Marek Jamrozy, Tarek Orfali and other persons, including not less than seven Ukrainian citizens, aiming to commit fiscal crimes and criminal offences which involved engaging in customs frauds in the course of the transit procedure for fresh garlic, laundering the proceeds of the related customs frauds, removing goods from customs supervision, bribing customs officers in connection with the customs clearance process, providing untrue information in export invoices relating to the sale of fresh garlic and using such documents, falsifying invoices relating to the purchase of hollow masonry units and using such documents, providing untrue information in T1 export declarations, while relying on such operations as a source of regular income;

**i.e. a crime under Article 258 Section 1 of the Criminal Code in relation to Article 65 Section 1 of the Criminal Code**

II)  From 4 July 2009 to 28 April 2010, in Dorohusk (Lubelskie Voivodeship), as part of an organized criminal group, while he was a staff member of the company 'Bak-Trans Zakład Transportowy Jan i Marek Blacha' based in Biłgoraj, acting jointly and in concert with Andrzej Blacha, co-owner of the company 'Bak-Trans', Witold Szpindor and Roman Szpindor, partners of the company 'Husar', Elżbieta Rutkowska, sales manager for the company 'HUSAR', Michał Nawrocki, driver for the company 'Husar', Krzysztof Jakubik, owner of the company 'Lat-Pol', Daniel Czop, co-owner of the company 'Cytrus', Parek Orfali, driver for the company 'Cytrus', and Marek Jamroży, driver for the company 'Bak-Trans', as well as other persons, including not less than seven Ukrainian citizens, acting within short time intervals, with the aim of achieving the same and premeditated objective of causing losses of tax revenue and customs duties, while relying on operations involving fiscal crimes as a source of regular income, he was providing misleading information to the Road Customs Branch in Dorohusk, being the office of destination, about the type of goods exported to Ukraine in that during the customs clearance process under the external transit procedure he was submitting T1 export declarations where the company 'Bak-Trans', BH 'Bartek Małgorzata Ptach – Taube', acting through Agencja Celna D.T.A Spółka z o.o., was indicated as exporter, together with the following documents:

1.  **as concerns the declaration No. MRN 09PL30308010E9A430** of 4 July 2009, where the company 'Bak-Trans' was indicated as exporter – the sale invoice No. 43)2009 – confirming the sale of 22,000 kg of fresh garlic for EUR 15,400.00 by the company 'Bak-Trans' to Yuriy Kvochka from Lviv, Ukraine, while no such transaction occurred because the goods exported, instead of fresh garlic, included 22 cellular concrete blocks worth EUR 1,044.70, which were transported abroad on 7 July 2009 by a DAF truck, reg. No. AC 3906A1, and a PP trailer, reg. No. AC



4502XX, driven by Andrii Lagoda, which resulted in that the misled Office closed the transit procedure for fresh garlic and acknowledged this fact in the T1 declaration, number as above, where the said fraud was committed by Marek Blacha acting jointly and in concert with Andrzej Blacha, and some citizens of Ukraine, who have not been identified so far;

2. **as concerns the declaration No. MRN 09PL30308010EC66C0** of 10 July 2009, where the company 'Bak-Trans' was indicated as exporter – the sale invoice No. 45)2009 – confirming the sale of 22,000 kg of fresh garlic for EUR 16,500.00 by the company 'Bak-Trans' to Yuriy Kvochka from Lviv, Ukraine, while no such transaction occurred because the goods exported, instead of fresh garlic, included 816 Solbet concrete blocks worth PLN 6,666.72, which were transported abroad on 15 July 2009 by a Renault truck, reg. No. AC 4472AP, and a Krone trailer, reg. No. AC 8069XX, driven by Viktor Treshchetko, which resulted in that the misled Office closed the transit procedure for fresh garlic and acknowledged this fact in the T1 declaration, number as above, where the said fraud was committed by Marek Blacha acting jointly and in concert with Andrzej Blacha, and some citizens of Ukraine, who have not been identified so far;

3. **as concerns the declaration No. MRN 09PI30308010EC4F90** of 10 July 2009, where the company 'Bak-Trans' was indicated as exporter – the sale invoice No. 44)2009 – confirming the sale of 22,000 kg of fresh garlic for EUR 16,500.00 by the company 'Bak-Trans' to Yuriy Kvochka from Lviv, Ukraine, while no such transaction occurred because the goods exported, instead of fresh garlic, included 720 Solbet-Optimal concrete blocks worth PLN 5,414.00, which were transported abroad on 25 July 2009 by a truck of unidentified make, reg. No. BKL9375AO, and a Schmitz trailer, reg. No. AC 6 498XX, driven by Mykola Tkhoruk, which resulted in that the misled Office closed the transit procedure for fresh garlic and acknowledged this fact in the T1 declaration, number as above, where the said fraud was committed by Marek Blacha acting jointly and in concert with Andrzej Blacha, and some citizens of Ukraine, who have not been identified so far;

4. **as concerns the declaration No. MRN 09PL303080J0EF6855** of 17 July 2009, where the company 'Bak-Trans' was indicated as exporter – the sale invoice No. 48)2009 – confirming the sale of 22,000 kg of fresh garlic for EUR 16,500.00 by the company 'Bak-Trans' to Yuriy Kvochka from Lviv, Ukraine, while no such transaction occurred because the goods exported, instead of fresh garlic, included 864 Solbet-Optimal concrete blocks worth PLN 4,259.52, which were transported abroad on 29 July 2009 by a DAF truck, reg. No. AC8591AM, and a Schmitz trailer, reg. No. AC 855XX, driven by Roman Lutsyk, which resulted in that the misled Office closed the transit procedure for fresh garlic and acknowledged this fact in the T1 declaration, number as above, where the said fraud was committed by Marek Blacha acting jointly and in concert with Andrzej Blacha, and some citizens of Ukraine, who have not been identified so far;

5. **as concerns the declaration No. MRN 09PL30308010F575B3** of 31 July 2009, where the company 'Bak-Trans' was indicated as exporter – the sale invoice No. 53)2009 – confirming the sale of 22,000 kg of fresh garlic for EUR 16,500.00 by the company 'Bak-Trans' to Yuriy Kvochka from Lviv, Ukraine, while no such transaction occurred because the goods exported, instead of fresh garlic, included



1,728 Solbet-Optimal plates worth PLN 4,250.83, which were transported abroad on 4 August 2009 by a Renault truck, reg. No. AC 7874AH, and a Paction trailer, reg. No. AC 3793XX, driven by Oleh Rakovets, which resulted in that the misled Office closed the transit procedure for fresh garlic and acknowledged this fact in the T1 declaration, number as above, where the said fraud was committed by Marek Blacha acting jointly and in concert with Andrzej Blacha, Daniel Czop and Tarek Orfali, and some citizens of Ukraine, who have not been identified so far;

6. **as concerns the declaration No. MRN 09PL30308010ABDC** of 18 September 2009, where the company 'Bak-Trans' was indicated as exporter – the sale invoice No. 67)09 – confirming the sale of 22,000 kg of fresh garlic for EUR 26,180.00 by the company 'Bak-Trans' to Yuriy Kvochka from Lviv, Ukraine, while no such transaction occurred because the goods exported, instead of fresh garlic, included 912 Solbet-Optimal plates worth PLN 3,685.38, which were transported abroad on 23 September 2009 by a DAF truck, reg. No. AC0382AE, and a Krone trailer, reg. No. EA265920, driven by Bogdan Marchuk, which resulted in that the misled Office closed the transit procedure for fresh garlic and acknowledged this fact in the T1 declaration, number as above, where the said fraud was committed by Marek Blacha acting jointly and in concert with Andrzej Blacha, Daniel Czop and Tarek Orfali, and some citizens of Ukraine, who have not been identified so far;

7. **as concerns the declaration No. MRN 09PL3030801148C087** of 29 January 2010, where the company 'Bak-Trans' was indicated as exporter – the sale invoice No. 7)2010 – confirming the sale of 22,000 kg of fresh garlic for EUR 27,500.00 by the company 'Bak-Trans' to Yuriy Kvochka from Lviv, Ukraine, while no such transaction occurred because the goods exported, instead of fresh garlic, included 864 Solbet-Optimal plates worth PLN 4,259.52, which were transported abroad on 31 January 2010 by a DAF truck, reg. No. AC6532AX, and a SOR trailer, reg. No. AC0187XT, driven by Olga Smal, which resulted in that the misled Office closed the transit procedure for fresh garlic and acknowledged this fact in the T1 declaration, number as above, where the said fraud was committed by Marek Blacha acting jointly and in concert with Andrzej Blacha, Witold Szpindor and Roman Szpindor, and some citizens of Ukraine, who have not been identified so far;

8. **as concerns the declaration No. MRN 09PL3030801154D2F0** of 20 February 2010, where the company 'Bak-Trans' was indicated as exporter – the sale invoice No. 15)2010 – confirming the sale of 22,000 kg of fresh garlic for EUR 27,940.00 by the company 'Bak-Trans' to Yuriy Kvochka from Lviv, Ukraine, while no such transaction occurred because the goods exported, instead of fresh garlic, included a so far unidentified quantity of Solbet-Optimal plates, which were transported abroad on 4 March 2010 by a DAF truck of unidentified make, reg. No. AC6532AX, and a SOR trailer, reg. No. AC0187XT, driven by an unidentified citizen of Ukraine, which resulted in that the misled Office closed the transit procedure for fresh garlic and acknowledged this fact in the T1 declaration, number as above, where the said fraud was committed by Marek Blacha acting jointly and in concert with Andrzej Blacha and some citizens of Ukraine, who have not been identified so far;

9. **as concerns the declaration No. MRN 10PL3030801173B7D0** of 21 April 2010, where the company 'Bak-Trans' was indicated as exporter – the sale invoice No. 35)2010 and a CMR road consignment note without number – confirming the sale of



22,000 kg of fresh garlic for EUR 28,600.00 by the company 'Bak-Trans' to Yuriy Kvochka from Lviv, Ukraine, and Yuriy Pidlisnyak from Lviv, Ukraine, the provision of transport services to the purchaser using a DAF truck, reg. No. LBL40CT, and a Kogel trailer, reg. No. AT9455235, driven by Marek Jamroży, while no such transaction occurred and no services of fresh garlic transport were provided, because the goods exported, instead of fresh garlic, included 864 Solbet-Optimal blocks worth PLN 4,259.52, which were transported abroad on 23 April 2010 by the vehicles referred to above, which resulted in that the misled Office closed the transit procedure for fresh garlic and acknowledged this fact in the T1 declaration, number as above, where the said fraud was committed by Marek Blacha acting jointly and in concert with Witold Szpindor, Roman Szpindor, Andrzej Blacha and Marek Jamroży, and some citizens of Ukraine, who have not been identified so far;

10. **as concerns the declaration No. MRN 10PL303080117785F9** of 28 April 2010, where the company 'BH-Bartek' was indicated as exporter – the sale invoice No. 45)2010, No. 36)2010, and a CMR road consignment note without number – confirming the sale of 22,300 kg of fresh garlic for PLN 54,614.00 by the company 'BH Bartek-Małgorzata Ptach – Taube' to Stachiw Anatolij from Ternopil, Ukraine, the provision of transport services to the purchaser using a DAF truck, reg. No. LBL40CT, and a Kogel trailer, reg. No. AT9455235, driven by Marek Jamroży, while no such transaction occurred and no services of fresh garlic transport were provided, because the goods exported, instead of fresh garlic, included 720 D600 hollow masonry units worth USD 2,268.00, which were transported abroad on 29 April 2010 by the vehicles referred to above, which resulted in that the misled Office closed the transit procedure for fresh garlic and acknowledged this fact in the T1 declaration, number as above, and the fresh garlic was sold in Poland by the company 'Bak-Trans', 'BH Bartek Małgorzata Ptach-Taube' and 'Bak-Trans', where the said fraud was committed by Marek Blacha acting jointly and in concert with Witold Szpindor, Roman Szpindor, Andrzej Blacha and Marek Jamroży, and some citizens of Ukraine, who have not been identified so far, while causing at the same time in all the cases referred to above that the goods in question were removed from customs supervision and as result remained in Poland and were sold – 220,000 kg of garlic – which led to a loss of customs duties of not less than PLN 1,223,180.00, i.e. a considerable loss;

**i.e. a crime under Article 87 Section 2 of the Fiscal Penal Code in relation to Article 90 Sections 1 and 2 of the Fiscal Penal Code in relation to Article 6 Section 2 of the Fiscal Penal Code and in relation to Article 7 Section 1 of the Fiscal Penal Code in relation to Article 37 Section 1 items 1, 2 and 5 of the Fiscal Penal Code**

13. Date and number of the decision about temporary detention:
**9 June 2015 District Court in Siedlce – file number II Kp 195/15.**

II. Dissemination of the APB will be effected by sending to the Police units.
- publication of All Points Bulletin data online
III. Photograph of the subject

**It is hereby requested that everyone who knows the place of stay of the wanted individual should inform the nearest Police unit or Prosecutor about the same (article 280 Section 1 clause 4 of the Code of Criminal Procedure).**

*Certified translation from Polish*          EXT-BLACHA-00074



**Warning – hiding the wanted party or assisting him/her in escape will be liable to imprisonment up to 5 years (article 239 Section 1 of the Criminal Code).**

**The identity of any informant shall be kept confidential (article 280 Section 2 of the Code of Criminal Procedure).**

Appendices
1. copy of the decision on temporary detention
2. warrant of admittance to nearest remand and centre.

*Round stamp with the national emblem of the Republic of Poland and the following circumscription:* Circuit Prosecutor's Office in Siedlce *1*

Signature and stamp of prosecutor
*(-) illegible signature*

*Round stamp with the national emblem of the Republic of Poland and the following circumscription:* Circuit Prosecutor's Office in Siedlce *1*

*Oblong stamp:*
Certified true copy
Clerk
Circuit Prosecutor's Office in Siedlce
Ewa Szostek
*(-) illegible signature*

*Round stamp with the national emblem of the Republic of Poland and the following circumscription:* Minister of Justice *4*



Copy of photograph of Marek Blacha – an appendix to the request for temporary detention and extradition of Marek Blacha

*photograph of the suspect*

*Round stamp with the national emblem of the Republic of Poland and the following circumscription:* Circuit Prosecutor's Office in Siedlce *1*

*Oblong stamp:*
Certified true copy
Clerk
Circuit Prosecutor's Office in Siedlce
Ewa Szostek
*(-) illegible signature*

*Round stamp with the national emblem of the Republic of Poland and the following circumscription:* Minister of Justice *4*



Extract from regulations applicable to the case registered under file number V Ds. 62/15 against Marek Blacha, including regulations under the Criminal Code, Fiscal Penal Code and the statute of limitations – an appendix to the request for temporary detention and extradition of Marek Blacha

Article 258 [Organised crime. Participation in an organised crime group]
Section 1
Whoever participates in an organised group or association having for its purpose the commission of offences shall be subject to the penalty of imprisonment from 3 months up to 5 years.

Article 87 [Import duty fraud]
Section 1.
Any person who by way of misleading the authority entitled to customs control exposes the customs receivables to reduction, will be liable to fine of up to 720 daily rates, or imprisonment, or both penalties jointly.

Section 2.
The same penalty shall be applied, if the import duty fraud involves goods or services in international trade subject to non tariff restrictions.

Article 90 [Removal of goods from customs supervision]
Section 1.
Any person who removes goods or means of transport from customs supervision shall be liable to fine of up to 720 daily rates, imprisonment of up to 3 years or both penalties.

Section 2.
The same penalty shall be applied to a person who destroys or damaged customs seal without a proper authorisation of relevant authority.

Article 6 [Unity of crime]
Two or more acts committed in short time intervals, relating to the execution of the same intention or with the utilisation of the same opportunity shall be considered to constitute a single prohibited act. In the case of prohibited acts involving evasion or underpayment of taxes, the above mentioned short time intervals shall be considered as being of 6 month duration.

Article 7 [Application of separate regulations]
Section 1.
If the same act exhausts the prerequisites specified in two or more regulations of the Code, the court will sentence only for one fiscal crime, or only for one fiscal misdemeanor on grounds of all connected regulations.

Article 37 [Extraordinary aggravation of the penalty]
Section 1.
The court will apply extraordinary aggravation of the penalty if the perpetrator
    1) intentionally commits fiscal offense, causing reduction of the tax of large value, or intentionally commits fiscal offense and the value of the object of such offense is significant,
    2) has made the fiscal offences a permanent source of income,
    5) commits fiscal crime acting in an organized group or syndicate aimed at committing of a fiscal crime,

*Certified translation from Polish*          EXT-BLACHA-00077



Article 44 [statute of limitations – fiscal crimes]

Article 44
Section 1.
Fiscal crimes become statute barred upon the elapse of the following number of years:
1) 5 – if the fiscal offense results in imposition of a fine, restriction of freedom or imprisonment of up to 3 years;
2) 10 – if the fiscal offense results in imposition the penalty of imprisonment in excess of 3 years.

Section 2.
The amenability for fiscal offences involving evasion or underpayment of taxes whatsoever shall also cease upon the offence having become statute barred.

Section 3.
In tax evasion or underpayment cases, as provided in Sections 1 or 2, the period of limitation shall begin to run at the end of the corresponding financial year. If the tax evasion crime involved customs duties, the period of limitation shall begin to run on the date of the customs duty having become payable. If it is not feasible to determine the due date; the period of limitation shall begin to run as soon as the debt is discovered.

Section 4.
In the cases stipulated in Sections 1 or 2, if a fiscal crime depends on specific occurrence of specific consequences stipulated under law, the period of limitation shall begin to run on the date of the occurrence of such consequences.

Section 5.
If during the period stipulated in Section 1 or 2 proceedings against the perpetrator were launched, the amenability for the fiscal offence specified in Section 1 clause 1 shall cease upon the elapse of 5 years, and in the case of the fiscal offence stipulated in Section 1 clause 2 shall cease upon the elapse of 10 years since the end of that period.

Section 6.
If an effective decision is repealed, the period of limitation shall begin to run on the date of decision in this respect, unless the amenability of the offence has already ceased.

Section 7.
The period of limitation shall not run, if any regulations under law prevent the launching or further conduct of an investigation concerning a fiscal offence."

*Round stamp with the national emblem of the Republic of Poland and the following circumscription:* Circuit Prosecutor's Office in Siedlce *1*

> *Oblong stamp:*
> Certified true copy
> Clerk
> Circuit Prosecutor's Office in Siedlce
> Ewa Szostek
> *(-) illegible signature*

*Round stamp with the national emblem of the Republic of Poland and the following circumscription:* Minister of Justice *4*

*Certified translation from Polish*        EXT-BLACHA-00078



*Photocopy copy of a partially bilingual (Polish and English) fingerprint chart, completed in handwriting.*

*Stamp of Voivodeship Police Headquarters in Rzeszów*

Barcode:
004472428A

### REPUBLIC OF POLAND

*Oblong stamp of the Police Central Forensic Lab*

*Oblong stamp:*
Certified true copy of the original
6 October 2017
*(-) illegible signature*

Surname: BLACHA
Given names MAREK

Policeman's identification no.
*illegible*

Maiden name: BLACHA
Father's given name: JAN
Mother's given name: JANINA
Address: UL. WIEJSKA 13A, 23-400 BIŁGORAJ,
Sex M
Date of birth/PESEL *(Personal ID)* 1969042107355
Place of birth: BIŁGORAJ
Nationality: POLISH, offence: Article 286 of the Criminal Code

KSIP OIO No. 5208076X
file No. D-11-8/2010
Police unit code: 090003
Case No. RSD-31/ *illegible*
Identity card: ANJ 411596

RIGHT HAND

| 1. thumb | 2. index finger | 3. middle finger | 4. ring finger | 5. little finger |

LEFT HAND

| 6. thumb | 7. index finger | 8. middle finger | 9. ring finger | 10. little finger |

| LEFT HAND - simultaneous print of all the four fingers | simultaneous prints of the thumbs | | RIGHT HAND – simultaneous print of all the four fingers |
|---|---|---|---|
| | LEFT | RIGHT | |
| | | | |

Legible signature of person whose fingerprints were taken
*illegible signature*

Date fingerprints taken:
22 February 2010
Place where fingerprints taken:
Poviat Police Headquarters in Biłgoraj

Legible signature of person taking fingerprints
*(-) illegible signature*

*Round stamp with the national emblem of the Republic of Poland and the following circumscription:* Circuit Prosecutor's Office in Siedlce *1*

*Oblong stamp:*
Certified true copy
Clerk
Circuit Prosecutor's Office in Siedlce
Ewa Szostek
*(-) illegible signature*

*Round stamp with the national emblem of the Republic of Poland and the following circumscription:* Minister of Justice *4*

*Certified translation from Polish*

EXT-BLACHA-00079

**AFIS SYSTEM REGISTRATION CARD**
**PALM PRINTS**

place barcode here

Legible signature of person whose fingerprints are taken:       Marek Blacha
ID of police officer in charge of registration:                851130
                                                               senior sergeant *name illegible*

Surname: BLACHA
Given names MAREK
Date and place of birth: 21 April 1969, BIŁGORAJ
Address: UL. WIEJSKA 13A, 23-400, BIŁGORAJ,
File no. D-11-8/2010

For registration purposes, only palm prints are taken(no fingers or edges) – Fold here..............

Left hand                                                      Right hand
*Oblong stamp of the Police Central Forensic Lab*

*Oblong stamp:*
Certified true copy of the original
6 October 2017
*(-) illegible signature*

Reason why prints are taken: Other

Left index finger                                              Right index finger

*Round stamp with the national emblem of the Republic of Poland and the following circumscription:* Circuit Prosecutor's Office in Siedlce *1*

*Oblong stamp:*
Certified true copy
Clerk
Circuit Prosecutor's Office in Siedlce
Ewa Szostek
*(-) illegible signature*

*Round stamp with the national emblem of the Republic of Poland and the following circumscription:* Minister of Justice *4*

Rep. No. 150/2019
Lipsk, 18 January 2019
I, Małgorzata Panasiuk, a sworn translator of the English and Russian languages, recorded on the list of sworn translators kept by Minister of Justice under No. TP/4455/05, do hereby certify and attest that the foregoing is a true and accurate translation of the original document presented to me.

*Certified translation from Polish*          EXT-BLACHA-00080





MINISTRY OF JUSTICE
REPUBLIC OF POLAND
www.ms.gov.pl

Warszawa, 17 August 2020

**Department of International Cooperation**
**and Human Rights**
**Division of International Legal Cooperation**
**in Criminal Matters**

DWMPC-II.071.2.2019
(please quote when replying)

> **David S. Silverbrand**
> **Trial Attorney**
> **Office of International Affairs**
> **Criminal Division**
> **United States Department of Justice**
> **1301 New York Avenue, NW**
> **Washington, DC 20530**

**Extradition Treaty between the Republic of Poland and the United States of America signed in Washington on July 10, 1996.**

**Extradition of Polish citizen Marek BLACHA from the USA to Poland**

**Your reference : Unknown**

Dear Mr. Silverbrand,

In reference to the request for extradition from the United States to Poland of Polish citizen **Marek BLACHA**, the Ministry of Justice of the Republic of Poland sends herewith the supplementary information submitted by the requesting Polish Prosecutor's Office, accompanied with English translation. The documents have been duly authorised by the Polish Minister of Justice in accordance with the Article 10 of the aforementioned Extradition Treaty.

Sincerely yours,

Tomasz Chałański

Head of the Division
of International Legal Cooperation
in Criminal Matters

By: M. Augustyniak

EXY SBLACHA 00082



REPUBLIC OF POLAND
NATIONAL PROSECUTOR'S OFFICE
**BUREAU OF INTERNATIONAL COOPERATION**

3 Postępu Street, 02-676 Warsaw
e-mail: sekretariat.bwm@pk.gov.pl
fax: + 48 22 125-14-22

Warsaw, *29.07.* 2020

Our Ref. No.: PK V Oz.w  708.2017

Your Ref. No.: unknown

**U.S. Department of Justice**

**Criminal Division**

**Office of International Affairs**

**1301 New York Avenue, NW**

**Washington, DC 20530**

**USA**

**e-mail: David.Silverbrand@usdoj.gov**

With reference tour previous correspondence, concerning the request for extradition of Polish citizen Marek Blacha, (Ref. No: PO I Ds 65.2017), please find attached the supplementary letter of Circuit Prosecutor in Siedlce of 29 May 2020 in this case.

Sincerely yours,

PROKURATOR
Iwona Chećko

Director of Bureau
of International Cooperation

Biuro Współpracy Międzynarodowej
Prokuratury Krajowej

Beata Hlawacz

EXT-BLACHA-00083

PROKURATURA OKRĘGOWA
W SIEDLCACH
**ZASTĘPCA PROKURATORA
OKRĘGOWEGO**
:d. Brzeska 97
08-110 SIEDLCE
tel./fax: 025 632-23-23 wew. 328 lub 329

Siedlce, dnia 29 maja 2020 r.

PO I Ds 65.2017

# Informacja uzupełniająca do wniosku o ekstradycję Marka Blachy

W nawiązaniu do wniosku o ekstradycję Marka Blachy oraz zapytania z dnia 8 stycznia 2020 roku, uprzejmie informuję, iż odnośnie regulacji prawnej dotyczącej braku dokładnego określenia czasu trwania kary pozbawienia wolności określonej w artykule 87 paragraf 2 kodeksu karnego skarbowego (poprzez odesłanie do artykułu 87 paragraf 1 kodeksu karnego skarbowego) ma zastosowanie artykuł 27 paragraf 1 kodeksu karnego skarbowego, z którego wynika, że *Jeżeli kodeks nie stanowi inaczej, kara pozbawienia wolności trwa najkrócej 5 dni, najdłużej - 5 lat; wymierza się ją w dniach, miesiącach i latach.*

Reasumując czyn z artykułu 87 paragraf 2 kodeksu karego skarbowego zagrożony jest karą grzywny do 720 stawek dziennych albo karze pozbawienia wolności, albo obu tym karom łącznie, gdzie kara pozbawienia wolności na podstawie artykułu 27 paragraf 1 trwa najkrócej 5 dni, najdłużej - 5 lat; wymierza się ją w dniach, miesiącach i latach.

Wyjaśniając kwestię obliczenia terminu przedawnienie karalności przestępstwa z art. 258 paragraf 1 kodeksu karnego zarzuconego Markowi Blacha w punkcie I wniosku o ekstradycję, należy odnieść się do przepisów artykułu 101 paragraf 1 punkt 3 oraz do artykułu 102 kodeksu karnego mówiących o ustaniu karalności oraz o przedłużeniu przedawnienia karalności.

Na wstępnie wyjaśnienia wymaga fakt, od kiedy należy liczyć termin przedawnienia karalności przestępstwa z art. 258 paraf 1 kodeksu karnego

popełnionego przez Marka Blachę w okresie od 4 lipca 2009 roku do 28 kwietnia 2010 roku.

Zgodnie z orzecznictwem i z doktryną zarówno przy przestępstwach rozciągniętych w czasie, wieloczynowych, trwałych, jak i o charakterze ciągłym, za czas popełnienia takich przestępstw traktować należy ostatni moment działania sprawcy, w tym czas dokonania ostatniego z czynów składających się na realizację przestępstwa ciągłego. (Wyrok Sądu Najwyższego z dnia 24 października 2013 roku III KK 311/13)

W związku z powyższym termin przedawnienia przestępstwa należy liczyć od dnia 28 kwietnia 2010 roku.

Czyn z artykułu 258 paragraf 1 kodeksu karnego, który został popełniony przez podejrzanego Marka Blachę w okresie od 4 lipca 2009 roku do 28 kwietnia 2010 roku zagrożony jest karą pozbawienia wolności od 3 miesięcy do 5 lat. Zgodnie z artykułem 101 paragraf 1 punkt 3 kodeksu karego mówiącego o przedawnieniu, jeżeli czyn stanowi występek zagrożony karą pozbawienia wolności przekraczającą 3 lata to karalność przestępstwa ustaje, jeżeli od czasu jego popełnienia upłynęło lat 10. Przedawnienie następuje w dniu 28 kwietnia 2020 roku (28 kwiecień 2010 roku +10 lat = 28 kwiecień 2020 roku). Z uwagi na fakt, iż w okresie tym zostało wszczęte postępowanie w niniejszej sprawie, okres 10 lat przedawnienia karalności zgodnie z artykułem 102 kodeksu karnego zostaje przedłużony o kolejne 10 lat (28 kwiecień 2020 roku +10 lat = 28 kwiecień 2030 roku).

Zgodnie z powyższym przedawnienie karalności czynu zarzucanego Markowi Blacha w punkcie I wniosku o ekstradycję przedawni się 28 kwietnia 2030 roku.

Wyjaśniając kwestię obliczenia terminu przedawnienie karalności przestępstwa z art. 87 paragraf 2 kodeksu karnego skarbowego w zbiegu z artykułem 90 paragraf 1 i 2 kodeksu karnego skarbowego w związku z artykułem 6 paragraf 2 kodeksu karnego skarbowego i w związku z artykułem 7 paragraf 1 kodeksu karnego skarbowego w związku z artykułem 37 paragraf 1 punkt 1, 5 kodeksu karnego skarbowego zarzuconego Markowi Blacha w punkcie II wniosku o ekstradycję, należy

EXT-BLACHA-00085

odnieść się do przepisów artykułu 44 paragraf 1 punkt 2 paragrafu 3 oraz paragrafu 5 kodeksu karnego skarbowego.

Czyn z artykułu 87 paragraf 2 kodeksu karnego skarbowego w zbiegu z artykułem 90 paragraf 1 i 2 kodeksu karnego skarbowego w związku z artykułem 6 paragraf 2 kodeksu karnego skarbowego i w związku z artykułem 7 paragraf 1 kodeksu karnego skarbowego w związku z artykułem 37 paragraf 1 punkt 1, 5 kodeksu karnego skarbowego, który został popełniony przez podejrzanego Marka Blachę w okresie od 4 lipca 2009 roku do 28 kwietnia 2010 roku zagrożony jest karą grzywny do 720 stawek dziennych albo karą pozbawienia wolności (trwającą najkrócej od 5 dni do najdłużej 5 lat) albo obu tym karom łącznie. Zagrożenie ww. karą wynika z uwzględnia najsurowszej kary za poszczególne przestępstwa.

Z uwagi na fakt, że mamy do czynienia z przestępstwem skarbowym polegającym na uszczupleniu lub narażeniu na uszczuplenie należności publicznoprawnej bieg przedawnienia rozpoczyna się z końcem roku, w którym upłynął termin płatności tej należności to jest 31 grudnia 2010 roku.

Zgodnie z artykułem 44 paragraf 1 punkt 2 oraz paragrafem 5 kodeksu karego skarbowego mówiącego o przedawnieniu przestępstw skarbowych, jeżeli czyn stanowi przestępstwo zagrożone karą pozbawienia wolności przekraczającą 3 lata to karalność przestępstwa skarbowego ustaje, jeżeli od czasu jego popełnienia upłynęło lat 10. Przedawnienie następuje w dniu 31 grudnia 2020 roku (31 grudnia 2010 roku +10 lat = 31 grudnia 2020 roku). Z uwagi na fakt, iż w okresie tym zostało wszczęte postępowanie w niniejszej sprawie, okres 10 lat przedawnienia karalności zgodnie z artykułem 44 paragraf 5 kodeksu karnego skarbowego zostaje przedłużony o kolejne 10 lat. (31 grudzień 2020 roku +10 lat = 31 grudzień 2030 roku).

Zgodnie z powyższym przedawnienie karalności czynu zarzucanego Markowi Blacha w punkcie II wniosku o ekstradycję przedawni się 31 grudnia 2030 roku, a nie jak błędnie podano we wniosku 1 stycznia 2031 roku.



Zastępca Prokuratora Okręgowego
w Siedlcach

Małgorzata Podniesińska

EXT-BLACHA-00086

Załącznik:

Wyciąg przepisów kodeksu karnego i kodeksu karnego skarbowego mających zastosowanie w niniejszej sprawie.

Zestawienie przepisów kodeksu karnego i kodeksu karnego skarbowego

mających zastosowanie w sprawie:

1. **Ustawa z dnia 10 września 1999 roku, Kodeks karny skarbowy** *(Dziennik Urzędowy 2018 pozycja 1958 tekst jednolity z dnia 15 października 2018 roku)*

(…) Rozdział 3 Przestępstwa skarbowe (…)

**Artykuł 23 kodeksu karnego skarbowego [Grzywna w stawkach dziennych]**

EXT-BLACHA-00087

paragraf 1 Wymierzając karę grzywny, sąd określa liczbę stawek oraz wysokość jednej stawki dziennej; jeżeli kodeks nie stanowi inaczej, najniższa liczba stawek wynosi 10, najwyższa - 720.

paragraf 2 Wyrokiem nakazowym można wymierzyć karę grzywny w granicach nieprzekraczających wysokości 200 stawek dziennych, chyba że kodeks przewiduje karę łagodniejszą.

paragraf 3 Ustalając stawkę dzienną, sąd bierze pod uwagę dochody sprawcy, jego warunki osobiste, rodzinne, stosunki majątkowe i możliwości zarobkowe; stawka dzienna nie może być niższa od jednej trzydziestej części minimalnego wynagrodzenia ani też przekraczać jej czterystukrotności.

(…)

**Artykuł 27 kodeksu karnego skarbowego [Granice kary pozbawienia wolności]**

paragraf 1 Jeżeli kodeks nie stanowi inaczej, kara pozbawienia wolności trwa najkrócej 5 dni, najdłużej - 5 lat; wymierza się ją w dniach, miesiącach i latach.

(…)

**Artykuł 44 kodeksu karnego skarbowego [*Przedawnienie* przestępstwa skarbowego]**

paragraf 1 Karalność przestępstwa skarbowego ustaje, jeżeli od czasu jego popełnienia upłynęło lat:

1) 5 - gdy czyn stanowi przestępstwo skarbowe zagrożone karą grzywny, karą ograniczenia wolności lub karą pozbawienia wolności nieprzekraczającą 3 lat;

2) 10 - gdy czyn stanowi przestępstwo skarbowe zagrożone karą pozbawienia wolności przekraczającą 3 lata.

paragraf 2 Karalność przestępstwa skarbowego polegającego na uszczupleniu lub narażeniu na uszczuplenie należności publicznoprawnej ustaje także wówczas, gdy nastąpiło *przedawnienie* tej należności.

paragraf 3 W wypadkach przewidzianych w paragrafie 1 lub paragrafie 2 bieg *przedawnienia* przestępstwa skarbowego polegającego na uszczupleniu lub narażeniu na uszczuplenie należności publicznoprawnej rozpoczyna się z końcem roku, w którym upłynął termin płatności tej należności. Jeżeli sprawca przestępstwa

EXT-BLACHA-00088

skarbowego dopuścił się uszczuplenia lub narażenia na uszczuplenie należności celnej, bieg jego *przedawnienia* rozpoczyna się z dniem, w którym powstał dług celny; jeżeli nie jest możliwe określenie dnia powstania długu celnego, bieg *przedawnienia* przestępstwa skarbowego rozpoczyna się z dniem najwcześniejszym, w którym istnienie długu celnego zostało ustalone.

paragraf 4 W wypadkach przewidzianych w paragrafie 1 lub paragrafie 2, jeżeli dokonanie przestępstwa skarbowego zależy od nastąpienia określonego w kodeksie skutku, bieg *przedawnienia* rozpoczyna się od czasu, gdy skutek nastąpił.

paragraf 5 Jeżeli w okresie przewidzianym w paragrafie 1 lub paragrafie 2 wszczęto postępowanie przeciwko sprawcy, karalność popełnionego przez niego przestępstwa skarbowego określonego w paragrafie 1 punkt 1 ustaje z upływem 5 lat, a przestępstwa skarbowego określonego w paragrafie 1 punkt 2 - z upływem 10 lat od zakończenia tego okresu.

paragraf 6 W razie uchylenia prawomocnego orzeczenia *przedawnienie* biegnie od dnia wydania orzeczenia w tym przedmiocie, chyba że karalność przestępstwa skarbowego już ustała.

paragraf 7 *Przedawnienie* nie biegnie, jeżeli przepis ustawy nie pozwala na wszczęcie lub dalsze prowadzenie postępowania w sprawie o przestępstwo skarbowe. (…)


Rozdział 7 Przestępstwa skarbowe i wykroczenia skarbowe przeciwko obowiązkom celnym oraz zasadom obrotu z zagranicą towarami i usługami
(…)
**Artykuł 87 kodeksu karnego skarbowego [Oszustwo celne]**

paragraf 1 Kto przez wprowadzenie w błąd organu uprawnionego do kontroli celnej naraża należność celną na uszczuplenie, podlega karze grzywny do 720 stawek dziennych albo karze pozbawienia wolności, albo obu tym karom łącznie.

paragraf 2 Tej samej karze podlega sprawca, jeżeli oszustwo celne dotyczy towaru lub usługi w obrocie z zagranicą, co do których istnieje reglamentacja pozataryfowa.

6

paragraf 3  Jeżeli kwota należności celnej narażonej na uszczuplenie lub wartość towaru lub usługi w obrocie z zagranicą, co do których istnieje reglamentacja pozataryfowa, jest małej wartości, sprawca czynu zabronionego określonego w paragrafie 1 lub 2 podlega karze grzywny do 720 stawek dziennych.

paragraf 4  Jeżeli kwota należności celnej narażonej na uszczuplenie lub wartość towaru lub usługi w obrocie z zagranicą, co do których istnieje reglamentacja pozataryfowa, nie przekracza ustawowego progu, sprawca czynu zabronionego określonego w paragrafie 1 lub 2 podlega karze grzywny za wykroczenie skarbowe.

(…)

## 2. **Ustawa z dnia 6 czerwca 1997 roku, Kodeks karny** *(Dziennik Urzędowy 2019.1950 tekst jednolity z dnia 14 października 2019 roku)*

(…) Rozdział  XI  Przedawnienie

**Artykuł 101  [Ustanie karalności]**

paragraf 1  Karalność przestępstwa ustaje, jeżeli od czasu jego popełnienia upłynęło lat:

1)  30 - gdy czyn stanowi zbrodnię zabójstwa;

2)  20 - gdy czyn stanowi inną zbrodnię;

2a)  15 - gdy czyn stanowi występek zagrożony karą pozbawienia wolności przekraczającą 5 lat;

3)  10 - gdy czyn stanowi występek zagrożony karą pozbawienia wolności przekraczającą 3 lata;

4)  5 - gdy chodzi o pozostałe występki;

5)  (uchylony).

(….)

**Artykuł 102  [Przedłużenie przedawnienia karalności]**

Jeżeli w okresie, o którym mowa w artykule 101, wszczęto postępowanie, karalność przestępstw określonych w art. 101 paragraf 1 ustaje z upływem 10 lat, a w pozostałych wypadkach - z upływem 5 lat od zakończenia tego okresu.

7

EXT-BLACHA-00090

**Certified translation from the Polish language**

CIRCUIT PROSECUTOR'S OFFICE
IN SIEDLCE
**DEPUTY CIRCUIT PROSECUTOR**
ul. Brzeska 97
08-110 SIEDLCE
tel./fax: 025 632-25-23 ext. 328 or 329

Siedlce, May 29, 2020

PO I Ds 65.2017

**Supplementary information to the request for extradition of Marek Blacha**

In reference to the request for extradition of Marek Blacha and the question of January 8, 2020, please be kindly informed that regarding the legal regulations concerning the lack of precise determination of the duration of imprisonment referred to in Article 87 section 2 of the Fiscal Criminal Code (by reference to Article 87 section 1 of the Fiscal Criminal Code) Article 27 section 1 of the Fiscal Criminal Code applies, from which it follows that *Unless the Code provides otherwise, imprisonment lasts not less than five days and not more than 5 years; it is imposed in days, months and years.*

Summing up, an act under Article 87 section 2 of the Fiscal Criminal Code carries a fine of up to 720 daily rates or imprisonment, or both these penalties jointly, where imprisonment by virtue of Article 27 section 1 last not less than five days and not more than 5 years; it is imposed in days, months and years.

Explaining the issue of calculating the period of limitation of the criminal offenses under Article 258 section 1 of the Criminal Code alleged to Marek Blacha in point 'I' of the extradition request, reference should be made to the provisions of Article 101 section 1(3) and Article 102 of the Criminal Code, regulating limitation of prosecution and extension of the period of limitation.

To begin with, it is necessary to explain the fact from when the period of limitation should be calculated with regard to the offense under Article 258 section 1 of the Criminal Code committed by Marek Blacha in the period from July 1, 2009 through April 28, 2010.

EXT-BLACHA-00091

According to case law and doctrine, both in case of crimes stretched in time, comprised of multiple acts, persistent, as well of continuous nature, the time of perpetration of such offenses should be adopted as the last moment of action of the offender, including the time of perpetration of the last of the acts constituting implementation of a continuous offense. (Judgment of the Supreme Court of October 24, 2013 III KK 311/13)

In connection with the foregoing, the period of limitation of prosecution of the offense should run from April 28, 2010.

The act under Article 258 section 1 of the Criminal Code, which was committed by the suspect Marek Blacha in the period from July 4, 2009 through April 28, 2010 carries penalty of imprisonment from 3 months up to 5 years. Pursuant to Article 101 section 1(3) of the Criminal Code concerning limitation, if an act constitutes an offense carrying a penalty of imprisonment exceeding 3 years, prosecution of the offense becomes limited by prescription after the lapse of 10 years from the time of its perpetration. Limitation occurs on April 28, 2020 (April 28, 2010 + 10 years = April 28, 2020). Due to the fact that during this period proceedings were initiated in the present case, the limitation period of 10 years under Article 102 of the Criminal Code is extended by a further 10 years (April 28, 2020 + 10 years = April 28, 2030).

In accordance with the foregoing, prosecution of the act alleged to Marek Blacha point 'I' of the extradition request shall become limited on April 28, 2030.

Explaining the issue of calculating the period of limitation of the criminal offenses under Article 87 section 2 of the Fiscal Criminal Code in conjunction with Article 90 section 1 and 2 of the Fiscal Criminal Code in connection with Article 6 section 2 of the Fiscal Criminal Code and in connection with Article 7 section 1 of the Fiscal Criminal Code in connection with Article 37 section 1(1), (5),of the Fiscal Criminal Code alleged to Marek Blacha in point 'II' of the extradition request, should be made to the provisions of Article 44 section 1(2), section 3 and section 5 of the Fiscal Criminal Code.

The act under Article 87 section 2 of the Fiscal Criminal Code in conjunction with Article 90 section 1 and 2 of the Fiscal Criminal Code in connection with Article 6 section 2 of the Fiscal Criminal Code and in connection with Article 7 section 1 of the Fiscal Criminal Code in connection with Article 37 section 1(1), (5) of the Fiscal Criminal Code, which was committed by the suspect Mark Blacha in the period from July 4, 2009 through April 28, 2010 carries a penalty of a fine of up to 720 daily rates or imprisonment (not less than 5 days up to

EXT-BLACHA-00092

no more than 5 years) or both these penalties jointly. The above threat follows from taking into account the most severe punishment for the individual offenses.

Due to the fact that we are dealing with a fiscal offense consisting in diminishing or exposure to diminution of a public receivable, the limitation period runs from the end of the year in which the payment deadline for this receivable expired, that is December 31, 2010.

Pursuant to Article 44 section 1(2) and section 5 of the Fiscal Criminal Code concerning limitation of fiscal offenses, if an act constitutes an offense carrying a penalty of imprisonment exceeding 3 years, prosecution of the fiscal offense becomes limited by prescription after the lapse of 10 years from the time of its perpetration. Limitation occurs on December 31, 2020 (December 31, 2010 + 10 years = December 31, 2020). Due to the fact that during this period proceedings were initiated in the present case, the limitation period of 10 years under Article 44 section 5 of the Fiscal Criminal Code is extended by a further 10 years (December 31, 2020 + 10 years = December 31, 2030).

In accordance with the foregoing, prosecution of the act alleged to Marek Blacha in point 'II' of the extradition request shall become limited on December 31, 2030, and not as mistakenly given in the request on January 1, 2031.

*Rectangular stamp:*
Deputy Circuit Prosecutor
In Siedlce
*/-/ illegible signature*
Małgorzata Podniesińska

*Round seal with the state emblem of the Republic of Poland in the center and the following inscription on the rim:* "CIRCUIT PROSECUTOR'S OFFICE IN SIEDLCE *1*".



**Attachment:**

Excerpt from regulations of the Criminal Code and Fiscal Criminal Code applicable in the case.

List of regulations of the Criminal Code and Fiscal Criminal Code applicable in the case:

1. **Act of September 10, 1999, Fiscal Criminal Code** – (Journal of Laws of 2018 item 1958 uniform text of October 15, 2018)

(…) Chapter 3 Tax offenses (…)

**Article 23 of Fiscal Criminal Code [Fine in daily rates]**

*Round seal with the state emblem of the Republic of Poland in the center and the following inscription on the rim:* "CIRCUIT PROSECUTOR'S OFFICE IN SIEDLCE *1*".

**Section 1**

Administering a penalty of a fine, the court specifies the number of rates and the amount of o one daily rate; unless the code provides otherwise, the lowest number of rates is 10, the highest – 720.

**Section 2**

Injunction sentence may inflict a punishment of a fine not exceeding 200 daily rates, unless the Code provides for a more lenient punishment.

**Section 3**

Setting the daily rate, the court takes into account the income of the perpetrator, his/her personal and family conditions, property relations, and earning possibilities; the daily rate may not be lower than one thirtieth part of the lowest monthly remuneration at the time of adjudication in first instance or exceed it more than four hundredfold.

(…)

EXT-BLACHA-00094

**Article 27 of Fiscal Criminal Code [Limits of imprisonment]**

**Section 1**

Unless the code provides otherwise, a penalty of imprisonment last a minimum of 5 days, a maximum of 5 years; it is meted out in days, months and years.

(…)

**Article 44 of Fiscal Criminal Code [*Limitation period* of fiscal offense]**

**Section 1.** A fiscal offence ceases to be punishable upon the expiration of the following periods since it has been committed:

1) 5 years – if the fiscal offence is punishable by a penalty of a fine, imprisonment or restriction of freedom for a period not longer than 3 years;

2) 10 years – if the fiscal offence is punishable a penalty of imprisonment for a period longer than 3 years.

**Section 2.** Punish ability of a fiscal offence consisting in reduction or exposure to reduction of a public legal duty also ceases when the limitation period for such a duty has expired.

**Section 3.** In cases provided for under Paragraphs 1 or 2 above, the course of limitation of a fiscal offence consisting in reduction or exposure to reduction of a public legal duty commences upon the end of the year when the due date for payment of such a duty expires. If a perpetrator of a fiscal offence has committed reduction or exposure to reduction of a customs duty, then the course of its limitation commences on the date of occurrence of the customs debt. If it is not possible to determine the date of occurrence of the customs debt, then the course of limitation of such a fiscal offence shall commence on the earliest date when the existence of the customs debt is established.

**Section 4.** In cases provided for under Paragraphs 1 or 2, if commitment of a fiscal offence depends on occurrence of an effect determined under the Code, then the course of limitation shall commence on the date when such an effect takes place.

**Section 5.** If in the period provided for in Section 1 or Section 2 proceedings were instituted against the perpetrator, the fiscal offense committed thereby, specified in Section 1 item 1, ceases to be punishable with the lapse of 5 years, and the fiscal offense committed thereby,

specified in Section 1 item 2, ceases to be punishable with the lapse of 10 years from the end of this period.

**Section 6.** If a legally valid judgement is reversed or deemed invalid, then the course of limitation shall commence on the date of issuing a judgement in that matter, unless the punishability of the fiscal offence has already expired.

**Section 7.** The course of limitation shall not commence if a legal regulation prevents launching or continuing proceedings into a fiscal offence (...)

(...)

**Chapter 7** Fiscal offenses and fiscal offenses against customs duties and the principle of foreign trade and services (...)

**Article 87 of Fiscal Criminal Code [Customs fraud]**

**Section 1**

A person who, by misleading a body authorized to perform customs control, exposes the State Treasury to diminution of a customs duty receivable, is subject to a penalty of a fine of up to 720 daily rates or a penalty of imprisonment for up to 2 years, or both these penalties jointly.

**Section 2**

The culprit is subject to the same penalty if the customs fraud concerns goods or services in foreign trade, as to which non-tariff restrictions apply.

**Section 3**

If the amount of customs due exposed to diminution or the value of goods or services in foreign trade as to which non-tariff restrictions apply is small, the culprit of the prohibited act specified in paragraph 1 or 2 is subject to a penalty of a fine of up to 720 daily rates.

**Section 4**

If the amount of customs due exposed to diminution or the value of goods or services in foreign trade as to which non-tariff restrictions apply does not exceed the statutory threshold, the culprit of the prohibited act specified in paragraph 1 or 2 is subject to a penalty of a fine for fiscal misdemeanor.

2. **Act of June 6, 1997, Criminal Code** – (Journal of Laws of 2019.1950 uniform text of October 14 2018)

(…) Chapter XI Limitation

### Article 101 Section 1. [Statute of limitation of penalty]

An offence may not be prosecuted upon the expiration of the following periods from the time of its perpetration:

1. 30 years – if the act is a felony of homicide;
2. 20 years – if the act is another felony;
2a. 15 years – if the act is an offense amenable to a penalty of imprisonment exceeding 5 years.
3. 10 years – if the act is an offense amenable to a penalty of imprisonment exceeding 3 years;
4. 5 years – in case of other offenses
5. /revoked/

(…)

### Article 102 [Extension of statute of limitation of penalty]

If proceedings are initiated against a person within the period provided for by article 101, then the offence specified in article 101 paragraph 1 committed by the person ceases to be punishable with the lapse of 10 years, and in other cases – with the lapse of 5 years from the end of such a period.

*Round seal with the state emblem of the Republic of Poland in the center and the following inscription on the rim:* "CIRCUIT PROSECUTOR'S OFFICE IN SIEDLCE *1*".

*Repertory No. 711/2020*
*I, the undersigned, Ryszard Pruszkowski, sworn translator of the English language entered on the list of sworn translators of the Minister of Justice, hereby certify that the above text is a true and complete translation of the original Polish document.*
*Warsaw, June 16, 2020*